IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>IVAN CERNA, et al.,<br><br>    Defendants.<br>_____/ | No. CR 08-0730 WHA<br><br>**RULING ON DEFENSE MOTIONS TO ENFORCE *BRADY* AND CASE MANAGEMENT ORDER RE TIMETABLE FOR *BRADY* DISCLOSURES AND REQUEST FOR COMMENT** |

**INTRODUCTION**

In this federal prosecution arising out of a joint federal-state investigation, the immediate question concerns the government's unilateral attempt to limit the universe in which it must search for *Brady* materials. Another question is how to balance timely access to *Brady* information against the need to protect civilian witnesses. Accepting fully the Ninth Circuit's ruling in *United States v. Fort*, 472 F.3d 1106 (9th Cir. 2007), which limited Rule 16 defense discovery, this order addresses the separate issue of *Brady* disclosures. The essence of this order rejects the government's artificial limitation on its *Brady* duty and holds further that district courts, under their case management powers, may require the government to reveal *Brady* materials in advance of trial — with the exception of *Brady* materials also constituting Jencks Act "statements," the latter being producible only after direct examination.

**STATEMENT**

This is a prosecution of 31 defendants in a RICO gang case. The indictment alleges 53 counts arising from alleged actions of the La Mara Salvatrucha street gang, also known as "MS-13." The indictment is a result of "Operation Devil Horns," an investigative effort by law enforcement agencies at local, state, and federal levels. The present case is just one part of a nationally organized effort since 2001 that has lead to the indictment and prosecution of MS-13 members throughout the country. The Department of Justice has issued numerous press releases on the nationwide probe. The United States Attorney's Office in this district has stated that "officers and agents from numerous federal, state and local law enforcement agencies provided substantial support during [the indictment]." Its press release listed eight different federal, state, and local agencies that provided support for the indictment. These agencies included: DEA, California Highway Patrol, California Department of Justice, California Bureau of Narcotics Enforcement, San Mateo County Gang Task Force, and the Richmond, San Francisco and South San Francisco Police Departments. The press release also indicated that ICE received assistance from more than five different federal, state, and local agencies during its investigation of MS-13 beginning in 2005.

This motion arises in response to the government's notice filed herein that it regarded only the FBI and ICE as the government's "agents" for the purposes of *Brady v. Maryland*, 373 U.S. 83 (1963). Concerned that the government has defined the scope of its *Brady* obligations too narrowly and that the government's obligations should extend to information held by more agencies than those listed in the notice, defendants now bring this motion to establish the scope of the government's *Brady* duty.

**ANALYSIS**

*Brady* material is normally understood to include *Giglio* material as well. So when this order refers to "*Brady*" or "*Brady* information," the reader will please understand that *Giglio*, *Henthorn*, and all information required by *Brady and its progeny* are included.

### 1. SUPERVISORY AUTHORITY.

A threshold legal question is the extent to which district courts have authority, under their supervisory and case management powers, to order prosecutors to make *Brady* disclosures *prior* to trial. With respect to *Brady* materials that also happen to be Jencks Act statements, *i.e.*, "statements" within the meaning of 18 U.S.C. 3500(e), the Ninth Circuit has plainly held that the Jencks Act trumps *Brady*. *United States v. Alvarez*, 358 F.3d 1194, 1211 (9th Cir. 2004); *United States v. Jones*, 612 F.2d 453, 455 (9th Cir. 1979), *cert. denied*, 445 U.S. 966 (1980). In light of these holdings, the government would be within its rights in withholding Jencks Act statements until after the witness testifies on direct — and this would be so even if the Jencks Act statements contain *Brady* information. District courts in this circuit have no authority to override strict observance of the Jencks Act. But this insistence may lead to trial continuances, as the Act expressly contemplates (18 U.S.C. 3500(c)). Or, it may lead to postponing some or all of the cross-examination while the trial continues with other witnesses. For immediate purposes, therefore, the concern reduces to *Brady* material falling outside the Jencks Act, *i.e.*, "non-Jencks *Brady* information."

It is, of course, true that the government has an independent duty to turn over *Brady* material without any request therefor, much less a court order. And, it must do so at least by the point in time that the disclosure can be effectively used. *Kyles v. Whitley*, 514 U.S. 419, 433, 437 (1995); *United States v. Bagley*, 473 U.S. 667, 682 (1980); *La Mere v. Risley*, 827 F.2d 622, 625 (9th Cir. 1987). Yet, *Brady* "does not necessarily require that the prosecution turn over exculpatory material before trial," *United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir. 1987), although a recent decision stated in contradiction that it "must be disclosed to the defense prior to trial." *United States v. Price*, 566 F.3d 900, 903 (9th Cir. 2009).

The government is fond of saying that it knows its *Brady* obligations and will honor them. While in the routine case this would be sufficient, it begs the question whether, in a large case like this, which even the government must concede is not routine, a district court has the authority to order the disclosures by a date certain *before* the trial to further ensure the efficient

3

administration of justice and to avoid a cascade of mid-trial continuances and the need to recall witnesses after further defense investigation necessitated by late disclosures.

The Ninth Circuit ruled in 1973 that district courts do have such discretion under their supervisory powers to order divulgence of names of prospective witnesses prior to commencement of trial. Judge Wallace wrote for a unanimous panel as follows:

> The Federal Rules of Criminal Procedure are intended to constitute a comprehensive procedural code for criminal cases in the federal courts. But even the rules themselves do not purport to set outer limits of the power of the court. On the contrary, Fed.R.Crim.P. 57(b) states:
>
>> If no procedure is specifically prescribed by rule, the court may proceed in any lawful manner not inconsistent with these rules or with any applicable statute.
>
> As the rules do not contain provisions pertaining to the divulgence of names of prospective witnesses, ordering their production is not inconsistent with the rules. Similarly, there is no statute on the subject except for § 3432. Therefore, the rules did not necessarily foreclose the district court from making the attacked order [footnote omitted]. However, the real question is whether there is power, aside from the rules, for the district court to make the order here attacked.
>
> It is recognized that wide latitude is reposed in the district court to carry out successfully its mandate to effectuate, as far as possible, the speedy and orderly administration of justice. "A federal court has the responsibility to supervise the administration of criminal justice in order to ensure fundamental fairness." *United States v. Baird*, 414 F.2d 700, 710 (2d Cir. 1969), *cert. denied*, 396 U.S. 1005, 90 S.Ct. 559, 24 L.Ed.2d 497 (1970).

*United States v. Richter*, 488 F.2d 170, 173–74 (9th Cir. 1973).

Although *Richter* directly involved only disclosure of witnesses, the same general principle would seem to empower a district court to require pretrial disclosure of *Brady* information. It is true that since 1973, Rule 57(b) — relied on in the quoted material in *Richter* — has been changed to say:

> A judge may regulate practice in any manner consistent with federal law, these rules, and the local rules of the district. No sanction or other disadvantage may be imposed for noncompliance with any requirement not in federal law, federal rules, or the local district rules unless the alleged violator was furnished with actual notice of the requirement before the noncompliance.

4

The essence of the old rule still resides in this new authority so long as actual notice of the order regulating practice is furnished to the parties. Another rule change was considered after *Richter* but not adopted. That would have required reciprocal witness disclosures. *See United States v. Hearst*, 412 F. Supp. 863, 867 (N.D. Cal. 1975). But the failure to adopt that change did not abrogate the discretionary authority to order, on a case-by-case basis, such disclosure as warranted. And, while the defense has no automatic right to *Brady* material prior to trial, *Richter* held that district judges have discretion, upon a proper record, to order relief on a case-by-case basis. *Richter* has never been overruled and remains valid within our circuit. *See United States v. Talbot*, 51 F.3d 183, 187–88 & n.4 (9th Cir. 1995); *United States v. Acosta*, 357 F. Supp. 2d 1228, 1234 (D. Nev. 2005).

The Third Circuit has addressed the precise issue now presented, holding that the district courts have authority to order *Brady* material to be disclosed prior to trial:

> Today, we affirm this court's longstanding policy and applaud the district court's effort to ensure prompt compliance with *Brady*. We flatly reject the notion, espoused by the prosecution, that "it is the government, not the district court, that in the first instance is to decide when to turn over *Brady* material." Brief for Appellant at 28. The district court may dictate by court order when *Brady* material must be disclosed, and absent an abuse of discretion, the government must abide by that order. Moreover, we expressly disapprove of the government's belated attempt to question the district court's authority.

*United States v. Starusko*, 729 F.2d 256, 261 (3d Cir. 1984). The Third Circuit's opinion cited to *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983). In turn, *Higgs* cited to a string of decisions from at least seven circuits said to stand for the proposition that "the district court, within its discretion, may order such disclosure to ensure the effective administration of the criminal justice system." *Id*. at 44 n.6. *Richter* was there cited as the Ninth Circuit's entry.

In 2008, the Ninth Circuit, sitting *en banc*, held that a district court consistent with Rule 16 and Rule 2 and as part of the court's inherent authority to manage its docket, may in appropriate circumstances require the government to disclose a final list of proposed trial witnesses and has the authority to enforce such an order. *United States v. W.R. Grace*, 526 F.3d 499, 513 (9th Cir. 2008). Although that decision did not have occasion to address pretrial disclosure of *Brady* material, it nonetheless seems plain that the same rationale must apply as

5

to non-*Jencks Brady* material, *i.e.*, a district court may set a deadline before trial to disclose all non-*Jencks Brady* material.

In sum, this order concludes that district courts have the authority, upon a proper record, to exercise their discretion to require non-*Jencks Brady* material to be disclosed prior to the commencement of trial.

## 2. THE EXERCISE OF DISCRETION.

In exercising its discretion, this Court has considered a number of factors. *First*, the Court has considered the need to protect witnesses, most particularly civilian witnesses, from retaliation for testifying. In this regard, however, we must all keep in mind that the names of prospective witnesses must be given to prospective jurors to ascertain bias toward or against any particular witness. Defendants have a right to be present at jury selection. This will ordinarily mean that civilian witnesses' names will be used in the courtroom before the first witness is sworn. This means that revelation of *Brady* material thereafter would *not* be the first time the names of civilian witnesses would be divulged to defendants.

*Second*, the Court has considered the need to avoid disruptive trial continuances. Jury comprehension would suffer as a result of continuances. An alternative to continuances would be to postpone the cross-examination until after time for reasonable followup and to move ahead with other witnesses in the meantime. This alternative, however, has its own drawbacks. In this massive case involving homicides, dozens of RICO predicate acts, and many counts, it will be necessary for the jury to catalog the evidence vis-a-vis the various defendants. It will be necessary to keep straight the evidence relating to the entire cast of characters. Jury comprehension is a paramount consideration in a case of this magnitude and severity. A string of continuances would disrupt jury comprehension. Too, it would present a risk of jurors needing to be discharged due to hardship or sickness, posing a risk of a mistrial. In short, it is necessary to manage the trial so that it runs straight through without disruption — or as close thereto as can be managed.

*Third*, the Court has taken into account the likely lead time defense counsel will need to use the material effectively, remembering that the trial will be underway (or virtually so) with its

6

1  parallel time demands. This includes the need to track down witnesses, including impeachment
2  witnesses. Providing at least the *non*-Jencks Act *Brady* material earlier will allow some
3  productive work to precede the turnover of Jencks Act statements.

4  *Fourth*, the Court has taken into account that impeachment materials for trial witnesses
5  ought to be deferred until closer to trial when it is practical to identify more precisely who the
6  witnesses will be. In this regard, there are two categories of witnesses. Police officer witnesses
7  may have complaint records deserving of earlier disclosure so that the files can be sorted
8  through, which will take some time. Impeachment materials of civilian witnesses, however,
9  should await the deadlines but at the end of this order due to witness-security concerns.

### 3. THE SCOPE OF *BRADY*.

In this case, the government filed a notice stating that only the FBI and ICE would be deemed its agents for purposes of *Brady*. Defense motions have now challenged that proposition. Although this order cannot accept all of the defense's view, this order rejects the government's artificial limitations for the following reasons.

The main question is what sources the prosecution team must check. The Supreme Court has rejected the view that prosecutors need only disclose based on what the prosecutors themselves know. Instead, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). That decision involved a *state* prosecutor and his duty to consult the police. Whether a *federal* prosecutor has a duty to learn of any favorable evidence known to local police acting on the government's behalf was not addressed. Where, however, the federal prosecutors have state police working on their behalf, it seems clear that the reasoning of *Kyles* requires federal prosecutors "to learn of any favorable evidence known to *others acting in the government's behalf*," including any local police acting on its behalf in the investigation.

The official press releases in this case made clear that at least four *federal* agencies must be deemed "agents" involved in the investigation for *Brady* purposes, namely ICE, DEA, FBI and ATF. That is now **SO ORDERED**.

7

1    The real issue is the extent to which the San Francisco Police Department (and
2 possibly other non-federal agencies) must also be deemed agents within the meaning of *Brady*.
3 The government is correct that the United States and California (and its state and local police)
4 are separate sovereigns. And, it is true that ordinarily the United States cannot control the local
5 police. That, however, is not dispositive.

6    Despite the separate sovereignty concept, two alternative avenues can lead to a *Brady*
7 duty in the federal-state context. The first is when the federal prosecutor uses a state or local
8 officer as a "lead investigating agent." When this occurs, the Ninth Circuit has held that
9 *Brady* requires turnover of the defense-favorable records in the possession of the agent.
10 In *United States v. Price*, 566 F.3d 900 (9th Cir. 2009), the federal prosecutor used a member
11 of the local police as his "lead investigative agent." The Ninth Circuit held that the federal
12 prosecutor had a duty to learn of and to disclose favorable evidence that likely was in the
13 possession of his or her lead investigating officer, namely an extensive local criminal record
14 of a key government witness against the accused, which was not disclosed until well after the
15 conviction. This was a *Brady* violation even though, the Ninth Circuit held, the prosecutor
16 had made a good faith innocent error. *Brady* required turnover of all *Brady* information in the
17 possession of the prosecution as well as "any of its agents involved [in the] prosecution." *Id*. at
18 908. Quoting another decision, *Price* stated: "Exculpatory evidence cannot be kept out of the
19 hands of the defense just because the prosecutor does not have it, where an investigating agency
20 does." *Id*. at 909. The duty is to turn over all favorable evidence known to the prosecutor or that
21 he could have learned from others acting on his behalf. If the federal prosecutor chooses to have
22 a state agency act as a lead investigating agency, then the agency has voluntarily obligated itself
23 to the *Brady* obligation. This holding seems consistent with the general caselaw.[*]

---

[*] When federal and state agencies cooperate extensively on a joint investigative task force, the state agencies may be deemed to be "agents" of the federal government such that their knowledge of exculpatory information should be imputed to federal prosecutors. *See United States v. Antone*, 703 F.2d 566 (5th Cir. 1979) (state investigators were deemed to be agents of the federal prosecution team for the purposes of *Brady* when "the two governments, state and federal, pooled their investigative energies to a considerable extent"); *United States v. Leos-Harmosillo*, 213 F.3d 644, 2000 WL 300967 (9th Cir. 2000) (unpublished) (*Brady* information possessed by state police officers was attributed to the prosecutors when the officers were acting on the federal government's behalf and subject to its control); *Hays v. State of Alabama*, 85 F.3d 1492 (11th Cir. 1996)

8

A second avenue arises when, even though the local agency is not a "lead investigative agent," the federal prosecutor consults local police records. When state police gives a federal investigator access to its files for the purpose of pulling items of interest to a federal investigation, *Brady* requires that the prosecution team review as well for *Brady* materials within the same universe of files. In this instance, separate sovereignty no longer matters. The reason is that the state has invited the federal authorities into its file room and given access to the evidence. Once inside the stacks with permission to rummage about for prosecution evidence, the federal authorities must search for and retrieve defense evidence bearing on the same question. The same would hold if the access is only by mere requests, *i.e.*, if the local police allow the federal prosecutor to make written or verbal requests for records searches to be conducted by local officers, then the federal prosecutor must ask for *all* information on the same subject, pro and con. This arises not because there is "agency" but because the federal prosecution team is given free access to retrieve information and the search must be even-handed as to the point of inquiry.

On the other hand, that the local police would be willing (or even offer) to allow greater access than a federal prosecutor actually utilizes should not translate to a federal obligation to scour the entirety of local police storerooms looking for defense evidence. Such a rule would be vastly impractical. It is enough that the federal prosecutor even-handedly seeks out defense evidence on the same point of actual inquiry. If, however, the local police qualifies as a "lead investigative agency," then the scope of the search is larger, as stated.

There will surely be many instances in which potential defense evidence goes unfound without necessarily being a *Brady* violation. That gap can be at least partially solved by Rule 17 subpoenas so long as their scope is narrowly directed and reasonable. Put differently, since the government's *Brady* obligations will not guarantee that all pro-defense information will be found and disclosed, the defense may exercise its own discovery rights and compel its production at trial. A reasonable and narrowly directed subpoena to a local police agency will usually be

---

(knowledge of statements in the possession of the FBI could be imputed to the state based on the level of cooperation between state prosecutors and the federal agencies).

9

1  enforced. To spare the local police the burden of such subpoenas, the federal prosecution may
2  choose (or not) to scour the local files in advance and to show, by sworn declaration in detail,
3  that all pro-defense materials have very likely been found and produced, thus obviating the need
4  for a Rule 17 subpoena. Depending on the circumstances, an evidentiary hearing might be
5  advisable to spot-check the accuracy of such representations.

    The present record is arguably inadequate to determine whether the San Francisco Police Department should be deemed an agent for *Brady* purposes. That the press release included it in the joint effort is not enough to make the San Francisco Police Department a "lead investigative agent." Nor is the record adequate to determine the full degree of "access." Therefore, an evidentiary hearing shall be held on these issues. Said hearing shall be **AUGUST 4, 2009, AT 9:00 A.M.**, and both sides may present up to three witnesses each limited to the agency and access points. Counsel must subpoena their witnesses for attendance.

                    *          *          *

Another question is the degree of diligence prosecutors must use in checking sources for favorable material. Writing for a unanimous Ninth Circuit panel, Judge Trott summarized the *Brady* rule as follows:

> *Brady* material is any evidence material either to guilt or punishment which is favorable to the accused, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 87–88, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963). A prosecutor's duty to reveal such evidence does not depend on a request by the defense. *United States v. Bagley*, 473 U.S. 667, 683, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985); *Thomas v. Goldsmith*, 979 F.2d 746, 749–50 (9th Cir. 1992). The *Brady* rule encompasses impeachment evidence as well as exculpatory evidence. *Bagley*, 473 U.S. at 676, 105 S.Ct. at 3380. Prior statements of a witness that are both material and inconsistent with his anticipated testimony fall within the *Brady* rule. *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

*United States v. Hanna*, 55 F.3d 1456, 1459 (9th Cir. 1995). In *Hanna*, the court of appeals vacated a conviction and remanded for the United States "affirmatively to demonstrate" whether it had discharged its *Brady* obligations. There, the police report contradicted the officer's trial testimony about how the gun was found. The court of appeals felt the prosecutor had not adequately investigated to learn all further evidence that might contradict the officer, refusing

10

to accept the prosecutor's "cursory statement" that it had produced all *Brady* information known to it. The problem was, the Ninth Circuit felt, that the prosecutor might well have found more impeachment evidence had she looked a bit harder.

While a prosecutor has a duty to learn of any favorable evidence known to others acting on behalf of the government, *Brady* does not require a prosecutor to unearth from an agency, even an agency involved in the investigation, every random scrap of paper of possible defense use. Given their enormity, it would be impractical to scour all files and desks and lockers looking for all nuggets, large and small. Fishing expeditions are not required. Instead, a prosecutor is required to use due diligence — affirmative due diligence — to gather *Brady* material from known and plausible sources of exculpatory information and then to turn over any *Brady* material that is found. The degree of diligence that is due depends on the facts and circumstances. It is impossible to give an exhaustive list of the factors. Certainly, one ever-present factor is judgment informed by experience as to where *Brady* materials may plausibly reside. Seasoned prosecutors and assisting agents know the usual range of plausible locations. Where a prosecutor has a specific reason to suspect that *Brady* material may reside at a source, of course, the prosecutor must inquire, even if the source would otherwise seem implausible. A related factor can be a narrowly defined and well directed request by defense counsel explaining why exculpatory material might be found in a certain file. Although defense counsel have no obligation to make requests for *Brady* material, a well-framed and well-timed letter may heighten the diligence due from a prosecutor by informing him or her of circumstances the prosecutor could not reasonably be expected to know. Another factor is the extent to which a particular investigative channel is used to obtain inculpatory information. When a prosecutor vigorously mines a particular channel for prosecution evidence, the prosecutor should use proportionate vigor to extract *Brady* material from the same source. Another consideration is the importance profile of the subject matter in the trial. The greater the importance, the more diligence is indicated and vice versa. Due diligence will almost always require more than generally asking a local police contact to check for *Brady* information, for such a request is unlikely to translate into a genuine effort to retrieve defense evidence with the

same rigor as prosecution evidence. In sum, while a prosecutor cannot be expected to unearth every defense nugget imaginable, a prosecutor must exercise such diligence as is due in the circumstances to learn of and to produce *Brady* material.

\*         \*         \*

Another issue is the meaning of "exculpatory." In other cases in this district, government counsel have implied that any document inculpating some other gang member is outside *Brady* even if it is favorable evidence to a different defendant, the rationale being that *other* evidence will tie that defendant to the gang and so the document hurts him too. This is counterfeit logic. A favorable passage in a document may aid a particular defendant on an important defense even if it hurts him on another front. The rationale does not convert otherwise *Brady* material into non-*Brady* material.

\*         \*         \*

A final issue concerns cumulative effect. Although the *United States Attorney's Manual* does not create discovery rights, one item therein deserves special emphasis:

> While items of information viewed in isolation may not reasonably be seen as meeting the standards in paragraphs 1 and 2 above, several items together can have such an effect.

*USAM* ¶ 9-5.001(C)(4) (2006). In other words, the test for *Brady* purposes is not whether any single item will make or break a case — rather, it is whether the cumulative effect of the undisclosed evidence would reasonably cast doubt on the integrity of a guilty verdict. This was a square holding of *Kyles v. Whitley*, 514 U.S. 419, 441–54 (1995). *Accord: Silva v. Brown*, 416 F.3d 980, 986 (9th Cir. 2005); *Carriger v. Stewart*, 132 F.3d 463, 481–82 (9th Cir. 1997).

\*         \*         \*

**4.    DISCLOSURE SCHEDULE FOR NON-JENCKS *BRADY* MATERIALS.**

Having considered the foregoing factors and pursuant to its supervisory and case-management authority, the Court **ORDERS** that non-Jencks *Brady* information be produced as follows:

    A.    *Henthorn* material on all law enforcement witnesses whom the government anticipates calling must be produced by **DECEMBER 11, 2009**.

12

1   This time will allow for motion practice to comb out disputes over compliance.
2   This category presents little or no risk of witness retaliation.

3       B.     All non-Jencks *Brady* information that only inculpates persons
4   never charged in this case or that is exculpatory of a defendant without
5   inculpating any other indicted person must be disclosed to all defense counsel
6   **DECEMBER 11, 2009**. This category presents little or no risk of witness
7   retaliation.

8       C.     Except as required above, all non-Jencks *Brady* information
9   relating to any specific government civilian witness shall be disclosed to defense
10  counsel **SEVEN CALENDAR DAYS** before trial. This category presents the highest
11  risk of witness retaliation.

12      D.     With respect to the issue of non-Jencks *Brady* information for
13  witnesses the government eventually elects *not* to call, the government must, if it
14  has subpoenaed them, keep them under subpoena, so that defendants shall when
15  the time comes be in a position to call them in the defense case without delay.
16  All such material shall be disclosed as soon as the government makes the election
17  and at all events at least **SEVEN CALENDAR DAYS** before the government rests its
18  case in chief.

19      E.     All other non-Jencks *Brady* information must be disclosed by
20  **DECEMBER 11, 2009**, and in all respects in time for effective use to be made of it
21  and the government is duty-bound to be fair and reasonable in evaluating when
22  that point has arrived. *See Kyles*, 514 U.S. at 437.

23      F.     Failure to comply with this timetable may lead to evidence
24  preclusion or other appropriate sanction. Where a specific and heightened risk to
25  a civilian witness is known by the government, it may seasonably move *ex parte*
26  for permission to delay the disclosures as to any such witness. Where disclosures,
27  even those in compliance with this timetable, deserve more followup than time

**United States District Court**
For the Northern District of California

permits under the timetable, defense counsel may move for a continuance or other relief on a case-by-case basis.

G. If any defendant is severed for a later trial, then no disclosures need be made to his defense counsel and a subsequent schedule shall be set for any such disclosures.

## CONCLUSION

Since some scheduling aspects of this order have not been vetted by counsel, all parties shall have until **JULY 6, 2009, AT NOON** (limited to five pages) to file any objections to the disclosure schedule above, with any responses thereto due by **JULY 10 AT NOON** (limited to three pages), after which a ruling shall be made without further oral argument.

**IT IS SO ORDERED.**

Dated: June 26, 2009.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE