IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,

  v.

IVAN CERNA, et al.,

    Defendants.

No. CR 08-0730 WHA

**ORDER RE *BRADY* AND LEAD INVESTIGATIVE AGENT ISSUE**

## INTRODUCTION

In this RICO gang prosecution arising out of a cooperative federal-state-local investigation, the prosecutor has fronted the question of whether the San Francisco Police Department should be deemed a "lead investigative agent" for *Brady* purposes.

## PROCEDURAL HISTORY

This criminal prosecution has been active for more than a year. A third superseding indictment was recently filed. It alleges 59 counts against 29 defendants arising from alleged actions of the Mara Salvatrucha gang, also known as "MS-13." The alleged offenses include a series of violent crimes in aid of racketeering, conspiracy to commit murder, narcotics offenses, conspiracy to commit robbery, illegal possession and dealing of firearms, and attempted exportation of stolen vehicles, among others. The indictment is a result of "Operation Devil Horns," an effort by federal law enforcement with the participation of state and local law

enforcement agencies. The present case is just one part of a national effort since 2001 that has led to the federal indictment and prosecution of MS-13 members throughout the country. This particular case accuses alleged gang members, mostly in San Francisco, known as "the MS-13 20th Street Clique."

*Brady* questions usually arise *after* a conviction upon the defense's learning of allegedly suppressed evidence by the prosecution. In this case, however, the *Brady* question was initiated by the government — well in advance of trial. Specifically, a proposed scheduling order dated February 17, 2009, invited the parties to submit any and all proposals calculated to moving this case to conclusion (Dkt. No. 215). On March 12, 2009, the government responded by suggesting that, as used in Federal Rule of Criminal Procedure 16 (Dkt. No. 250):

> The term "agent" . . . needs to be clarified. The San Francisco Division of Immigration and Customs Enforcement ("ICE") is the investigative agency in this matter, and neither it nor Government counsel should be charged with constructive possession of Rule 16 materials that may or may not be in the custody of myriad other federal, state, and local law enforcement and other governmental agencies. The Government would respectfully submit that the definition of agency that applies in the *Brady* context should apply on this issue as well.

Defense counsel objected to this interpretation (Dkt. No. 254). The matter was discussed at a hearing on March 17, 2009. A final scheduling order issued. It included a deadline for the filing of "[m]otions to deem state law enforcement or federal law enforcement other than ICE or the FBI to be an 'agent' within the meaning of [Rule 16] and/or for *Brady-Giglio* purposes" (Dkt. No. 265).

On March 20, the government filed another notice clarifying its interpretation of "agent" for *Brady* purposes, this time stating that it considered ICE *and* the FBI to be its "agents" (but no one else) (Dkt. No. 266). This notice too was met by a series of defense objections. The defense requested the government to produce (Dkt. No. 315):

> All *Brady* evidence in the possession of all the authorities, be they local, state, federal, or international that have worked on this joint investigation and/or have worked with any of the government's witnesses [that] have been relied upon to gather evidence and/or to obtain search warrants and/or will be relied upon at trial.

2

In particular, defendants argued that the prosecution's *Brady* obligation in this case extended to federal, state and local agencies including the FBI, DEA, Department of Homeland Security, ICE, DOJ, SFPD, California Highway Patrol, ATF, San Mateo County Gang Task Force, South San Francisco Police Department, California Department of Justice, California Bureau of Narcotics Enforcement, and the El Salvadoran National Police, among others (*ibid.*). Defendants even demanded that the government produce any *Brady* evidence in the possession of the El Salvador Trans-National Anti-Gang Project "and those assisting it," including El Salvador police agents such as the Policia Civil Nacional and others (Dkt. No. 362).

The Court has sorted through the general issue in two steps. An order issued on June 26, 2009 (Dkt. No. 403), stating that at least four federal agencies must be deemed "agents" involved in the investigation for *Brady* purposes, namely ICE, DEA, FBI, and ATF. The record was inadequate to determine whether the SFPD should be deemed an "agent" for *Brady* purposes, so an evidentiary hearing was scheduled for August 4.

The August 4 evidentiary hearing took place as planned (Dkt. No. 591). During this hearing, Sergeants Dion McDonnell and Mario Molina of the SFPD's Gang Task Force ("GTF") testified as to the scope of the SFPD's involvement in the federal investigation of the MS-13. To accommodate other witnesses, a second hearing was scheduled and took place on August 31, at which Special Agent Christopher Merendino of ICE testified as to the same issues.

An order on September 2 stated that the record was now closed as to the issue of whether the SFPD should be deemed an agent for *Brady* purposes except that, due to the failure of defense counsel to move in certain exhibits, they were belatedly allowed into evidence (Dkt. No. 612). A deadline was set for the parties' submissions of proposed findings of fact and conclusions of law (Dkt. No. 600), which was then done (Dkt. Nos. 624–26, 636–38). On a different but related issue, the government submitted a statement on September 14 that "it does not consider the San Francisco Police Department a 'government agent' for purposes of Federal Rule of Criminal Procedure 16(a)(2)," *i.e.*, the work-product exclusion from discovery (Dkt. No. 626).

A separate evidentiary hearing on a different issue took place on September 23. Sergeant Dion McDonnell and Lieutenant Ernest Ferrando of the SFPD testified as to the

3

SFPD's policies and procedures in maintaining documents on criminal suspects (Dkt. No. 666). That contest was between defense counsel and counsel for the SFPD over a defense subpoena directed at the SFPD. The federal prosecutor did not participate. A defense motion is now pending, addressed below, to re-open the evidentiary record regarding the scope of *Brady* to admit the testimony from the September 23 hearing (*see* Dkt. Nos. 654, 655, 657, 660).

## FINDINGS OF FACT

The findings herein are based on evidentiary hearings in August at which several state and federal law enforcement officers testified as to the scope of their respective investigations of the MS-13. The specific purpose of these hearings was to provide counsel an opportunity to present evidence as to whether the SFPD should be deemed to be a "lead investigative agent" within the meaning of *Brady*.

Sergeant Dion McDonnell of the San Francisco Police Department testified that he worked for the SFPD's Gang Task Force ("GTF") from July 2004 to October 2004, then again from July 2007 until the present. At GTF, Sergeant McDonnell has been specifically assigned to investigate crimes committed by Latin gangs in San Francisco, including the MS-13. Sergeant Mario Molina of the SFPD testified that he was assigned to GTF from 2003 until 2008. During this time, his specialty was Latin gangs throughout San Francisco and specifically in the Mission and Ingleside Districts and the Tenderloin, including the MS-13. Lieutenant Ernest Ferrando of the SFPD testified that he has worked for the SFPD since 1989 as an investigator, sergeant and lieutenant, and since 2006 has been assigned to GTF.

Special Agent Christopher Merendino of the United States Immigration and Customs Enforcement testified that he has been a special agent since 2002, was the case agent on Operation Devil Horns from July 2005 until the end of 2008, and is currently a national program manager in the National Gang Unit in Washington. As case agent, he "managed pretty much all aspects of the investigation, conducted surveillance, gathered intelligence, and gathered evidence

4

of the criminal activity of the 20th Street Clique of MS-13 in San Francisco" (Tr. 8/31 at 15). With the benefit of the foregoing, this order now makes the following findings.[1]

\*          \*          \*

1.  When the indictment was announced, the United States Immigration Customs Enforcement in tandem with the United States Attorney's Office issued a press release describing the federal investigation and the indictment (Dkt. Nos. 361 Exh. A, 381 Exh. 3):

> In a large-scale, targeted enforcement action . . . , federal, state, and local agents and officers executed nearly two dozen search warrants and 20 arrest warrants related to the case . . . Officers and agents from numerous federal, state and local law enforcement agencies provided substantial support during yesterday's enforcement action, including the Drug Enforcement Administration (DEA); the California Highway Patrol; the California Department of Justice; the California Bureau of Narcotics Enforcement; the San Mateo County Gang Task Force; and the Richmond, San Francisco and South San Francisco police departments. ICE received assistance with the investigation itself from the DEA; the Bureau of Alcohol, Tobacco, Firearms and Explosives; the Federal Bureau of Investigation; the California Highway Patrol; the San Francisco Police Department; and other law enforcement agencies. In addition, the El Salvadoran National Police and ICE's Attaché Office in El Salvador aided with the case by conducting searches and interviews of MS-13 associates in El Salvador . . . The investigation leading to yesterday's arrests is part of Operation Community Shield, a comprehensive initiative launched by ICE in 2005 to disrupt and dismantle transnational street gangs. Under Operation Community Shield, ICE partners with federal, state and local law enforcement agencies to target these violent organizations and their members for arrest, prosecution, and, where applicable, deportation.

2.  The press release also quoted United States Attorney Joe Russoniello describing the investigation as a "coordinated effort by federal, state and local law enforcement agencies" (*ibid.*). Similar press releases were also issued by the FBI on October 10, 2007 (Dkt. No. 381 Exh. 4), and the United States Department of State on September 25, 2008 (Dkt. No. 381 Exh. 5). Largely based on these press releases, defendants contend that all of the agencies named in the press releases were "lead investigative agents" of the federal prosecutor. Because the SFPD cooperated with the federal investigation to a greater extent than any of the other non-federal

---

[1] "Tr. 8/31" refers to the reporter's transcript for the August 31 hearing. "Tr. 8/4" refers to the reporter's transcript for the August 4 hearing.

5

agencies named above, this order primarily addresses the relationship between the SFPD and federal agents.

3. There was a substantial degree of cooperation between the SFPD and the federal government during the investigation of the MS-13. Illustrative of this finding is witness testimony articulating the numerous instances in which federal agents and SFPD officers cooperated on joint law enforcement actions and informally shared information.

4. Various cooperative actions were taken by the SFPD in conjunction with federal law enforcement agencies during Operation Devil Horns. For example, an investigation in 2005 called "Mission Possible" was led by federal agents from the Department of Justice, ICE, FBI, and ATF, in which the SFPD participated (Tr. 8/4 at 124–25). More generally, ICE agents and confidential federal informants occasionally provided SFPD officers with information regarding the location of certain evidence or crimes in progress, to which SFPD officers responded by either seizing and turning the evidence over to ICE agents or by interdicting the crime (*id.* at 198–99, 204–07; Tr. 8/31 at 75, 97–98). ICE agents also provided the contact information of several SFPD officers to two confidential federal informants for contacting the SFPD as necessary to ensure personal or public safety (Tr. 8/4 at 209–11). On at least one occasion, federal agents provided the SFPD with information on the location of a firearm, and the SFPD used that information to apply for and execute a state search warrant (*id.* at 208–09). ICE agents requested SFPD assistance in the execution of a federal search warrant on two occasions — once at defendant Jonathan Cruz-Ramirez's residence, wherein the SFPD secured the perimeter around the house while ICE agents searched the interior of the house, and again at defendant Walter Palma's residence, wherein the SFPD SWAT/SRT team assisted during a high risk entry of the residence (*id.* at 187; Tr. 8/31 at 22–26, 32–35, 151–52). Once, Special Agent Merendino requested and was allowed to be present during the SFPD's parole search of defendant Moris Flores' residence (Tr. 8/31 at 29–30). Also, on occasion, evidence seized by the SFPD in connection with state criminal investigations was forwarded to federal agents to be used in connection with Operation Devil Horns (Tr. 8/4 at 202–04). And on at least one occasion, an

6

1  SFPD officer did a ride-along with an ICE agent and SFPD officers were present at a federal
2  debriefing of suspected MS-13 members (*id.* at 115–17, 186–87).

3      5.    There were also instances in which, although working independently, SFPD
4  officers and ICE agents were investigating the same crimes at the same places (*id.* at 199–201).

5      6.    In a written interagency state-federal agreement, the SFPD agreed to cooperate
6  with federal agents regarding Operation Devil Horns. This GTF Unit Interagency Operations
7  request was signed and approved on September 8, 2007, by individuals in both the SFPD and
8  various federal law enforcement agencies to facilitate cooperation during Operation Devil Horns
9  (*id.* at 100–03; Tr. 8/31 at 114–19). The agreement approved ongoing SFPD assistance to the
10 United States Department of Justice regarding the MS-13 investigation (Tr. 8/4 at 101–02).
11 In connection with this agreement, the SFPD complied with all document requests made by
12 federal agents from September 2007 until November 2007 (Tr. 8/31 at 116–19, 121).

13     7.    Apart from this formal agreement, there was also an on-going process of
14 "informal" information sharing between various SFPD officers and federal law enforcement
15 agencies (Tr. 8/4 at 26–28). Beginning as early as 2006, federal agents requested and the SFPD
16 provided SFPD information regarding the MS-13 (*id.* at 115, 119–20, 145–46, 162–66, 182).
17 When federal agents had a question that they believed could be answered by someone in the
18 SFPD, the federal agents "would inquire, and it would generally make it down the pipe to
19 whoever could best answer a question . . . or whoever was available" (*id.* at 73–74). Also, on
20 occasion, agents from ICE, FBI, and DEA were present at the 850 Bryant Street GTF office in
21 San Francisco to have meetings or just to touch base with SFPD officers (*id.* at 51–53).
22 But sometimes SFPD officers did not talk to federal agents for months (*id.* at 192).

23     8.    Notwithstanding the cooperation referenced above, this order finds that the SFPD
24 did not subject itself to the direction and control of federal authority for purposes of gathering
25 evidence in the case. Illustrative of this finding is witness testimony stating that neither the SFPD
26 nor its materials were under the control of the federal government or federal prosecution, thus
27 federal agents had to follow specific procedures to view or obtain SFPD documents.

7

9.      It was not a duty of SFPD officers to assist with the federal investigation (*id.* at 82). Although some GTF members were "cross-designated" by the SFPD to have a formal role in communicating with various federal law enforcement agencies (*id.* at 30–31), none of the "cross-designated" individuals worked on the MS-13 prosecution, federal investigation, or Operation Devil Horns (*id.* at 32–34). Nor were federal agents in SFPD officers' chain of command (*id.* at 137, 214; Tr. 8/31 at 155). In sum, SFPD officers did not report to or take directions from federal law enforcement officers (Tr. 8/4 at 137, 214).

10.     The state and federal investigations were *separate*. For example, SFPD witnesses explained that the federal investigation "wasn't our investigation" (*id.* at 78); the federal agents "had their own investigation going" (*id.* at 183); "I don't remember actually doing operations with [federal agents] on the streets. I did my own thing" (*id.* at 185); "[we] would be notified about [the federal criminal investigation]. But we are not together in the Mission District" (*id.* at 188); "they also had their own investigation on the same crime at the federal level . . . I had my local investigation, and they had their own investigation" (*id.* at 189); "ICE was doing their own thing, SFPD was doing their own thing" (*id.* at 200); when SFPD and federal agents acted together during a probation search or search pursuant to a warrant, "we're doing our things and they're doing their thing" (*id.* at 187, 199). Special Agent Merendino likewise stated, "[g]enerally . . . SFPD's actions were independent of what ICE did" (Tr. 8/31 at 95); the SFPD did not "work[] with ICE to investigate" crimes in San Francisco, rather "the SFPD responded periodically to requests for information" (*id.* at 28); "[g]enerally, [SFPD] worked independently, autonomously, and did the work on their own. I just provided information from our source that was relevant to public safety" (*id.* at 75). Moreover, the SFPD and the federal agents had different ultimate objectives. For example, the primary goal of Operation Devil Horns was to secure a federal indictment of the MS-13 20th Street enterprise, not to "help the state develop state cases" (*id.* at 20, 93, 156). As clarified by Sergeant Molina, "they had their own federal investigation, and I have my local crimes happening in my district and my city. So obviously, my objective is different than theirs . . . Their investigating was overall, so different objectives" (Tr.

8

8/4 at 180). In sum, the SFPD's objective was to investigate and assist in the prosecution of state cases — a separate objective from that of Operation Devil Horns (Tr. 8/31 at 156).

11. The SFPD *declined* to assist federal agents when "there was no immediate public safety threat" (*id.* at 42–43, 136). Indeed, state-federal police action occurred when doing so was required for public or officer safety reasons (*see* Tr. 8/4 at 155, 207, 215–16; Tr. 8/31 at 20). In one such cooperative instance, the SFPD secured the perimeter surrounding the execution of a federal search warrant conducted by ICE agents because there were not enough federal agents to safely conduct the operation alone (Tr. 8/4 at 187; Tr. 8/31 at 34–35, 40, 152). The SFPD did not attend the federal briefing that occurred prior to the search, and only showed up to secure the perimeter five minutes before execution of the search warrant (Tr. 8/31 at 22–23). The SFPD did not take direction from the federal agents as ICE executed the search warrant but, instead, "had their own management at the scene" and were under the chain of command of their own SFPD commanding officer (*id.* at 22, 152). When an SFPD officer stepped inside the house during the execution of the federal search warrant, ICE agents did not object because the SFPD was, according to Special Agent Merendino, "their own entity. They're not — I don't have any authority to tell them not to enter the residence" (*id.* at 23–24). After the execution of the federal search warrant, the federal agents requested that the SFPD book the evidence that was seized simply because doing so would "expedite processing of the firearm" that was suspected in a San Francisco murder (*id.* at 25–26).

12. Documents and materials were not freely shared between the SFPD and federal agencies. For example, the federal prosecution did not have unfettered access to SFPD documents and materials and federal agents could not simply roam through the GTF file room or rummage through GTF files (Tr. 8/4 at 142; Tr. 8/31 at 126). GTF file cabinets were locked and federal agents could not, on their own, retrieve GTF files (Tr. 8/31 at 157). Federal agents were likewise not given access to GTF databases regarding Operation Devil Horns (Tr. 8/4 at 142–43). Instead, federal agents could submit requests to view specific SFPD files, but an SFPD officer would have to retrieve the requested files for a federal agent to view, escort the federal agent into a secured GTF room, then sit and monitor while the federal agent viewed the requested files

9

(*id.* at 85–86, 141–42; Tr. 8/31 at 157). Federal agents could request an SFPD officer to make a copy of the file (*id.* at 126–27). Likewise, documents in the possession of federal agencies were not just freely shared with the SFPD — to the contrary, certain federal documents were only available to the SFPD on a "need-to-know or request basis" (*id.* at 71). Indeed, SFPD officers were not always privy to the purposes underlying federal agents' requests for information and materials (Tr. 8/4 at 161, 163, 165, 174, 179).

13. San Francisco's sanctuary policy, also known as the City of Refuge Policy, led the SFPD on some important occasions to refuse to supply evidence for the federal prosecution (except via subpoena). Illustrative of this finding is witness testimony that the sanctuary policy led the SFPD to refuse certain federal document requests, thwarted a joint state-federal cooperation agreement, and required SFPD officers to obtain special approval from their chain of command before even communicating with ICE agents.

14. Special Agent Merendino testified that due to the sanctuary policy, the SFPD tried to have as little contact as possible with ICE agents (Tr. 8/31 at 154–55):

> A. As I've referenced earlier, because of the Sanctuary — the City of Refuge Policy, San Francisco police officers are very — very concerned about contact with ICE acts . . . [T]he regulations, the policy's very vague, so they as soon just not [*sic*] have any contact with ICE.
>
> \*      \*      \*
>
> The Court: What policy is this again?
>
> A: . . . I believe they call it a — Sanctuary City Policy, City of Refuge, which shields foreign nationals from identification by ICE with the assistance of SFPD . . . They provided me a copy of the policy.

15. Largely due to the sanctuary policy, the SFPD did not always comply with federal agent requests to obtain SFPD files. For example, the SFPD required federal agents to provide document requests on certain letterhead (*id.* at 122). But Special Agent Merendino testified that even when the letterhead policy was complied with, some federal requests were still declined by the SFPD: "SFPD continually had issues with providing ICE documentation because of their restrictions on City of Refuge Policy. They often had to . . . obtain a second opinion and third opinion through chain of command to provide anything to us directly . . . There was a process

10

still involved despite the [cooperation] agreement" (*id.* at 120, 122–23). In addition, Sergeant McDonnell testified that, due to the sanctuary policy, the formal state-federal cooperation agreements had to be renewed every time there was a new federal request and sometimes just "died on the limb for lack of use" (Tr. 8/4 at 148–49).

16. The sanctuary policy led the SFPD to on at least one occasion withhold documents from federal agents until the agents obtained a subpoena. The witnesses testified that in approximately late 2007 or early 2008, federal agents complained that requested materials were not being provided by the SFPD "expeditiously" enough (Tr. 8/31 at 111–12, 119):

> Q. What did you say to Mr. McDonnell?
> A. Can you share with me your alpha files.[2]
>
> \*      \*      \*
>
> Q. And what did Mr. McDonnell say to you?
> A. He said he would have to obtain approvals from management . . . I had to bother him on numerous occasions for — over the next month or two to try to obtain authorization.

17. After further requests were met with what Special Agent Merendino characterized as "stonewalling" by the SFPD, federal agents finally had to obtain a grand jury subpoena to get the requested SFPD files (Tr. 8/4 at 143, 146–47, 150–58; Tr. 8/31 at 73, 110–13, 119, 121, 137). The witnesses testified that this "stonewalling" by the SFPD occurred despite the existence of the GTF Interagency Operations Request signed by both the SFPD and federal agencies in September 2007 approving certain GTF assistance to the United States Department of Justice regarding the MS-13 investigation (Tr. 8/4 at 100–03, 129–32; Tr. 8/31 at 113–15, 117–18, 120, 122).

18. The sanctuary policy required SFPD officers to obtain approval from their SFPD chain of command before all interactions with ICE agents (Tr. 8/4 at 138–39). In contrast, SFPD officers could talk to or share information with fellow SFPD officers without obtaining prior approval from their chain of command (*id.* at 138; Tr. 8/31 at 60). Under the sanctuary policy,

---

[2] SFPD "alpha files" were files of documents regarding individual MS-13 suspects filed by name in alphabetical order.

11

1  any SFPD interactions with ICE had to be "strictly in a criminal nature and absolutely nothing to
2  do with an immigration nature with regards to citizenship or status, et cetera" (Tr. 8/4 at 140–41).
3  To obtain approval, the SFPD officer was required to submit a memo "outlin[ing] exactly what
4  the scope of th[e] investigation [was]," then that memo traveled through a somewhat cumbersome
5  and time- and paper-intensive approval process (*ibid.*). As a result, the process of working and
6  communicating with ICE "entail[ed] more paperwork and more approvals" than working within
7  the SFPD (*ibid.*). Although SFPD officers occasionally participated in federal law enforcement
8  actions in conjunction with Operation Devil Horns, as detailed above, participating SFPD officers
9  always had to obtain prior approval through their own SFPD chain of command (*id.* at 137–38).

10      19.    The relationship that the SFPD shared with the federal law enforcement
11  agencies during Operation Devil Horns was the same general type of relationship that the SFPD
12  shared with other federal, state, and local law enforcement agencies (*id.* at 136–37, 175–79).
13  And Special Agent Merendino likewise stated that the federal agencies had similar relationships
14  with other non-federal agencies "as the need arose" or depending on the location of the incident
15  in question (Tr. 8/31 at 80, 155).

**ANALYSIS**

17      In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that the
18  prosecution may not suppress evidence favorable to an accused "where the evidence is material
19  either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."
20  Among other things, *Brady* has since been extended to evidence that impeaches prosecution
21  witnesses. *Giglio v. United States*, 405 U.S. 150, 154–55 (1972).

22      While a prosecutor must disclose all *Brady* material of which he or she has knowledge,
23  the Supreme Court has also rejected the view that a prosecutor need *only* disclose evidence based
24  on what he or she personally knows. Instead, "the individual prosecutor has a duty to learn of any
25  favorable evidence known to the others acting on the government's behalf in the case, including
26  the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). "Others acting on the government's
27  behalf in the case" is the critical phrase at issue here.

*Kyles* was a *state* prosecution involving evidence in the hands of *state* police, but was extended by the Ninth Circuit to cover a *federal* prosecution using a federalized local police officer as the "lead investigative agent." *United States v. Price*, 566 F.3d 900, 908–09 (9th Cir. 2009). *Kyles* and *Price* hold, in essence, that the prosecutor is deemed to have *constructive* knowledge of any *Brady* materials in the agent's possession. As a result, under *Brady*, a prosecutor must turn over to the defense any *Brady* materials of which the prosecutor has actual or constructive knowledge.

In *Price*, the federal prosecutor used a local police detective as his "lead investigative agent." Although the prosecutor had instructed him to run a criminal background check on a key governmental witness, the witness' extensive local criminal record went undisclosed. After conviction, the evidence came out in a separate prosecution. Upon this revelation, the prosecutor in *Price* claimed that he had not been told by his lead investigative agent about the results of the background check and thus there had been no intentional withholding. The Ninth Circuit held that the federal prosecutor had a duty to learn of and disclose favorable defense evidence in the possession of the lead investigating agent. Remanding for fact-finding, Judge Reinhardt (for the panel) stated at footnote 11:

> If the record is conclusive that all relevant agents of the government did not know about the *Brady* material, then, of course, no *Brady* violation has occurred as the "government has no obligation to produce information which it does not possess or of which it is unaware." *Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir. 1995).

*Price* is the only Ninth Circuit decision to find that a state (or local) agent qualified as a "lead investigative agent" in a federal prosecution. There, the agent was *both* a special agent with the Bureau of Alcohol, Tobacco and Firearms and a Portland police officer. 566 F.3d at 906. He occupied the customary and important role of the case agent assisting the prosecutor throughout the investigation and trial, usually sitting at counsel table. The agent was clearly subject to the direction and control of the prosecutor. The latter "instructed" and "directed" the agent, according to the opinion (at page 903). He was called the "lead investigative agent" and the "lead investigating officer" by the circuit court (page 903) and "my agent" by the prosecutor (page 906), who further said the agent had examined records "on [his] behalf" (page 906).

13

There is no one at the SFPD who has come close to performing this role. Federal Agent Ben Horton (who replaced federal agent Christopher Merendino) is the analogue in our case to the lead investigative agent in *Price*. A local police agency that merely supplies information for and cooperates with a federal prosecution is not a "lead investigative agent" under *Price*.

To return to the main point, the test is "acting on the government's behalf in the case." In order to be "acting on the government's behalf in the case," this order holds that the state or local officer must have been "federalized" by subjecting himself or herself to federal direction, such as by voluntarily becoming the federal prosecutor's lead investigative agent at trial or at an evidentiary hearing. Once that occurs, the federal prosecutor has the authority to direct the agent and can instruct the agent to search for records back at the local station. Unless state or local officers have so federalized themselves, however, the United States Attorney has no such authority to carry out that responsibility, *i.e.*, to direct a search at the local police station. Put differently, before deeming the *federal* prosecutor to have constructive knowledge of all evidence at a *local* police station, we must be sure the prosecutor has the authority to direct a search there (or the authority to search it himself).

It seems true here that on a few occasions over several years, the SFPD arrested someone (or took some other police action) at the request of federal agents investigating the MS-13. This was usually done to protect a source or to protect the public, such as where the federal agents had cause to believe that a murder was about to happen. This follow-up did not, however, constitute "acting on the [federal] government's behalf in the case." At all times, the local police were free to make their own enforcement decisions. They were not subject to the direction and control of a federal prosecutor. Likewise, at the many hearings herein thus far, the chair of the lead investigative agent has always been occupied by a federal agent, not a member of the SFPD. The main assistance given by the SFPD to the prosecutor has been to supply police reports and evidence of local homicides and other crimes allegedly committed by the accused. This evidence has been extracted from the SFPD via grand jury subpoena but usually voluntarily upon request. Such assistance, however, does not constitute "acting on the government's behalf" in the case. It constitutes "assisting" the government. It constitutes "cooperating" with the government.

14

"Assisting" and "cooperating" do not translate to "acting on behalf of." Otherwise, every person who cooperates with a federal investigation would be deemed a federal agent and the federal prosecutor would be deemed to have constructive knowledge of everything in his or her possession, custody or control. This would impose an impossible burden on the prosecutor to search for needles in haystacks over which the prosecutor had no right of access or right of control. This conclusion is consistent with if not compelled by the holdings of *United States v. Shryock*, 342 F.3d 948, 983–84 (9th Cir. 2003), and *United States v. Aichele*, 941 F.2d 761, 764–65 (9th Cir. 1991), both of which held that federal prosecutors had no *Brady* obligation to obtain impeachment materials held by the California Department of Corrections because such documents were not in the federal prosecutors' possession, custody or control. *See Ross v. State of Texas*, 474 F.2d 1150, 1153 (5th Cir. 1973) (as to burden).

Would it matter if the local police are willing, even if not obligated, to provide anything and everything the federal agents request? It must be observed that due to San Francisco's official policy of protecting illegal immigrants from federal ICE agents, the SFPD were *not* willing to do so here. They required the federal prosecutor to procure a grand jury subpoena to obtain local gang records at least on one occasion. But it is also true that, at other times, the SFPD seemed generally receptive and willing to assist and provide information on request by the federal agents. Even had the local police been willing to do so on *every* occasion (which they were *not*), this order holds that such cooperation would still not have been enough to deem the local police as "acting on the [federal] government's behalf in the case." The reason is that the local agency would not have federalized itself and thus subjected itself to the direction and control of the federal authority, such that the federal prosecutor would have had the authority and power to instruct the local police to search for exonerating evidence.

*United States v. Antone*, 603 F.2d 566 (5th Cir. 1979), does not require a different result. It is true that a dictum stated that a federal prosecutor could be charged with constructive knowledge of evidence in the files of the state agency on a "case-by-case" basis when there had been extensive interaction and cooperation between the two agencies. That decision extended the agency concept referenced in *Giglio v. United States*, 405 U.S. 150 (1972). *Giglio* actually only

15

held that one Assistant United States Attorney was the agent of another Assistant United States Attorney in the same office concerning knowledge of promises made to a prosecution witness. It would be a giant leap to hold that federal prosecutors are charged with knowledge of everything lurking in the desk drawers of local police who cooperate with federal law enforcement. No Fifth Circuit decision (or Ninth Circuit decision) has ever gone so far. To do so would place United States Attorneys in an impossible position of forcing them to guess where pro-defense materials might be located and imposing on them a responsibility to obtain such materials without providing them the power to compel their production (short of a formal subpoena, an avenue already available to the defense in appropriate cases).

It would be disturbing, of course, if a federal prosecutor made information requests calculated to fetch only inculpatory evidence. In this regard, the June 26 order stated:

> A second avenue arises when, even though the local agency is not a "lead investigative agent," the federal prosecutor consults local police records. When state police gives a federal investigator access to its files for the purpose of pulling items of interest to a federal investigation, *Brady* requires that the prosecution team review as well for *Brady* materials within the same universe of files. In this instance, separate sovereignty no longer matters. The reason is that the state has invited the federal authorities into its file room and given access to the evidence. Once inside the stacks with permission to rummage about for prosecution evidence, the federal authorities must search for and retrieve defense evidence bearing on the same question. The same would hold if the access is only by mere requests, *i.e.*, if the local police allow the federal prosecutor to make written or verbal requests for records searches to be conducted by local officers, then the federal prosecutor must ask for *all* information on the same subject, pro and con. This arises not because there is "agency" but because the federal prosecution team is given free access to retrieve information and the search must be even-handed as to the point of inquiry.

The evidentiary hearing record is uniform and consistent and this order so finds that the prosecutor and federal agents herein have been even-handed in their information requests to the SFPD. There is no basis, therefore, to suspect that a blind eye has been turned toward exculpatory evidence when making information requests.[3]

---

[3] As stated, the prosecutor has expressly disavowed any reliance on Rule 16(a)(2) (the exemption from disclosure of investigative materials prepared by an attorney or other governmental agent) to justify withholding local police reports of redacted portions thereof. Therefore, there is no occasion to consider whether any such

16

\*        \*        \*

On September 25, 2009, Defendant Guillermo Herrera submitted a request to supplement the evidentiary record regarding the *Brady* motion with the September 23, 2009, testimony of Sergeant Molina and Lieutenant Ferrando (Dkt. No. 654). This motion is hereby **DENIED**. The government did not participate in that hearing. The parties were the SFPD and defense counsel, and the hearing was done for a limited purpose — the defense subpoena was directed at only SFPD officers and the evidentiary hearing was in aid of a motion to compel. Initially, the attorney for the government did not even plan to attend, but upon the Court's request he ultimately was present at the hearing as a spectator only, which was stated on the record. So it would be unfair to now use that transcript against the government. Nonetheless, the Court is convinced that nothing came out in the evidentiary hearing that would change the result of this order.

In this connection, in the reply to the government's opposition regarding said motion, Defendant Herrera stated (Dkt. No. 657):

> The chief MS13 investigator at SFPD . . . destroyed his notes and can't recall what happened to memos regarding those informants and regarding activities of the gang. This destruction/loss occurred only a month of so before the indictment in this case. Moreover, it appears to be SFPD practice, if not policy, to destroy GTF . . . files and memos on informants.

This order finds that, in fact, there was no "practice, if not policy," of the SFPD to destroy GTF informant files. To the contrary, Lieutenant Ferrando testified that the SFPD had a policy in place wherein there was no set time period for "purging" GTF files. If an individual were to pass away, Lieutenant Ferrando explained that the SFPD would then review that individual's file, redistribute the components as necessary among other files, and then purge the irrelevant remainder. Likewise, if a person seemed rehabilitated or was reportedly no longer a gang member, the SFPD would also review the file to see if the file should be "lifted" — *i.e.*, purged from the GTF file system. But Lieutenant Ferrando stated that he was not aware of any instances of officers

---

reliance would convert the SFPD into a "government agent in connection with investigating or prosecuting the case." Fed. R. Crim. P. 16(a)(2). That issue was recognized but not resolved in *United States v. Fort*, 478 F.3d 1099 (9th Cir. 2007).

17

"unilaterally" lifting files from the GTF system, nor are there written instructions stating that officers *can* unilaterally purge files. As for Sergeant Molina, he did testify that he shredded old and useless notes, but only after first converting them into a typed memo. In sum, defendant Herrera's accusation of an SFPD policy, if not practice, of purging GTF files is unsupported by the record.

## CONCLUSION

For the foregoing reasons, this order holds that the San Francisco Police Department has not been shown to be a "lead investigative agent" within the meaning of *Kyles* and *Price*. If the San Francisco Police Department is not such an agent, it follows, a fortiori, that no other state or local agency should be deemed such an agent, for it seems clear that, of all police, the San Francisco Police Department had the closest ties to the investigation.

A concluding word is in order about the unique procedural posture of this order. *Brady* imposes a *self-executing duty* on the prosecutor. The defense does not have to ask for, much less move for, production of *Brady* materials. The reason is that the prosecutor is in the best position to know what evidence will be of assistance to the defense. *Brady* motions, therefore, usually arise *after* conviction and *after*, if at all, some pro-defense evidence has gone unproduced but uncovered after the fact. *Brady* motions need not arise prior to trial. In this case, however, the government itself sought an advance ruling. A prior order determined that ICE, FBI, DEA, and ATF must be deemed "lead investigative agents." This order has now laid out the principle that should apply, at least in the undersigned judge's opinion of the law. Consequently, there is no need for further *Brady* hearings on this issue as to other entities. The government ought to be able to apply the principle as to other entities and to decide properly under its self-executing duty. Similarly, there is no need for any other defense motions to deem someone a "lead investigative agent," and to the extent any such motion is pending, it is hereby **DENIED**.

**IT IS SO ORDERED.**

Dated: October 5, 2009.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE