IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>  v.<br><br>IVAN CERNA, et al.,<br><br>Defendants.<br>                                                             / | No. CR 08-0730 WHA<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS RE EXPERT WITNESS DISCLOSURES** |

**INTRODUCTION**

On April 26, 2010, the government made its Rule 16(a)(1)(G) expert disclosures for 24 experts that the government intends to use in its case-in-chief in this RICO gang prosecution. Defendants now bring two sets of motions regarding these expert disclosures. *First*, defendants assert that the government has not adequately disclosed the opinions about which its experts will testify. *Second*, defendants assert that the government has not adequately disclosed the foundation, bases and reasons for all of its experts' opinions. Defendants seek to delay the filing of *Daubert* motions challenging these government experts — currently due on June 18, 2010 — until the government has provided proper disclosures and counsel have had adequate time to review them.

**STATEMENT**

This is a RICO/VICAR prosecution of an alleged gang called Mara Salvatrucha, also known as "MS-13." The grand jury indictment charged 31 Bay Area defendants with RICO

conspiracy, conspiracy to commit murder and assault with a dangerous weapon in aid of racketeering, and various non-RICO narcotics, assault and vehicle-related crimes. One hundred twenty overt acts were alleged. Six of the defendants are eligible for the death penalty, although the government has not yet filed statutory notice of intent to seek the death penalty against any of the death-penalty eligible defendants. This prosecution has been pending more than two years with almost all of the accused still in custody.

The first scheduling order (Dkt. No. 265) was issued fifteen months ago after the government fell behind on its own proposed discovery-disclosure schedule and the case bogged down in gridlock. It set a deadline of September 14, 2009, for the government to produce its required expert materials under Rule 16(a)(1)(G). The government, however, missed this filing deadline. An order followed advising the government that it "must do much better" with regard to meeting deadlines (Dkt. No. 774). The Court order stated that the government's failure to comply with the September 14 expert disclosure deadline in particular was "so discouraging" that it would wait until the government could submit a firm date by which it could produce the required documents before settling on a revised scheduling order (Dkt. No. 781).

The revised and current scheduling order issued on December 17, 2009 (Dkt. No. 998). It scheduled defendants for trial by chapters. The simplest cases, chiefly defendants not charged with RICO conspiracy, were to be tried first. Those cases are now done. The main body of accuseds, RICO defendants not facing the death penalty, was set for trial in September 2010. Finally, any death-notified defendants were set for trials beginning in August 2011. The new deadline for the government to produce its expert disclosures for the trial in September 2010 was set for April 26, 2010. A summary was provided by the due date but its adequacy is now challenged.

**ANALYSIS**

Rule 16(a)(1)(G) requires that the government provide a summary of the opinions of its experts to be used during its case-in-chief. The rule requires that "[t]he summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." The Advisory Committee Note to the 1993 Amendment stated

2

that the bases and reasons must be sufficient to allow counsel to frame a *Daubert* motion (or other motion *in limine*), to prepare for cross-examination, and to allow a possible counter-expert to meet the purport of the case-in-chief testimony. The summary of bases relied upon by the expert "should cover not only written and oral reports, tests, reports and investigations, but any information that might be recognized as a legitimate basis for an opinion under Federal Rule of Evidence 703, including opinions of other experts." The comment also stated, however, that where a witness is so "generic" and routine (such as a DEA laboratory chemist) that the testimony will be largely predictable, a shorthand summary of the witness's qualifications and testimony may be adequate.

The majority of the 24 expert summaries disclosed by the government adequately describe the expert's opinions, the bases and reasons for those opinions, and the witness's qualifications. For example, for Linda Abaun, a gunshot residue analyst, the government provided the following summary of her opinion (Leung Decl. Exh. A at EXPERT000001):

> Among other things, Abaun will testify about the analysis of gunshot residue swabs taken from Erick Lopez and Carlos Garrido on or about January 8, 2006. She will testify that both Lopez and Garrido had gunshot residue on at least one hand, which suggests that Lopez and Garrido either fired a gun, was in close proximity to a gun as it was discharged, and/or touched a gun or other object with gunshot residue on it. *See, e.g.,* EXPERT00005 (attached hereto and incorporated by reference herein).

The phrase "among other things" is problematic and is addressed in the footnote below.[1] "EXPERT00005" referred to an attachment provided to the defense including the laboratory examination report prepared by Ms. Abaun summarizing the gunshot residue analysis at issue. The government's summary for Ms. Abaun also summarized the bases and reasons for her opinion:

> Abaun's testimony will be based on her experience and training and her analysis of gunshot residue samples collected from Lopez

---

[1] Defendants also complain that the expert notices describe the subject of each expert's testimony as "among other things" about which the expert will testify. In opposition, the government asserts that this phrase serves only to provide notice to defendants that the summaries may not specify every detail of the testimony. This order takes the government at its word. Certainly, Rule 16(a)(1)(G) requires only a summary of an expert's testimony, bases and reasons, and not every detail. Expert witnesses shall not, however, be permitted on the basis of the phrase "among other things" to testify on undisclosed opinions, bases and reasons not disclosed in the government's summaries.

3

> and Garrido on or about January 8, 2006, which confirmed that gunshot residue particles — notably lead, barium, and antimony — were detected in samples taken from Lopez and Garrido.

The laboratory examination report (appended to the summary) described the results of this analysis in greater detail. The government additionally provided a copy of Ms. Abaun's curriculum vitae and summarized her qualifications:

> Abaun has worked as a Criminalist for the San Francisco Police Department since 2006. Prior to that, she worked as a Forensic Scientist for Forensic Analytical in Hayward, California. She received a Bachelor of Science degree in biochemistry from U.C. Santa Barbara in 1998, and then received a Master of Science degree in criminal justice specializing in forensic science from Michigan State University in 2000. She has also received additional training since completing her formal education.

Defendants seek additional government disclosures which they contend are necessary to understand the bases and reasons underlying her opinions: (1) any literature relied upon by her in testifying about the subject testimony, (2) lists of cases testified in during the last four years, (3) copies of transcripts of previous testimony, (4) bench notes, diagrams or other notes created during the process of drafting typewritten reports, (5) copies of standard operating procedures, procedures manuals or other criteria followed by her and (6) results of proficiency testing.

Rule 16(a)(1)(G) does not require recitation of the chapter and verse of the experts' opinions, bases and reasons. No rule, statute, or decision necessitates such comprehensive disclosure. The government has provided adequate bases and reasons as to Ms. Abaun for counsel to frame a *Daubert* motion or other motion *in limine*, to prepare for cross-examination, and to allow a possible counter-expert to meet the purport of the case-in-chief testimony. This is sufficient to meet the government's obligations under Rule 16(a)(1)(G).

It is true that at a *Daubert* hearing, counsel may want additional records for purposes of cross-examining Ms. Abaun. Counsel may attempt to obtain the additional information they seek by filing subpoenas on the SFPD or the witnesses as appropriate.[2]

---

[2] An October 2009 order declined to hold that the SFPD and other state and local agencies were *per se* "lead investigative agents" such that the government's *Brady* obligation would extend to materials in their possession (Dkt. No. 692).

4

\*          \*          \*

Similarly, the government provided the following summary for Venus Azar, a medical examiner for the San Francisco Medical Examiner's Office:

> Among other things, Azar will testify about the medical examinations she conducted on two murder victims, Ernad Joldic (slain on March 28, 2008) and Ivan Miranda (slain on July 31, 2008). For each victim, she will testify as to the cause of death and the nature of the injuries suffered, *i.e.*, Joldic was slain by gunshot wounds will Miranda was slain by stab wounds. *See, e.g.,* EXPERT00007–EXPERT00033 (attached hereto and incorporated by reference herein).
>
> *Bases and reasons*
>
> Azar's testimony will be based on her experience and training — including her specialized medical training — and the autopsy she performed on each of the victims.
>
> *Qualifications*
>
> Azar has worked as an Assistant Medical Examiner for the San Francisco Medical Examiner's Office since 2000. Prior to that, she was employed as an Assistant Medical Examiner for the cities of Richmond and Hanover, in Virginia. She received her Baccalaureate's degree in biology from Oregon State University in 1987 and her Doctor of Medicine degree from Oregon Health Science University in 1992. She was then a resident at the New York Presbyterian Hospital between 1993 and 1998, and then a forensic pathology fellow in the Office of the Chief Medical Examiner in Richmond, Virginia, from 1998 through 1999. She has also received additional training since completing her formal education.

"EXPERT00007–EXPERT00033" refer to the medical examiner's reports for the two murder victims about whom Dr. Azar's opinion shall be offered. These appendices described in detail the examination and analysis performed by Dr. Azar, as well as her conclusions. Dr. Azar's curriculum vitae was also appended.

Assessing its disclosures, the government has provided and adequate disclosure of her opinions as to the cause of death and nature of wounds suffered by the victims examined by Dr. Azar, as well as the bases and reasons. The latter may be gleaned from the detailed autopsy report. This is sufficient. Again, defendants may seek to subpoena additional materials from the San Francisco Medical Examiner's Office if so desired for a *Daubert* challenge.

It is unnecessary to analyze all 24 of the experts disclosed by the government in this manner. Instead, this order shall focus only on those experts for whom the government's disclosures fall short of the requirements of Rule 16(a)(1)(G).

*         *         *

Defendants challenge the adequacy of the government's disclosures regarding the opinions of its four "electronics experts" who downloaded the contents of various devices. With respect to three of these experts — ICE Special Agents Walter Hart, James Munjone and Kendrick Yeung — the government's one-sentence summary of their proposed opinions is identical: "Among other things, [the witness] will testify about the procedures he employed to download the contents of electronic devices such as computers, cellular telephones, and other electronic devices so that the contents could be reviewed" (*id.* at EXPERT0000152 (Hart), EXPERT000293 (Munjone), EXPERT000331 (Yeung)). Similarly, the government's summary of the opinion of its fourth electronics expert, San Mateo County Crime Analyst Jennifer Carr, states merely, "Among other things, Carr will testify about the procedures she employed to download the contents of electronic devices, notably, a cellular telephone recovered from Danilo Velasquez" (*id.* at EXPERT000337).

Defendants argue that these summaries fail to describe each "witness's opinions" as required by Rule 16(a)(1)(G), and instead merely describe what each witness did. As noted above, however, the Advisory Committee Note to Rule 16(a)(1)(G) stated that where a witness is "generic" and routine such that her testimony will be largely predictable, a shorthand summary of the witness's qualifications and testimony may be adequate. This order finds that downloading alpha-numeric information from electronic storage devices in this modern era is routine, and will not exclude the witnesses on that basis.

Nevertheless, the government's disclosures for Agents Hart, Munjone and Yeung are inadequate because they do not identify any of the specific electronic devices which these experts downloaded. (Only defendant Velasquez's cellular telephone which was downloaded by Ms. Carr is identified in the government's disclosures.) This is insufficient to allow counsel to frame a *Daubert* motion or other motion *in limine*, to prepare for cross-examination, or to allow

a possible counter-expert to meet the purport of the case-in-chief testimony. These violate Rule 16. Ms. Carr shall be permitted to testify regarding the download of defendant Velaquez's phone. To the extent that defendants wish to obtain the protocol she used to download the information, they shall be required to subpoena it from San Mateo County.

\*      \*      \*

The government's summary for Niki Zamora, a forensic specialist for the San Mateo Sheriff's Office Forensic Laboratory, states (Leung Decl. Exh. A at EXPERT000334):

> Zamora will testify about participating in the examination of a stolen Honda that was recovered in San Francisco on or about February 20, 2009, which was suspected as being the vehicle used by the gunmen in the murder of Moises Frias (and the shooting of several other individuals) on February 19, 2009, in the vicinity of the Daly City BART Station in Daly City. She helped collect gunshot residue and DNA samples, as well as fingerprints, from the vehicle.

This summary fails to specify what opinions Ms. Zamora will offer, much less the evidence taken from the Honda about which she will be testifying. It also does not link her summary to specific forensic reports or other attachments. While Rule 16(a)(1)(G) does not require the disclosure of the entire basis of the experts' opinions, the government's disclosure falls far short. A forensic specialist analyzing gunshot residue, DNA samples and fingerprints cannot be considered perfunctory. The Zamora disclosure violates Rule 16.

\*      \*      \*

Finally, defendants challenge the adequacy of the government's summaries of the proposed testimony of two of its gang experts LAPD Detective Frank Flores, SFPD Sergeant Dionn McDonnell, and SFPD Sergeant Mario Molina. The summary for Detective Flores, among other things, stated that he "will testify regarding MS-13 tattoos, symbols, codes, colors and graffiti, and how they are used to communicate" (Leung Decl. Exh. A at EXPERT000066). The summary, however, provided no clue as to what Detective Flores's opinions would be regarding those tattoos, symbols, codes, colors and graffiti, or how they are used to communicate. Similarly, the summary of Sergeant McDonnell stated that he would "testify regarding gang rules and policies, about the San Francisco clique's activities and past membership, about its clashes with rival gangs, its symbols, colors, tattoos, and graffiti, its codes

7

and slang, and about its connections with other cliques outside the Bay Area, including MS-13 leadership in Los Angeles and El Salvador" (*id.* at EXPERT000278). But the summary did not provide any indication of Sergeant McDonnell's actual opinions regarding these subjects, much less any bases and reasons.

On May 17, 2010, prior to the hearing on the present motions, the government disclosed amended expert summaries of Detective Flores and Sergeant McDonnell (Alvarado Reply Exh. A). These elaborated summaries described the witnesses' proffered (but not the bases) opinions in somewhat more detail.[3] But they were produced 21 days after the deadline. It is hard to continue to excuse so many repeated violations by the government of its due dates, including due dates it stipulated to, if not proposed. Given, however, that the defense needs a trial continuance anyway, the government will be allowed an opportunity to cure, subject to the substantive evidentiary difficulty now discussed.

\*           \*           \*

The substantive concern is this: Should police officers be allowed to testify as "experts" to supply opinions in place of hard facts to prove elements of an offense? Leading up to the hearing, the government was ordered to show cause why the proposed testimony of Detective Flores, Sergeant McDonnell and Sergeant Molina should be admitted at all in the case-in-chief, especially as to the history and evolution of MS-13, its structure, its rules, and its operations as a criminal enterprise, given that these are key elements to be proven for the RICO counts.

No one should be convicted and sent to prison based on an opinion of a police officer that an element of an offense was committed when that element is amenable to ordinary fact proof. The reason we have jury trials, place the burden of proof on the government, and require unanimity is to insist that the government to prove the *facts* of a crime. One of the key elements of a RICO conspiracy is the structure, organization, and management of the affairs of a

---

[3] For example, the government's new disclosure for Officer Flores states that his opinion that "the gang has certain rules, including rules requiring members to confront and attack rival gang members and others targeted by the gang, retaliating against rival gang members' attacks, prohibiting cooperation with law enforcement, and requiring discipline for violations of gang rules, which could include beating or, at its most extreme, death, and supporting the gang through dues" (Goldrosen Decl. Exh. A at 1).

8

racketeering enterprise, all as they relate to conducting the affairs of an enterprise through a pattern of racketeering activity. Juries are good at sorting out the facts, deciding, for example, what, if any structure resides within a particular gang. Juries would ordinarily rely on fact witnesses, such as cooperating witnesses and undercover officers, to supply the facts. They do not need police opinions to do this. Under Rule 702, expert testimony is reserved for opinions that will assist the trier of fact. Moreover, criminal trials should not be allowed to degenerate into a "battle of experts," for plainly the defense would want to put on its own opinion testimony. A battle of experts would risk confusion, waste time, and draw attention away from the hard facts themselves. This should be avoided under Rule 403.

Here, the main thrust of the proffer will not assist the trier of fact. The way MS-13 operated and its structure should be proven with facts, not opinions, at least on quintessential fact questions. The racketeering organization alleged to exist in this case is the MS-13 gang itself. *The gang's existence, organization and history should, therefore, be proven through undercover officers, cooperating witness, admissions by defendants, co-conspirator statements, physical evidence, documents, videos and photographs, wiretaps, and recordings.* Sergeant McDonnell and Sergeant Molina, if not Detective Flores, were investigators in this very matter. It is no doubt true that in the course of their police work, they developed opinions on the accuseds and their alleged criminal organization. But those are mere opinions by highly partisan players.

Such shortcut proof for key elements of a crime like racketeering and organizational structures in a RICO prosecution should be viewed with skepticism. In *United States v. Mejia*, 545 F.3d 179, 195 (2d Cir. 2008), the Second Circuit vacated convictions for racketeering-related crimes because, *inter alia*, expert testimony by police officer about activities of the gang to which defendants belonged was an impermissible "shortcut" to establish elements of charged offenses:

> [I]t is a little too convenient that the Government has found an individual who is expert on precisely those facts that the Government must prove to secure a guilty verdict — even more so when that expert happens to be one of the Government's own investigators. Any effective law enforcement agency will necessarily develop expertise on the criminal organizations it investigates, but the primary value of that expertise is in facilitating the agency's gathering of evidence, identification of

9

> targets for prosecution, and proving guilt at the subsequent trial. When the Government skips the intermediate steps and proceeds directly from internal expertise to trial, and when those officer experts come to court and simply disgorge their factual knowledge to the jury, the experts are no longer aiding the jury in its factfinding; they are instructing the jury on the existence of the facts needed to satisfy the elements of the charged offense.

*United States v. Mejia*, 543 F.3d 179 at 191.

The government correctly points out that in *Hankey*, *Padilla* and *Takahashi*, the Ninth Circuit has allowed the introduction of law enforcement expert opinion regarding the existence, structure, and history of gangs. In each of the cases relied upon by the government, however, such expert testimony was allowed only as rebuttal testimony and for the limited purpose of impeaching a defense witness. In *United States v. Hankey*, 203 F.3d 1160, 1164 (9th Cir. 2000), the court permitted expert testimony regarding a gang's "code of silence" to provide the jury with an explanation for why a defendant would lie on a co-defendant's behalf. In *United States v. Padilla*, 387 F.3d 1087, 1094 (9th Cir. 2004), the court similarly permitted expert testimony regarding punishment for junior members of the gang who failed to support senior members. The testimony was allowed only for the limited purpose of impeaching the exculpatory testimony of a witness who was a junior member of the gang. In *United States v. Takahashi*, 205 F.3d 1161, 1165 (9th Cir. 2000), the court allowed expert testimony regarding the loyalty oaths sworn by members of the Yakuza gang for the limited purpose of impeaching a witness. No RICO conviction has been expressly sustained in the Ninth Circuit wherein the RICO elements were proven by opinion evidence from a gang expert admitted in the case-in-chief. Note well that *Hankey*, *Padilla*, and *Takahashi* did not involve charges of racketeering conspiracy as in the present matter.

The extent to which such gang expert evidence should be submitted in the case-in-chief was potentially presented in several Ninth Circuit appeals but not reached due to reversals on other grounds. For example, a gang expert testified in a RICO prosecution that was reversed on other grounds in *United States v. Shryock*, 342 F.3d 948 (9th Cir. 2003). The court of appeals

10

did not reach our evidentiary issue.[4] The same was true in *United States v. Chong*, 419 F.3d 1076 (9th Cir. 2005), except that it was not a RICO prosecution. Similarly, *United States v. Garcia*, 151 F.3d 1243 (9th Cir. 1998), reversed a non-RICO conspiracy conviction and did not approve the use of a gang expert.

Two district judges in our circuit have allowed gang expert evidence in the case-in-chief in a RICO/VICAR prosecution. Judge Maxine Chesney did so in *United States v. Cyrus*, CR05-324 MMC. There was no opinion or explanation as to how the evidence was used in the case-in-chief. In *United States v. McIntosh*, 2008 WL 4754763 (CD Cal. 2008), Judge Virginia Phillips allowed some and disallowed other aspects of proposed gang experts' testimony.[5]

In the Second Circuit, it is true that RICO convictions have been affirmed despite case-in-chief opinion evidence from gang experts. *United States v. Daley*, 842 F.2d 1380 (2d Cir. 1988); *United States v. Locascio*, 6 F.3d 924 (2d Cir. 1993). More recently, however, the Second Circuit, as stated, has markedly backed away from approving use of such evidence, expressly noting the danger in letting a government expert usurp the role of judge and jury by instructing the jury how to find an element of the charge and the danger of police experts really amounting to little more than case agents steeped in information about the case. The court of appeals stated that this risk was especially high where an expert testified both as an expert and as a fact witness.

> The Government cannot satisfy its burden of proof by taking the easy route of calling an "expert" whose expertise happens to be the defendant.

---

[4] The opinion did not reveal, moreover, whether the opinion came in the case-in-chief.

[5] In an order on November 27, 2007 (CR 02-938, Dkt. No. 5763), Judge Phillips granted the defendants' motion for a pretrial hearing regarding the gang experts' qualifications, relevance and reliability, but held that in general such witnesses could testify both as lay and expert witnesses. An evidentiary hearing was granted regarding whether a gang expert could opine on whether the defendants were "validated members" of the AB prison gang, but prior to the hearing the government stated it would not seek to introduce such testimony. In a March 14 order (Dkt. No. 5909), the court denied the defendants' motions to exclude gang expert testimony regarding (1) the origins, purpose, structure, symbols used by and membership rules of the AB, (2) the methods of communication of the AB (but not as to "plain language" interpretation), and (3) the AB's relationships with other prison gangs. The gang expert was not allowed to offer opinions regarding an alleged "race war" between the AB and the "DC Blacks" prison gang, because those opinions lacked sufficient facts and a reliable methodology. The gang expert was allowed to testify about the relations between the AB and the DC Blacks, but not to give the opinion that animosity between the gangs amounted to a "race war."

11

1  It stated that district courts have broad discretion whether to admit gang experts. *United States v.*
2  *Mejia*, 545 F.3d at 188–98 (2d Cir. 2008).[6]

3  On the other hand, there are certain opinions by police officers that would normally be admissible. One example is to explain specific coded words and phrases used by drug dealers and their true meanings as used in specific recorded telephone calls so long as the reasons and bases for the translations are set forth. Akin to an interpreter, an agent who has listened to hundreds of calls among drug traffickers will learn from the context the true meaning of words and phrases. A jury will not have the ability to listen to hundreds of calls and to know the immediate context of each so as to learn the translations. There are other opinions in this vein that would be admissible.[7]

For the foregoing reasons, this order holds that police expert opinions as to the structure, organization, and operations of the MS-13 gang will not be allowed in as case-in-chief evidence to prove the substantive elements of the RICO or VICAR offenses charged herein. On the other hand, subject to foundation, police expert opinions will be allowed to explain code words and customs used by drug dealers in the Bay Area so long as the specific passages and events which are the subjects of the opinions are specified in a proper Rule 16 disclosure along with the basis and reasons therefor.

\*          \*          \*

Returning to the form of the Rule 16 expert summary, it did not specify each specific opinion, much less the reasons and bases for each. Given the discouraging history of missed deadlines by the government, the undersigned judge is most reluctant to excuse yet another but will do so because the defense needs and will be granted a continuance of the September 2010

---

[6] The Fourth Circuit affirmed a RICO/VICAR conviction based on Detective Flores' testimony in another MS-13 case. The objection discussed on appeal concerned whether such evidence violated the Confrontation Clause (due to expert reliance on third parties not testifying). *United States v. Ayala*, 601 F.3d 256, 275 (4th Cir. 2010).

[7] Even when this is allowed, however, the Rule 16 disclosure should identify the particular words and phrases at issue and provide the bases and reasons for the translations. It is not enough to simply say that an officer will explain the codes used by the gang and this will be based on his or her training and experience. If this would be burdensome in the instant case, it is only because of the massive size of the way in which the prosecutors themselves have chosen to indict and investigate this case.

12

1  trial date (for unrelated reasons). Therefore, the government may cure the curable in a
2  supplemental Rule 16 disclosure. The supplement must summarize each opinion, as exemplified
3  by the following illustration:

> With respect to the recording DH 999 dated MM-DD-YYYY, Officer XYZ will testify that the word "piece" meant "gun" and the word "item" meant "package of cocaine." The basis for this opinion is his experience in monitoring drug transactions and in listening to 1600 recordings involving the same individuals between 2004 to 2009, many of which used the same terms in the same way.

*Each* opinion and basis must be stated with at least this much particularity. If this will be burdensome, it is only because the government has chosen to frame a prosecution of unprecedented mass involving 31 accuseds and over 3200 individual recordings, all in Spanish, generated and maintained with precious little organization by ICE agents. Before trial, our prosecutors must determine each item they plan to lay before the jury. This order and Rule 16 do not require anything more than the prosecution must ultimately require of themselves in presenting the expert opinion at trial. The supplemental Rule 16 disclosure must be filed by **NOON ON JUNE 30, 2010.** As to Zamora and the electronic devices, the government may also cure the shortfalls identified earlier in this order by a new detailed submission meeting the specificity requirements, also due by **NOON ON JUNE 30, 2010**.

Although this order has ruled out a large swath of the proposed gang expert opinion, it has done so based on a pithy summary. Given the trial continuance granted defendants, there is time to allow the prosecutors another chance for gang-opinion testimony. Conceivably, there may be aspects that would be allowed. The government may submit revised gang expert disclosures meeting the specificity requirements by **NOON ON JUNE 30**.[8] *Daubert* and other

---

[8] Detective Flores, for example, should state the specific basis for each sentence in the summary. For example, how does he know that "gang rules generally require members to be 'jumped in,' which is an initiated process that requires the initiate to be beaten by other gang members"? How specifically does he know that "local [gang] meetings are the most common, during which members of a local clique address issues and concerns relevant to the clique, collect gang dues — which are used to buy weapons and drugs or used to pay for lawyers or bail or commissary accounts of imprisoned members or to maintain the families of imprisoned members, as well as to send up the chain of command — administer discipline and initiate new members." Long sentences like this should be divided and each part should state the basis for the opinion, such as personal observation as undercover officer versus hallway police gossip versus training seminar versus admissions by multiple gang members versus newspapers/magazines and so on. It is important to know the foundation for

13

defense objections must be filed by **NOON ON JULY 27** for hearing on **SEPTEMBER 13 AT 1:30 P.M.**, with the oppositions due by **AUGUST 12** and the replies due on **AUGUST 24**, each at noon. This schedule applies only to the gang experts, forensic specialist Niki Zamora, and the electronic experts. All other *Daubert* and other challenges to the government's experts remain due by **NOON ON JUNE 18**, as stated after the recent hearing in Docket No. 1794, to be heard on the original schedule.

## CONCLUSION

For the reasons stated above, defendants' motions regarding the government's expert witness disclosures are **GRANTED IN PART AND DENIED IN PART**, subject to yet another opportunity for the government to cure.

**IT IS SO ORDERED.**

Dated: June 8, 2010.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

---

each specific opinion.