IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>IVAN CERNA, *et al.*,<br><br>Defendants.<br>_____/ | No. CR 08-0730 WHA<br><br>**MEMORANDUM OPINION RE WHY ALL RECORDINGS NEED NOT BE TRANSLATED AND TRANSCRIBED** |

This sprawling RICO/VICAR gang prosecution, now pending for more than two years, seems peerless when it comes to the number of case management burdens on counsel and the district judge. This memorandum opinion is devoted to the Number One Headache — the thousands of hard-to-hear recordings — all in Spanish — turned over by the government to English-speaking defense counsel. The government has translated and transcribed only a fraction and evidently plans to keep it that way. The recurring question has been: To what extent should these be translated and transcribed by defense (at CJA public expense) before the main trial? Over the last two years, many hours of hearings and pages of briefing before the district judge and the magistrate judge have been considered. A massive CJA-funded translation/transcription project for these recordings has long been inching along. Defense counsel now states that the project will need another year or so to complete. Long ago, however, the trial was set for two months from now. Reluctantly, the Court will postpone the trial by another six months in order to allow more of these recordings to be processed. That will be it. At long last, the Court has

1  concluded that there is no necessity for indulging in the enormous luxury of translating and
2  transcribing each and every recording and that counsel have sufficient information about the
3  recordings to prioritize the few that really need processing.  True, this may mean that not every
4  stone will go unturned.  But that is so in every case.  Counsel must always make reasonable
5  judgments about which stones to turn over.  This is no different.  Here, now, are the supporting
6  details.

7                                    *          *          *

8        The indictment was filed on September 24, 2009.  The Court set an initial schedule for
9  production of discovery by the government and initial review of that discovery by the defense in
10 this matter at a hearing on December 9, 2008.  The order directed the defense to review discovery
11 progressively as it was produced in order to be in a position to set a schedule for the first wave
12 of motions by the next calling of the case in February 2009.  On February 9, 2009, however,
13 both sides submitted a joint status conference statement reporting that the discovery process
14 was proceeding less rapidly than anticipated (Dkt. 207 at 2).  Several hundred hours of foreign
15 language recordings were produced to defendants on February 5, 2009, and the parties were not
16 ready to set a trial date due to the logistical and technical problems associated with translating the
17 recordings.  This audio discovery consisted of recordings from body wires worn by government
18 informants, telephone calls between informants and defendants, and recorded jail calls from
19 defendants.

20       Attorney Susan Raffanti submitted an initial application for funding to pay translator
21 Haydee Claus to make a list of and translate the tapes.  The application was discussed at the
22 February hearing (Dkt. 225).  With the agreement of defense counsel, Attorneys Raffanti and
23 Peter Goodman were tasked with preparing and submitting CJA applications for funding to
24 translations and transcriptions in this matter.  There is no need to go into the CJA details,
25 although all of the information in this paragraph is well known in this case.

26       At a status conference in March 2009, the Court stated that it would authorize sufficient
27 resources for the defense to obtain its own English transcripts in time to prepare for trial even if
28 the prosecutors would not do so (March 9 Tr. at 31–32).  In the March 2009 scheduling order that

1  followed, the Court stated that it would "work hard to process all CJA requests promptly and to
2  approve all reasonable requests" (Dkt. 265).

3        Attorneys Raffanti and Goodman solicited and evaluated proposals from various providers
4  in order to find a translation service which could best do the job competently, as quickly as
5  possible, and at a reasonable price. On April 20, 2009, the Court approved $130,000 in CJA
6  funds to pay for the services of Ms. Claus and her team to transcribe and translate from Spanish
7  into English various recorded conversations as discovery.

8        Due to the amount of background noise and large number of unidentified speakers on the
9  recordings, Ms. Claus and her team ultimately made less progress on the recordings than
10 anticipated. In September 2009, defense counsel made an additional joint *ex parte* request for
11 another large outlay. On September 24, the Court approved $80,000 of this request. The denial
12 of the additional funds was without prejudice to further requests.

13       On October 19, 2009, defense counsel publicly submitted a joint status report on the
14 progress of the defense transcription and translation (Dkt. 756). They estimated that the
15 government had produced, as of that date, approximately 800 hours of Spanish language audio,
16 mostly jail calls after the accuseds were in custody. Of all this material, only about 58 hours of
17 recordings had been completely transcribed and translated by Ms. Claus and her team, with an
18 additional 19 hours in the intermediate stages of translation. On October 20, defendants applied
19 for more in CJA funds to pay for Ms. Claus and her team to continue translating and transcribing
20 the recordings.

21       On October 21, an order set the trial schedule for the six defendants charged only with
22 the simpler offenses and not charged with RICO conspiracy (Dkt. 774). It stated, "It is not
23 necessary to translate and transcribe every recording in the larger case prior to trial of the smaller
24 cases. Most of these recordings are not relevant to the first six defendants" (Oct. 21 Order at 5).
25 The government was ordered to disclose to defendants the precise recorded conversations it
26 intended to use in its case-in-chief, a list that identified all recordings produced in discovery, and
27 actual translations and transcripts it intended to use in its case-in-chief. On October 26, a further
28

1  amount was sought by counsel for additional translations and transcriptions.  It was approved.
2  The simpler cases have now been resolved.
3      With respect to the non-simple cases, namely the RICO cases against the large mass of
4  defendants, counsel applied for an additional large CJA request for yet more translation and
5  transcription services.  The Court referred this request to Magistrate Judge Laurel Beeler for
6  hearing on the record and for recommendation (Dkt. 1444).  In tandem with this, all parties
7  including the government were also referred to Judge Beeler for more conferences and a
8  recommendation as to how to better solve the various problems concerning the recordings.
9  This effect, however, has not borne fruit.
10     Additional funds were thereafter approved on May 27, 2010, in a sealed CJA order for
11 translations and transcriptions, including further large amounts to Ms. Claus and her team to
12 translate 150 additional hours of nonbody wire recordings and to two additional firms to come
13 in and help.  These expenditures cover the translations and transcriptions of the remaining body
14 wire, consensual phone calls, and video sound recordings.  All together, more than $1.7 million
15 CJA dollars have been authorized to translate and transcribe the recordings.  This is a staggering
16 amount.
17     In sum, we have been working on the translation/transcription challenge for over eighteen
18 months.  The Court itself has invested considerable time in evaluating CJA requests and hearing
19 open-court argument, all directed to how to manage the recordings.  The entire matter was also
20 examined by our new Magistrate Judge Laurel Beeler, fresh out of the federal prosecutor's office,
21 for possible solutions.  Even Circuit Judge Marsha Berzon, in her role as CJA circuit reviewer,
22 has examined the large amounts being spent and the expensive way in which counsel and the
23 translators are going about their work.
24                    *          *          *
25     The longstanding September 2010 trial date was challenged by defense counsel at a recent
26 hearing.  Yet another trial postponement was requested.  That is the immediate question.  This led
27 to a number of submissions by both sides.  Based thereon, the Court now concludes that a
28 postponement of the trial to March 2011 is warranted.  The much longer postponement requested

4

by the defense is not warranted. Far and away, the main reason given is the perceived need to process *all* of the recordings.

After deep immersion in every aspect of this facet of the case, the Court is firmly of the view that all that needs to be done (and more) will and can be translated and transcribed in time for effective use in a trial in **MARCH 2011**. Here are the reasons: *First*, *all of the consensual recordings have already been translated and transcribed or can be before the trial.* These recordings are the most critical. The consensual recordings (body wires and phone conversations recorded with the informants' permission) are the high-grade ore, meaning the recordings most likely to be probative. The consensual recordings were made specifically to obtain evidence. They were made while and during the alleged conspiracy and were made for the very purpose of documenting its crimes. *Again, these can be completely done by the new trial date.* Counsel must manage the project so as to make sure this happens.

*Second*, the remainder of the recordings merely are jail calls. These were made *after* the accuseds were charged and apprehended. All callers were on notice that their jail house phone calls would be recorded. As a result, these recordings are unlikely to have probative evidence. They are low-grade ore.

*Third*, with respect to the jail calls, defense counsel have sufficient clues to select those most likely to be probative and to have those translated and transcribed in time. Counsel are in a position to prioritize the few that should be translated and transcribed. Significantly, the government has already listed the recordings, including jail recordings, it plans to use for its case-in-chief. Those obviously should be translated and transcribed. These are a tiny fraction of the thousands of jail calls. And, as to all jail calls, the government has identified the telephone number called from the jailhouse and stated which defendant it thinks is associated with that number (and thus who possibly placed the call). Moreover, by listening to the outset of the recording, one can review the segment wherein the caller is asked to identify himself. While usually the true name is not given, a nick name may be sometimes given and the nicknames are generally known. This may rule out, as being of no interest, some recordings.

5

This order accepts the defense proposition that useful evidence to impeach testifying informants may be in the jail calls, although surely this will be a tiny, tiny fraction of all of the jail calls. (One such recording was used at the *Noches* trial and is already known and can be used yet again in the RICO trial against 1218.) But defense counsel already have clues as to which calls include informants. They can use these clues to prioritize the translation/transcriptions.

With respect to jail recordings made of defendants themselves, it would be most pertinent to translate and transcribe those that the government plans to use in its case-in-chief. These have already been listed, as stated. It is highly unlikely that the rest of the jail calls would contain some exculpatory statement, such as an accused saying that he — the speaker — actually did the crime and that some other accused was innocent. While nothing is impossible, each jail caller is on notice that his calls are recorded and, therefore, it is unlikely he will confess to a crime on the jailhouse phone. There is time between now and March 2011 for defense counsel to make reasonable prioritizations and maximize their chances of finding any such exculpatory material, putting aside for now whether it would be admissible. This can be done by following the clues referenced above and by talking with their own clients as to who might have said what in various jail calls.

This order recognizes that not all of the thousands of jailhouse calls will be translated and transcribed before trial. They do not need to be for a fair trial. In no case — this or any other — can counsel possibly turn over every stone. Prioritization must be made. The main priority — the consensual recordings — are the core of our problem. They have already been translated and transcribed or can be by the date of trial. The balance of the problem consists of jail calls, which for the reasons stated, are low-grade ore. Not all of these stones need be turned over. We must rely on the professional judgment of counsel to select the most promising to investigate. Excellent counsel are in this case. The Court is convinced that they can use the data available and their extensive investigative experience — not to mention the unprecedented large CJA sums

6

United States District Court
For the Northern District of California

appropriated for this project — to uncover whatever material is of any helpful evidentiary value from among the jail calls.*

Because the Court has concluded that there is no necessity to process all of the recordings, there is no occasion to hold an evidentiary hearing to find out why Agent Merandino and other ICE agents failed to maintain better ROIs on the recordings. Also, ICE has nothing to do with the jail calls. The ICE consensual recordings can all be processed before trial anyway.

Dated: July 15, 2010.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

---

\* If it were deemed necessary to translate and transcribe all jail calls, then the case would never be ready for trial, given that the accuseds continue to use the jail phones to call out. Under that scenario, the defense could insist on a never-ending stream of subpoenas and continuances to recover yet more recordings from the jails (or argue that federal prosecutors must do so for them under *Brady*). The government has now ceased doing this on a voluntary basis, having recognized the problem and having evidently decided there is no duty to obtain the jail calls for the defense in the first place.

7