**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

          Plaintiff,

  v.

IVAN CERNA, *et al*.

          Defendants.

                         /

No. CR 08-0730 WHA

**ORDER RE SUPPRESSION MOTIONS FILED BY DEFENDANTS HERNANDEZ, CASTILLO, AND FLORES**

**INTRODUCTION**

In this RICO/VICAR prosecution, all suppression motions by the non-death eligible defendants charged with RICO conspiracy have been made. This order addresses all such motions except defendant Danilo Velasquez's suppression motions, which will be heard on October 19, 2010, and defendant Angel Noel Guevara's suppression motions, which will be addressed in a separate order. All motions addressed herein were initially heard on September 13, 2010.

As a preliminary matter, no defendant has submitted a sworn declaration. Instead, all defendants relied on police records in making their suppression motions, and in a few instances, sworn declarations from defense counsel. Ordinarily, the moving defendant must comply with Criminal Local Rule 47-2(b), which requires sworn declarations or affidavits for motions presenting issues of fact. Denial of a suppression motion because the moving defendant failed to submit a supporting declaration has been affirmed by the court of appeals. *United States v.*

*Wardlow*, 951 F.2d 1115, 1116 (9th Cir. 1991).

In some circumstances, however, it would be unfair to the moving defendant to strictly enforce the local rule. For example, where the pertinent history is all known only by police officers, defense counsel cannot be expected to obtain declarations from the officers, given their partisan role. In such a circumstance, it is sufficient for defense counsel to proffer the police reports, for it is reasonable to presume that the officers will likely testify in accordance with their own reports. Then the question arises whether a moving defendant should be afforded an evidentiary hearing to contradict the police records or the government's proffer even though the defendant himself has not proffered the requisite sworn statements to call such records into question.

Where the motion challenges a warrantless search or seizure, the burden is on the government to justify the search or to show an exception. That is, once the movant demonstrates that a warrantless search or seizure occurred, the burden shifts to the government to demonstrate a justification or exception, usually via officer declarations. Officer declarations are not always essential, for police reports relied on by the movant himself may sometimes supply the justification, at least where reports are clear and consistent. If the government makes this demonstration, the movant may nonetheless sometimes be afforded an evidentiary hearing. This will usually occur if the movant raises an issue of material fact such as via the accused's own declaration. In the absence of such a declaration, the police reports or officer declarations may "vague out" on key points, or even worse, be inconsistent, also warranting an evidentiary hearing. Fishing expeditions, based on nothing more than a hope that something may turn up once the witnesses testify are not enough to warrant an evidentiary hearing.

Where the government's opposition, at least if fully credited, meets the government's burden to justify a warrantless search or seizure or fully rebuts movant's factual assertions — based on the same police reports advanced by the movant — then there is no need for an evidentiary hearing unless the movant shows that an evidentiary hearing can be anticipated to develop facts showing the search or seizure was unlawful. The party seeking an evidentiary hearing must justify it in some meaningful way. Counsel must specify what he or she expects an

evidentiary hearing will prove if allowed.  If counsel asserts that certain facts can be anticipated but those facts should be known to the defendant, then the moving defendant must submit a sworn declaration under Criminal Local Rule 47-2(b) specifying such facts (unless other sworn evidence makes the same factual point).

In order to have standing to challenge an unlawful search or seizure, a defendant has the burden to prove his or her legitimate expectation of privacy has been violated.  *Rawlings v. Kentucky*, 448 U.S. 98, 104–105 (1980).  Without knowing what specific evidence is objected to or what expectation of privacy may have been implicated, we cannot assess whether a defendant has standing to attack the alleged unlawful search or seizure.

**ANALYSIS**

With the foregoing in mind, the suppression motions of defendants Giovanni Hernandez, Wilbert Castillo, and Moris Flores are ruled on as follows.

**1.    HERNANDEZ'S MOTION TO SUPPRESS (DKT. NO. 2001).**

Defendant Giovanni Hernandez moves to suppress all evidence seized as a result of his warrantless detention, search, and arrest on August 12, 2008, and all evidence seized during a subsequent warrant-authorized search of 970 Ingerson in San Francisco on August 20, 2008 (Dkt. No. 2001).  As explained herein, an evidentiary hearing is warranted.

The relevant part of the current record is as follows.  On August 12, 2008, SFPD officers Sergio Lopez and Henry Espinoza observed Mr. Hernandez and two other individuals standing outside of Taqueria Cancun at 2288 Mission Street in San Francisco (Dkt. No. 2001-1 at 8; Lopez Decl. ¶¶ 5, 6).  The officers believed the three individuals to be gang members.  The officers purportedly approached the individuals to admonish them for violating Section 25 of the San Francisco Municipal Police Code which stated:

> No person, without permission, expressed or implied, of the owner, lessee, or other person in charge of private property or business premises shall enter upon such private property or business premises after having been notified by the owner, lessee, or other person in charge thereof to keep off or to keep away therefrom . . . Such notification . . . may be oral or in the form of a written notice, posted in a conspicuous place, describing the specific area and hours in which persons are to keep off or to keep away.

United States District Court
For the Northern District of California

M.P.C. § 25(b), (c).  The officers then performed a pat search of all three individuals for weapons. As a result of this pat search, Officer Lopez located a kitchen knife in Mr. Hernandez's pocket and placed him under arrest for carrying a concealed weapon.

Mr. Hernandez was thereafter taken to Mission Police Station where Sergeant McDonnell and Officer Molina took over the investigation (Dkt. No. 2001-1 at 8).  At the station, a photograph, a camera, a micro-card adapter, two cell phones, and a small amount of marijuana were seized from Mr. Hernandez.  The electronic content of Mr. Hernandez's cell phones and camera was searched (Dkt. No. 2001-1 at 15; Lopez Decl. ¶ 8; Molina Decl. ¶ 8).  Mr. Hernandez was also interviewed by the officers and made a number of statements.  Two days later, Superior Court Judge Mary Morgan issued a search warrant for 970 Ingerson (Dkt. No. 2001-1 at 10).  The search of 970 Ingerson returned "four pieces of indicia" and "200 rounds of shotgun ammunition" (*id*. at 11).

*          *          *

Mr. Hernandez has alleged issues of material fact with sufficient definiteness, clarity, and specificity such that an evidentiary hearing is warranted.  Although Mr. Hernandez failed to submit a sworn declaration, strict enforcement of the local rule is not warranted in this instance as the government has the burden to justify the warrantless stop and pat search of Mr. Hernandez and even if the police records, the government's opposition, and the police officer declarations are fully credited, material facts remain that could not be resolved by a declaration from Mr. Hernandez.

*First*, the police report specified that Mr. Hernandez was detained so that the police officers could admonish him for violating Section 25 of the Municipal Police Code.  Mr. Hernandez argues that no reasonable police officer could have believed he was in violation of Section 25 as he was allegedly standing on a public sidewalk.  Although Mr. Hernandez has not submitted a declaration stating he was on a public sidewalk, the government has not contested this claim in its opposition and the police records and declarations similarly do not contradict this claim.  Instead, the police records and the government's submissions specify that Mr. Hernandez was outside of Taqueria Cancun without asserting that the area was private property (Opp. 6–7;

Dkt. No. 2001-1 at 8; Lopez Decl. ¶ 5).  Thus, the government has not conclusively shown that Mr. Hernandez was not on a public sidewalk.  Similarly, the government has not conclusively shown that the officers had some reasonable suspicion, supported by articulable facts, that criminal activity was afoot.

*Second*, the record is not clear regarding the lawfulness of the pat search.  To warrant the pat search, the officers were required to have an objectively reasonable suspicion that Mr. Hernandez was armed and dangerous.  The Lopez declaration and the police report only discuss general atmospherics and do not state whether Mr. Hernandez was acting in a particular way to raise the officers' suspicions (Dkt. No. 2001-1 at 8; Lopez Decl. ¶ 6).  Accordingly, there are material issues of fact surrounding the circumstances of the pat search.

An evidentiary hearing will be held to determine whether the warrantless detention and pat search of Mr. Hernandez can be justified.  If the answer is in the negative, all evidence seized as a result of the detention and pat search, as well as from the arrest and the warrant-authorized search of 970 Ingerson, will be suppressed.  If the pat search is held constitutional, the follow-on additional challenges to the search of the cell phones, camera, and 970 Ingerson will be considered.  Thus, counsel should be prepared to address all issues at the evidentiary hearing.

## 2. CASTILLO'S MOTION TO SUPPRESS (DKT. NO. 1990).

Defendant Wilbert Castillo moves to suppress "any physical items seized or any observations obtained" as a result of: (1) a vehicle stop and search on October 27, 2005; and (2) a field interview on January 15, 2006 (Dkt. No. 1990).  Mr. Castillo has not submitted his own sworn declaration in support of his motion.  Mr. Castillo relies entirely on police records and a declaration from his counsel.  For the reasons stated herein, Mr. Castillo's motion is **DENIED**.

### A. Vehicle Stop on October 27, 2005.

Mr. Castillo has failed to articulate a basis for suppression of any evidence flowing from the traffic stop.  The record is as follows.  On October 27, 2005, Officer Molina was told that a group of Mara Salvatrucha members entered a black sports-utility vehicle near 20th Street and Mission Street (Dkt. No. 1990 at 10).  Walter Palma was driving the vehicle and Mr. Castillo was a passenger.  The vehicle traveled down 20th Street and ran a red light at Valencia Street, a

**United States District Court**
For the Northern District of California

1   violation of the California Vehicle Code.  Officer Molina stopped the vehicle to investigate the

2   traffic violation and ongoing gang activity.  Officer Molina was then joined by additional police

3   officers — Officer Richardson, Officer Sanchez, Inspector Lau, Sergeant Browne, and Special

4   Agent Kwak.  Mr. Palma, the driver, was asked to provide his driver's license but stated that he

5   did not have it with him.  Due to the large number of passengers (four) and their gang affiliation,

6   for officer safety, Officer Molina asked the passengers to step out of the vehicle.  Officer Molina

7   was then advised by dispatch that Mr. Palma's license was suspended or revoked.  Mr. Palma was

8   placed under arrest for driving with a suspended license, running a red light, and for not having a

9   license in his possession.  Officer Richardson and Officer Molina conducted an inventory search

10  of the vehicle prior to it being towed, during which the officers discovered a black backpack

11  containing a silver dagger in a metal sheath and two small plastic vials labeled "Jose Quinteros"

12  and containing white pills.

13          Mr. Castillo was not arrested but his photograph may have been taken during the stop

14  since Officer Molina requested that Inspector Lau take photographs of the detained individuals.

15  These photographs are not part of the current record.  Although Mr. Castillo challenges

16  "observations" that resulted from the vehicle stop, Mr. Castillo does not specify what

17  observations were made of him.  It appears from the police records that observations of Mr.

18  Castillo were limited to incidental, identifying information.

19                              *          *          *

20          As an initial matter, Mr. Castillo lacks standing to challenge any evidence seized.  Mr.

21  Castillo's motion does not even concede that he was present during the incident — as he will only

22  admit that he was "allegedly a passenger" (Br. 2).  As Mr. Castillo does not even concede in an

23  *unsworn* statement that he was present at the scene of the alleged unlawful stop, it is a mystery

24  how he has standing to challenge the alleged unlawful stop or any fruit flowing from it.

25  Nonetheless, even disregarding Mr. Castillo's attempt to have it both ways — refusing to admit

26  he was present for the incident but attempting to suppress evidence related to the stop — Mr.

27  Castillo's claims still fail.

28

6

*First*, Mr. Castillo has failed to assert an expectation of privacy in the backpack and thus does not have standing to challenge the search and seizure of its contents. *Rawlings*, 448 U.S. at 104–105. The record indicates that the backpack was suspected to belong to Jose Quinteros — who was present and in fact arrested for its contents — and Mr. Castillo has offered no assertions (sworn or unsworn) to the contrary.

*Second*, Mr. Castillo has failed to adequately challenge the government's showing that the vehicle was stopped because it ran a red light. Mr. Castillo did not submit a sworn declaration contesting the lawfulness of the traffic stop. The declaration submitted by Mr. Castillo's counsel is not an adequate proffer and there is no reason that Mr. Castillo could not have submitted a declaration stating that the vehicle did not run a red light, if it in fact did not. *See Wardlow*, 951 F.2d at 1116. The police records are clear-cut on this point and Mr. Castillo has not demonstrated what facts he believes an evidentiary hearing would elicit to contradict the current record. With respect to the subsequent detention of Mr. Castillo, nowhere in his motion does Mr. Castillo contradict the government's showing that a detention of Mr. Castillo was necessary for officer safety. Thus, Mr. Castillo has provided no basis to anticipate useful facts would emerge from an evidentiary hearing. Accordingly, the stop and detention of Mr. Castillo was not unlawful and any photographs or observations of Mr. Castillo are not excludable as unlawful fruit.

### B.      Field Interview on January 15, 2006.

Mr. Castillo has entirely failed to explain how the field interview of him on January 15, 2006, violated the Fourth Amendment. According to a field interview report, Mr. Castillo was interviewed near 1070 Valencia Street in San Francisco, for a traffic misdemeanor involving a Honda Accord (Dkt. No. 1990 at 17). The field interview report noted that Mr. Castillo was wearing a black jacket, a light blue shirt, tan pants, and white and blue shoes. The report also noted other identifying information about Mr. Castillo (name, address, alias, height, sex, weight, hair and eye color, gang affiliation, moniker, and date of birth). No further information exists in the record about this field interview except for the fact that Alex Vargas and Evar Escobar may have been part of the same incident (*id*. at 18–19).

7

**United States District Court**
For the Northern District of California

1   Notably, Mr. Castillo has failed to specifically articulate whether he is challenging the

2   incident as an unlawful stop, detention, or other seizure — he only specifies that he was

3   "apparently stopped" on January 15, 2006 (Br. 3).  Furthermore, Mr. Castillo has not submitted a

4   declaration contesting the government's showing that the encounter was due to a traffic

5   misdemeanor.  As discussed above, the declaration from Mr. Castillo's counsel is not sufficient to

6   dispute the current record.

7   Regardless, Mr. Castillo only challenges observations that flowed from the field interview.

8   Again, Mr. Castillo fails to articulate which observations he challenges, but the record indicates

9   that the only observations made of Mr. Castillo were incidental observations.  Incidental

10  observations not obtained for an incriminating purpose are not excludable under the "fruit of the

11  poisonous tree" doctrine, even if they resulted from an unlawful search or seizure.  *United States*

12  *v. Foppe*, 993 F.2d 1444, 1449 (9th Cir. 1993).  Accordingly, the field interview of Mr. Castillo

13  was not unlawful and any observations of Mr. Castillo are not excludable as unlawful fruit.

14      **3.**    **FLORES' WARRANTLESS SEARCHES SUPPRESSION MOTION (DKT. NO. 1992).**

15  Defendant Moris Flores moves to exclude physical evidence, observations, statements,

16  photographs, and all other evidence obtained as a result of four separate warrantless searches or

17  arrests.  An evidentiary hearing is warranted with respect to the warrantless detention and arrest

18  of Mr. Flores on May 17, 2008.  Mr. Flores' motion is otherwise **DENIED**.  Each of the four

19  incidents raised in Mr. Flores' motion is discussed herein.

20  Defendant Giovanni Hernandez, who was detained during the incident on May 17, 2008,

21  seeks to join Mr. Flores' motion regarding that incident (Dkt. No. 2022).  Mr. Hernandez's

22  joinder motion is **GRANTED**.

23      **A.**    **Arrest at Mission High School on December 11, 2003.**[1]

24  Mr. Flores has not contradicted or called into question any facts from the police report that

25  are material to the disposition of this motion, so the matter can be resolved on the current record.

26

27        [1]  In his motion, Mr. Flores erroneously identified the date of the arrest as December 10, 2003 (Br. 1,

28  5).  In its opposition, the government erroneously identified the date of the arrest and incident as December 20, 2003 (Opp. 20).  The police report stated that the date of the incident was December 10, 2003, and the date of the arrest was December 11, 2003 (Dkt. No. 1992-1 at 3).

United States District Court
For the Northern District of California

1    The current record is as follows.  According to his police report, SFPD officer Edward Carew was

2    alerted by Mission High School security that a fight was occurring on the second floor of the

3    school on December 10, 2003  (Dkt. No. 1992-1 at 7).  After responding to the scene of the fight,

4    Officer Carew was informed that the parties involved had been taken to the Dean's office.

5    Officer Carew then went to the Dean's office to speak to the students that were involved.  The

6    names of the students Officer Carew spoke with have been redacted from the incident report.  The

7    first student Officer Carew spoke with stated that he was confronted by Mr. Flores and Douglas

8    Garay on the street outside of Mission High School.  The student claimed they accused him of

9    writing Norteño gang graffiti.  The student stated that Mr. Flores brandished a knife at him and

10   threatened "We're gonna kill you."  The student fled, but was chased until he ran into the high

11   school.  The student stated that he knew Mr. Flores and Mr. Garay were fellow students at

12   Mission High School and would recognize them if he saw them again.  The second student stated

13   that Mr. Flores and Mr. Garay confronted him about wearing blue — a Sureño gang color.  The

14   second student also stated that he knew Mr. Flores and Mr. Garay were fellow students at Mission

15   High School and would recognize them if seen again.  After Officer Carew took both students'

16   statements, he attempted to locate Mr. Flores and Mr. Garay but failed to do so.

17         The next day, Officer Carew continued the investigation.  He spoke with a third student,

18   who wished to keep her identity confidential.  The third student stated that she had seen and heard

19   Mr. Flores and Mr. Garay the previous day threatening to hurt the second student outside of

20   Mission High School (*id*. at 7–8).  The third student referred to Mr. Flores and Mr. Garay as

21   "blue" — indicating they were Sureño gang members (*id*. at 8).

22         Officer Carew conducted a "cold show" wherein Mr. Flores was positively identified by

23   the students.[2]  Thereafter, Mr. Flores was taken into custody without a warrant and given a

24   *Miranda* warning.  Mr. Flores refused to make a statement except that he was near the school

25   with Mr. Garay but did not enter and did not have contact with anybody.  Mr. Flores was booked

26   for making criminal threats, aggravated assault with a knife, having a weapon on school grounds,

27

28         [2]  It is unclear whether the police report's reference to *four* students was an error as the remainder of
the report did not indicate there was a fourth witness.

9

exhibiting a deadly weapon in a rude manner, a gang enhancement, and being a juvenile in violation of the law. While booking Mr. Flores, Officer Carew noticed Mr. Flores had a belt buckle with an "S" on it. As Officer Carew "knew" this was a buckle commonly worn by Sureños, he confiscated it.

<div align="center">*          *          *</div>

Mr. Flores seeks to exclude the "S" belt buckle obtained from Mr. Flores and his post-arrest statements. Mr. Flores argues that hearsay statements of anonymous witnesses of unascertainable reliability are insufficient to establish probable cause for Mr. Flores' warrantless arrest. This argument is rejected. Under the totality of circumstances known to Officer Carew, as established by the police report, a prudent person would have concluded that there was a fair probability that Mr. Flores committed a crime. *See United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007). At least three students offered statements that Mr. Flores had engaged in criminal behavior, and probable cause may be founded upon hearsay. *Hart v. Parks*, 450 F.3d 1059, 1066 (9th Cir. 2006). Moreover, two of the three witnesses were not "anonymous" — their identities were known by Officer Carew. Furthermore, there is no indication in the record that there were signs at the time that any of the students were not credible.

Mr. Flores contends that "though one of the witnesses supposedly claimed Mr. Flores threatened him with a knife, a few minutes later, when Mr. Flores was detained in the Dean's office, he did not possess any weapon" (Br. 9–10). If this statement were accurate, it would cast some doubt on the student's statement that Mr. Flores brandished a knife that morning. Officer Carew's report, however, does not state that Mr. Flores was detained in the Dean's office a few minutes after the incident. Mr. Flores was detained in the Dean's office *the next day*. The fact that no knife was recovered from Mr. Flores the next day has no bearing on whether he had a knife the preceding day. Statements by Mr. Flores after he was arrested were also obtained lawfully. Mr. Flores has not asserted that any statement was given involuntarily and does not rebut the police report's statement that Mr. Flores was read and understood his *Miranda* rights (Dkt. No. 1992-1 at 8).

<div style="writing-mode: vertical-rl">United States District Court<br>For the Northern District of California</div>

Mr. Flores has not contradicted or called into question any material facts from the police report, so the matter can be resolved on the current record. Accordingly, Mr. Flores' motion to exclude evidence obtained as a result of his warrantless arrest on December 10, 2003, is **DENIED**.

### B.    Search of 890 Goettingen Street on September 15, 2005.

The current record consists of police reports and a declaration from one of the searching officers. Although there are some inconsistencies in the record, these inconsistencies are not material to the disposition of Mr. Flores' motion. The record is as follows. On September 15, 2005, ICE agent Christopher Merendino and SFPD officers Mario Molina, Dion McDonnell, and Henry Espinoza conducted a warrantless search of 890 Goettingen Street in San Francisco (Dkt. No. 1992-1 at 11–12). At the time, Mr. Flores was on juvenile probation for a prior crime (Molina Decl. ¶ 7). As part of this probation, Mr. Flores was under a warrantless search condition and was prohibited from associating with other gang members.

There are inconsistencies in the record as to why the officers initially went to 890 Goettingen to conduct the probation search. Agent Merendino's investigation report specified that officers went to 890 Goettingen to perform a probation search and that at the time of the search, Mr. Flores was a suspect in a gang-related shooting that occurred on September 3, 2005 (Dkt. No. 1992-1 at 11–12). Officer Molina's declaration, submitted in support of the government's opposition, stated that Mr. Flores had violated the gang non-association clause of his probation, and a search warrant had been issued as a result (Molina Decl. ¶ 7). In contrast, Officer Molina's incident report from 2005 recounted that the visit to 890 Goettingen was for arrest warrant service (Dkt. No. 1992-1 at 13).

According to Agent Merendino's report, in Mr. Flores' bedroom, the officers discovered a football with MS-13 inscribed on it and other miscellaneous items in plain view. The officers also found a notebook that included gang graffiti and a roster of MS-13 20th Street clique members. Officer Molina's incident report further specified that the notebook was in plain view. Officer's Molina's declaration stated that while at 890 Goettingen, he noticed "what appeared to be gang symbols," so he "conducted a search of Mr. Flores' room and found a variety of gang

**United States District Court**
For the Northern District of California

1  indicia . . . " (Molina Decl. ¶ 7).  Similarly, Agent Merendino's report noted that gang indicia

2  was in plain view (Dkt. No. 1992-1 at 5).

3                              *              *              *

4          Mr. Flores seeks to exclude the seized notebook, gang graffiti, football, gang rosters, and

5  any other evidence obtained as a result of the search.  The parties agree that Mr. Flores was

6  subject to a warrantless search condition pursuant to a juvenile probation order and that the

7  officers only needed a "reasonable suspicion" of criminal activity to search Mr. Flores or his

8  property (Reply Br. 5; Opp. 20).  Mr. Flores contends, however, that the officers did not have the

9  requisite "reasonable suspicion" of criminal activity to search the residence.  Specifically, Mr.

10 Flores argues that while the police had reasonable suspicion to believe Mr. Flores had violated his

11 probation by leaving his court-ordered placement at a group home, the police did not have

12 reasonable suspicion that Mr. Flores had violated the gang non-association condition (Reply Br.

13 6).  Thus, Mr. Flores argues that the police should only have checked 890 Goettingen to see if Mr.

14 Flores was present.

15         It is true that there is inconsistency in the record as to whether the officers initially went to

16 890 Goettingen to conduct a probation search because Mr. Flores was suspected of violating the

17 gang non-association condition or whether the officers went to execute an arrest warrant because

18 Mr. Flores had run away from his court-ordered placement.  These inconsistencies, however, are

19 not material and the two motivations are not mutually exclusive.  A probation search condition

20 allows for a search of a probationer's residence as long as there is a reasonable suspicion of

21 criminal activity.  *United States v. Knights*, 534 U.S. 112, 121 (2001).  The record as-is

22 demonstrates that the officers had a reasonable suspicion of criminal activity.  Both parties agree

23 that there was an outstanding arrest warrant for Mr. Flores.  This alone was enough for the

24 officers to conduct a probation search of his residence.

25         In any event, the government has proffered sufficient evidence, including a sworn

26 statement from Officer Molina, that Mr. Flores had violated the gang non-association clause of

27 his probation (Molina Decl. ¶ 7).  Mr. Flores has not submitted a declaration to the contrary.

28 Furthermore, there is ample support in the record that once the officers arrived at 890 Goettingen,

United States District Court

For the Northern District of California

1   there was gang indicia in plain view, warranting the non-plain view probation search.  Mr. Flores'

2   motion to exclude evidence obtained from the SFPD's warrantless search of 890 Goettingen on

3   September 15, 2005, is therefore **DENIED**.

4               **C.     Arrest on May 17, 2008.**

5          Mr. Flores has sufficiently articulated a need for an evidentiary hearing regarding his

6   warrantless arrest on May 17, 2008.  The current record is not adequate to resolve Mr. Flores'

7   motion, as Mr. Flores contests material facts that go to the lawfulness of his arrest.

8          The incident at issue was described in SFPD officer Shaun Navarro's police report as

9   follows.  On May 17, 2008, Officer Navarro and Officer Poggio were dispatched to 20th Street

10  and Mission Street to respond to a call that an individual pointed a gun at a car passenger (Dkt.

11  No. 1992-1 at 24).  Officer Navarro interviewed the complaining witnesses — a husband and wife

12  who had been in a car with their baby at the time of the incident.  The wife recounted that Mr.

13  Flores and Jose Mejia were standing on the sidewalk, along with a number of other men,

14  including Giovanni Hernandez.  The wife stated that while the car was stopped at a red light, Mr.

15  Flores and Mr. Mejia threw gang signs at the car.  The wife rolled down the car window and told

16  the group to stop harassing them inasmuch as a baby was in the car.  An individual in Mr. Flores'

17  group, Jose Sanchez, then walked up to the car, pulled a black semi-automatic from his

18  waistband, and pointed it at the wife with his right hand.  According to Officer Navarro's report,

19  the wife identified Mr. Flores in a "cold show."  Mr. Flores, along with Mr. Sanchez and Mr.

20  Mejia, were then arrested.  Although Mr. Hernandez was detained at the scene, he was not

21  arrested.  Once the officers and arrestees arrived at Mission Police Station, Sergeant McDonnell

22  took over the investigation and seized the cell phones of the three arrestees and Mr. Sanchez's

23  baseball cap (*id.* at 24–25).  Sergeant McDonnell also instructed Officer Navarro to list the

24  complaining witnesses in his report as confidential persons.  It turned out, however, that the

25  complaining witnesses lied about their identities and gave aliases (Dkt. No. 2165-1 at 2).

26         It is the government's burden to show by a preponderance of evidence that there was

27  probable cause for Mr. Flores' warrantless arrest.  *United States v. Ladley*, 517 F.2d 1190, 1192

28  (9th Cir. 1975).  If Officer Navarro's police report contained no errors or misrepresentations,

                                        13

there was likely probable cause.  Mr. Flores, however, contests a number of facts contained

within the report — namely, whether the alleged witnesses ever existed and the credibility of the

witnesses (Reply Br. 4).  This is a colorable assertion, given the lies told by the complaining

witnesses about their identities.  This quirk raises suspicion about the whole story in the police

report.  Although Mr. Flores does not provide a sworn declaration, Mr. Flores does not have

personal knowledge of these facts and cannot be expected to obtain statements from unidentified

witnesses or police officers.  Thus, an evidentiary hearing must be held to determine whether the

witnesses ever existed, and if so, whether their statements were accurately recounted in Officer

Navarro's police reports, and whether there was any indication that the witnesses were not

credible.

### D.     Pat Search on August 23, 2008.

Mr. Flores has not raised any issues of material fact with respect to this incident.

Accordingly, no evidentiary hearing is needed to resolve Mr. Flores' challenge.

According to SFPD officer Matthew Mason's police report, on August 23, 2008, Officer

Mason and Officer Jones performed a traffic stop of a vehicle without a rear license plate (Dkt.

No. 1992-1 at 37).  Danilo Velasquez was driving and Mr. Flores was sitting in the passenger

seat.  After being asked for his driver's license, Mr. Velasquez informed Officer Mason that he

did not have one.  Officer Mason asked Mr. Velasquez to exit the vehicle and observed a knife

that appeared to have a six-inch blade next to the driver's seat.  After the knife was discovered,

another police officer — Officer Dudy — pat searched Mr. Flores for weapons.  When Officer

Dudy felt a long metal object, he reached into Mr. Flores' pocket and seized the object — a

switchblade knife.  Mr. Flores was issued a citation for possession of the switchblade knife.

Mr. Flores does not contest that the SFPD had probable cause to stop the car in which he

was a passenger, issue the driver a ticket for driving with a suspended license, and tow the car

(Dkt. No. 1993 at 12).  Nor does he challenge the police report's assertion that the knife was in

plain view of the officers.  Mr. Flores contends, however, that the SFPD had no reason to hold

Mr. Flores at the scene and pat search him for weapons.  Mr. Flores, however, has not submitted a

1   declaration and has not articulated any facts that contradict the police report's account of the stop

2   and pat search.

3       The pat search of Mr. Flores was lawful.  The Fourth Amendment permits a frisk or pat

4   search if there is a reasonable, articulable suspicion that an individual poses a threat to the

5   investigating officer or others.  *See United States v. Davis*, 530 F.3d 1069, 1082 (9th Cir. 2008).

6   Although it is true that a lawful pat search does not always flow from a justified stop — here, the

7   pat search was conducted not as a result of the stop, but rather, the spotting of a large knife in

8   plain view.  The discovery of the knife created a reasonable, articulable suspicion that Mr. Flores

9   or Mr. Velasquez — individuals who were both seated next to where the knife was found — may

10  have weapons on their person and could pose a threat to the investigating officers.  This

11  warranted a pat search of Mr. Flores and it was not unreasonable for Officer Dudy to pull the

12  switchblade from Mr. Flores' pocket after he felt a long, metal object during the pat search.

13  Accordingly, Mr. Flores' motion to exclude evidence obtained as a result of the SFPD's August

14  23 pat search of him is **DENIED**.

15          **4.    FLORES' 890 GOETTINGEN SUPPRESSION MOTION (DKT. NO. 1994).**

16      As part of his overarching request to exclude all evidence seized from 890 Goettingen

17  Street on April 23, 2008, defendant Moris Flores moves for a *Franks* evidentiary hearing to

18  investigate whether the search warrant affidavit contained material falsehoods that were necessary

19  to the finding of probable cause for the warrant.  *See Franks v. Delaware*, 438 U.S. 154 (1978).

20  For the reasons stated herein, a *Franks* evidentiary hearing is warranted.

21      Defendant Manuel Franco moves to join in the instant motion (Dkt. No. 2086).  Mr.

22  Franco's joinder motion is **DENIED**.  Mr. Franco's joinder motion only states that he "lived in the

23  house located at 890 Goettingen and as such has standing and the same legal and factual

24  arguments advanced by Mr. Flores."  The motion entirely fails to establish that Mr. Franco had a

25  reasonable expectation of privacy at 890 Goettingen *at the time of the search*.

26      Mr. Flores alleges that the search warrant affidavit submitted by SFPD Inspector Michael

27  Johnson contained material false statements that a "confidential reliable informant" had recorded

28  conversations with Mr. Flores wherein Mr. Flores indicated he was involved with the double

United States District Court

For the Northern District of California

1    homicides of Ernad Joldic and Philip Ng.  Mr. Flores argues that these falsehoods were

2    deliberately or recklessly included in the affidavit and were critical to the probable cause finding.

3    The government admits that the Johnson affidavit contained misstatements, specifically that Mr.

4    Flores' statements were recorded and were made on particular dates, but argues that these

5    misstatements were not material and were not deliberate or reckless (Opp. at 13, 17).

6         Counsel for Mr. Flores has made a substantial preliminary showing that the search warrant

7    affidavit contained materially incorrect statements and that the errors and inaccuracies were so

8    numerous and suspicious as to raise an inference of deliberate or reckless misrepresentation.  As

9    part of its opposition to Mr. Flores' motion, the government has submitted declarations from

10   Inspector Johnson and Officer Molina which, if fully credited, go a long way toward explaining

11   the errors and suspicious circumstances.  The errors and suspicious circumstances are too severe,

12   however, to accept the declarations at face value, without providing the defense an opportunity

13   for cross examination at an evidentiary hearing.  Put differently, Mr. Flores has made the

14   substantial preliminary showing required by *Franks* for a hearing and an opportunity for an

15   evidentiary hearing should not be denied merely because the government has submitted

16   explanatory declarations.  Mr. Flores cannot be expected to rebut the explanatory declarations

17   without an opportunity to cross examine.  Again, the errors were too numerous and suspicious to

18   be excused as an innocent mistake without an evidentiary hearing.

19        This does not mean that informant 1211 need testify.  Instead, Officer Johnson and

20   Sergeant Molina will first be examined, along with any other officers or witnesses counsel decide

21   to call.  Informant 1211, however, may or may not need to testify depending on the state of the

22   record at the end of the evidentiary hearing.  If it is deemed necessary, the undersigned may

23   consider an *in camera* examination of informant 1211.  *United States v. Kiser*, 716 F.2d 1268,

24   1273 (9th Cir. 1983).

25        **5.    FLORES' 80 FOREST GROVE SUPPRESSION MOTION (DKT. NO. 2000).**

26        Defendant Moris Flores moves to exclude all evidence seized from 80 Forest Grove,

27   Apartment 22, in Daly City on August 26, 2008, on the basis that the search warrant was facially

28   overbroad and insufficiently particular.  For the following reasons, the motion is **DENIED**.  The

search warrant was not facially overbroad nor insufficiently particular.  Mr. Flores, however, has indicated that the police officers may have seized items from 80 Forest Grove that were outside the scope of the warrant.  As discussed in Section B below, the parties are to meet and confer on this separate issue.

Defendant Manuel Franco moves to join in Mr. Flores' motion (Dkt. No. 2098).  Mr. Franco's joinder motion is **DENIED**.  Mr. Franco's joinder motion offers absolutely no explanation as to how Mr. Flores' suppression motion applies to him and makes no assertion that Mr. Franco had an expectation of privacy in 80 Forest Grove.

### A.    Facial Challenge to the Warrant.

Mr. Flores moves to exclude all evidence seized from 80 Forest Grove on the grounds that portions of the warrant were facially overbroad and lacked sufficient particularity.  Specifically, Mr. Flores challenges the warrant's authorization for police to seize "unspecified photographs" and "any materials that may be construed to be associated with a criminal street gang, specifically M.S.-13" (Br. 4).  Mr. Flores, however, concedes that the portions of the search warrant authorizing the police to seize guns, ammunition, cell phones, and clothing related to the shooting of Armando Estrada were sufficiently specific (*id.* at 5).  Where invalid portions of a warrant may be stricken and the remaining portions held valid, seizures pursuant to the valid portions may be sustained.  *United States v. Schmidt*, 947 F.2d 362, 372 (9th Cir. 1991).  Consequently, this order need only determine whether the two objected-to provisions of the warrant were facially overbroad or lacked sufficient particularly.

The search warrant was issued by Superior Court Judge Susan Breall on August 25, 2008.  The search warrant authorized seizure of the following items from 80 Forest Grove: "Firearm: described as a shotgun, ammunition, blue bandanna, white t shirt, blue jeans, white tennis shoes, indicia, photographs, cell phone(s), videos, and any materials that may be construed to be associated with a criminal street gang, specifically M.S.-13" (Dkt. No. 2000-1 at 3).  The warrant specified that the items to be seized were used as a means of committing a felony, were possessed with the means of committing a public offense, and/or tend to show a felony had been committed.  Although the warrant specified that "Exhibit A" was "attached hereto and incorporated by this

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1    reference," no such exhibit was attached (Dkt. Nos. 2179, 2222).  Instead,"Exhibit A" was written

2    on the face of the warrant itself.  The search warrant affidavit submitted by SFPD Inspector John

3    Cagney, however, was attached and incorporated by reference (Dkt. No. 2000-1 at 3).

4          In his affidavit, Inspector Cagney described the events establishing probable cause to

5    search 80 Forest Grove as follows.  Armando Estrada was killed at 20th Street and Mission Street

6    in San Francisco on July 11, 2008 (Dkt. No. 2000-1 at 6).  The shooter was seen wearing a blue

7    and white bandana over his face.  Guillermo Herrera, a suspected MS-13 gang member, was

8    identified as a suspect in the homicide and positively identified by a witness (*id*. at 6–7).

9    Inspector Cagney explained that Mr. Flores and Mr. Franco were documented members of MS-13

10   and identified Mr. Flores as a "shot caller" for MS-13 who was suspected of organizing and

11   carrying out attacks against rival gang members (*id*. at 7–8).

12         Inspector Cagney stated that the investigation led him to conclude that there was a

13   "conspiracy between Mr. Flores, Guillermo Herrera, and Manuel Franco to conceal

14   instrumentalities of the Estrada homicide" (*id*. at 8).  Inspector Cagney defined these

15   "instrumentalities" as including, but not limited to, "the weapon and ammunition used, the

16   clothing worn, and evidence that may link Herrera, Flores, and Franco together as members of the

17   M.S.-13 street gang."  To support this conclusion, Inspector Cagney specified that a witness to the

18   homicide informed him that bystanders at the scene stated "Slow [Mr. Flores] did it" and cell

19   phone records retrieved from Mr. Herrera's cell phone indicated Mr. Flores' cell phone was in

20   contact with Mr. Herrera's cell phone before and after the homicide.  Inspector Cagney

21   specifically described a text message from Mr. Flores' cell phone to Mr. Herrera's cell phone that

22   stated: "call Dreamer [Manuel Franco] hide the thing, he is going to bring you guys, and erase the

23   message" (*id*. at 8).  After describing this text message, Inspector Cagney explained that criminal

24   street gangs often conspire to plan, execute, and conceal their crimes.  Inspector Cagney also

25   elaborated that "criminals also commonly video and [sic] or photograph themselves or others

26   while committing crimes" and that "crimes involving possible gang suspects will also yield

27   indicia of gang ties, photos, cell phones, phone lists, art, and letters that identify other members of

28   the gang and evidence of other crimes committed by the gang" (*id*. at 9).

* * *

The search warrant provision authorizing the seizure of gang-related material was not facially overbroad or insufficiently particular.  In determining whether a warrant is sufficiently specific under the Fourth Amendment, one or more of the following questions may be considered: (1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued.  *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986).

Mr. Flores does not advance specific arguments as to how probable cause to seize gang-related materials was lacking.  Regardless, the Cagney affidavit, attached and incorporated by reference to the warrant, made clear that there was sufficient probable cause for the SFPD to search and seize gang-related materials that indicated the association of Mr. Flores, Mr. Franco, or Mr. Herrera with MS-13.  Probable cause exists when there is a "fair probability" based on the totality of the circumstances that contraband or evidence is located in a particular place.  *Illinois v. Gates*, 462 U.S. 213, 230 (1983).  The Cagney affidavit supported a fair probability that the Estrada homicide was gang-motivated, that the cover-up of the homicide was conducted by MS-13, and that evidence regarding the Estrada homicide and gang affiliation of the suspected perpetrators would be found at 80 Forest Grove.  This scenario is unlike *Millender v. County of Los Angeles*, __ F.3d __, 2010 WL 3307491 (9th Cir. Aug. 24, 2010), where gang affiliation had no bearing on the suspected crime for which the search warrant was issued.  Here, the underlying crime and cover-up for which the warrant was issued was believed to be gang-related or gang-motivated.  Thus, there was probable cause to seize gang-related materials and the warrant was not overbroad.

The warrant and the incorporated statement of probable cause also set out sufficiently particular standards by which the officers could differentiate between items subject to seizure against items that were not.  The warrant and incorporated affidavit made clear that the officers were to search for items evincing affiliation with MS-13.  Warrants may authorize a search for

United States District Court

For the Northern District of California

classes of generic items if the government was not "able to describe the items more particularly in light of the information available to it at the time the warrant was issued." *Spilotro*, 800 F.2d at 963. Here, the nature of the evidence sought was not amenable to a more particular description. By its nature, gang-related indicia may include a broad swath of "everyday" or "ordinary" items that only become gang-related indicia in certain contexts or once certain modifications or inscriptions are made to the items. Thus, the warrant's provision regarding gang-related materials was not insufficiently particular.

Similarly, the warrant's "photographs" provision was not overbroad or insufficiently particular. Mr. Flores argues that the warrant authorized the police to seize "unspecified photographs" and such authorization was overbroad and lacked particularity. The government does not agree that the warrant called for seizure of "unspecified photographs" — the government contends that the warrant only allowed seizure of photographs related to MS-13 (Opp. 20). Although there is ambiguity as to the scope of the term "photographs" on the face of the warrant, the Cagney affidavit clarified that the warrant only sought photographs that may be evidence of the Estrada homicide or that evince association with MS-13. As the Cagney affidavit was attached and incorporated by reference to the warrant, the term "photographs" was to be read in context of the affidavit. Thus, only photographs evincing gang association or some relation to the Estrada homicide were authorized to be seized under the warrant. As discussed above, the gang-related materials provision was not overbroad or insufficiently particular. Consequently, neither was the photographs provision.

In any event, Mr. Flores has not demonstrated that Inspector Cagney was dishonest or reckless in preparing his affidavit, nor that the executing officers' reliance on the warrant was objectively unreasonable. Accordingly, under the "good faith" exception, any deficiency in the search warrant does not require exclusion of the evidence seized under the warrant. *United States v. Leon*, 468 U.S. 897, 926 (1984).

**B.     Execution of the Warrant.**

Although the warrant was not facially overbroad or insufficiently particular, Mr. Flores alleges that the officers seized items unrelated to MS-13, such as tennis rackets and family photos

United States District Court

For the Northern District of California

of young children (Dkt. No. 2000 at 5).   According to the police records and the warrant return, the following items were seized from 80 Forest Grove: a superior court receipt; phone charger; numerous small ziplock bags; foil with a lock of hair inside of it; "numerous of indicia"; "indicia in Guillermo Herrera's [name]" described as "name - letter"; a t-shirt; two razor cutters; "indicia in Franco's name" described as Manzanares letters, bills, photos, t-shirt, two cell phones, and keys; two cameras and negatives; a vehicle title in Edwin Ramos' name; two Motorola cell phones; "wallets with indicia" described as "contents with Flores and Martinez's name also passport (U.S.) in Flores' name"; "numerous pieces of Flores indicia" described as bills, letters, receipts, and pay stubs; "MS-13 gang indicia" described as belt, flags, shirts, photos, dollar bill, notebooks; two cell phones; a set of keys; bail bond paperwork; "indicia in Mr. Franco's name"; and tennis rackets (Dkt. No. 2000-1. at 4, 12–14, 17–18 ).

As the current record does not include photographs or detailed descriptions of the items seized, the undersigned cannot tell whether the items were improperly seized.  Furthermore, the parties' submissions do not make clear which items the government will seek to introduce into evidence and whether Mr. Flores objects to any of these items.  Accordingly, counsel for Mr. Flores and counsel for the government are to meet and confer to determine whether the government seeks to introduce any items that Mr. Flores contends were seized outside the scope of the warrant.  The parties are to submit a final report to the undersigned by **OCTOBER 10, 2010**, at **NOON**.  If any disagreements remain, the report shall include a description of the contested items, and where possible, photographs of the items.

### 6. FLORES' CELL PHONE RECORDS SUPPRESSION MOTION (DKT. NO. 1993).

Mr. Flores moves to exclude all cell phone records seized from Metro PCS pursuant to a search warrant issued on September 24, 2008, for telephone number 415-368-2649.  For the lengthy reasons that follow, the search warrant was overbroad and insufficiently particular.  The warrant only established probable cause for seizure of cell phone records from May 1, 2008, to the end of the search warrant period, but authorized the seizure of cell phone records starting on September 24, 2007.  This does not necessarily mean that the records will be excluded from evidence, however, as the inevitable discovery doctrine may apply.  Even so, the current record is

not clear as to whether the records would have been inevitably discovered.  As the government

has the burden to prove the applicability of the inevitable discovery doctrine, by **OCTOBER 10,**

**2010,** at **NOON**, the government must supply the undersigned with the cell phone records it

intends to use at trial and any sworn testimony necessary to determine whether the cell phone

records would have inevitably been discovered.

Defendant Giovanni Hernandez seeks to join Mr. Flores' motion, with respect to cell

phone records seized from 415-574-8164 as a result of the same search warrant challenged by Mr.

Flores (Dkt. No. 2023).  This joinder motion is **GRANTED**.

### A.    Overbreadth and Particularity.

Mr. Flores argues that the search warrant lacked particularity and was overbroad in that it

was: (1) not adequately limited in time; and (2) not adequately limited in subject matter.  In

determining whether a warrant is sufficiently specific under the Fourth Amendment, a court is to

consider whether probable cause existed to seize all items of a particular type described in the

warrant and whether the warrant was adequately particular given the circumstances.  *Spilotro*, 800

F.2d at 963.

On September 24, 2008, ICE agent Brian Ginn applied for a search warrant for cell phone

records — such as text messages and voicemail messages — from September 24, 2007, to

September 24, 2008, for telephone numbers 415-368-2649 and 415-574-8164 (Dkt. No. 1993-1 at

7).  According to Metro PCS subscriber records, the former telephone number was registered to

Mr. Flores and the latter was registered to Mr. Hernandez.  The same warrant application sought

call origination and termination location information and call detail records for Mr. Flores'

telephone number for the period between June 1, 2008, and September 24, 2008.  Magistrate

Judge Nandor Vadas issued the search warrant on the same day the warrant application was

submitted (*id*. at 18).

The warrant specified that it was believed that the cell phone records would contain

evidence of criminal violations of 18 U.S.C. 1962(d) (racketeering conspiracy) and 18 U.S.C.

1959(a)(1) (murder in aid of racketeering).  The Ginn affidavit elaborated that the cell phone

records were sought to investigate a murder that was allegedly committed by MS-13 members to

United States District Court

For the Northern District of California

1    intimidate their rivals.  The Ginn affidavit alleged that Mr. Flores and Mr. Hernandez, along with

2    other MS-13 members, were involved in planning, committing, concealing, and publicizing the

3    murder of Armando Estrada and that the requested records would constitute or lead to evidence

4    regarding the murder (*id*. at 12–13).

5         To establish probable cause for the warrant to issue, the Ginn affidavit recounted the

6    following.  Mr. Estrada was shot at close-range with a shotgun on July 11, 2008 (*id*. at 10).  Mr.

7    Estrada was a member of a loose-knit group of counterfeit identification traffickers known as

8    "micaros" or "nieros."  The 20th Street clique of MS-13 used the threat of violence to extort or

9    "tax" criminals, including the micaros, who operated in the clique's claimed territory.  In the

10   months preceding his death, Mr. Estrada was allegedly threatened by MS-13 members for failure

11   to pay tax to MS-13.  Guillermo Herrera, a "known" MS-13 member, was identified by a witness

12   as the shooter of Mr. Estrada.  Mr. Herrera was arrested for the shooting on July 15, 2008.  After

13   his arrest, Mr. Herrera was seen typing frantically on his cell phone.  On August 11, 2008, a

14   search warrant issued for records from the Herrera cell phone and the text messages obtained

15   indicated that Mr. Flores was in contact with Mr. Herrera on the date of the homicide, including

16   one message that stated "Call Drimer [sic] [Manuel Franco], hide the thing, he is going to bring

17   you guys, and erase the message" (*id*. at 12).  Based on these text messages, Mr. Franco's and Mr.

18   Flores' residence — 80 Forest Grove in Daly City — was searched on August 26, 2008.  During

19   the search, cell phones belonging to Mr. Franco and Mr. Flores were seized (*id*. at 13).

20        Agent Ginn's review of the call history records of the cell phones indicated that the cell

21   phones belonging to Mr. Franco, Mr. Hernandez, Mr. Flores, and Mr. Herrera were in

22   communication before and after the Estrada homicide (*id*. at 13–15).  A review of the Herrera cell

23   phone records also revealed that around the time of the Estrada homicide, the Herrera and

24   Hernandez cell phones were in contact with the same cell site towers at the same time (*id*. at 15).

25   Text messages sent by the Flores cell phone to the Herrera cell phone also indicated Mr. Flores

26   may have been involved in the homicide or its cover-up.  Messages from the Flores cell phone

27   also appeared to coach Mr. Herrera to say he was in church with his brother during the homicide

28   (*id*. at 5).  Further, 24 calls were placed between the Herrera cell phone and the Flores cell phone

1    after the Flores cell phone received a text message notification that Mr. Herrera had been arrested

2    (*id*. at 16).

3         The Ginn affidavit also recounted ICE interviews of Mr. Franco wherein Mr. Franco

4    implicated Mr. Flores, Mr. Herrera, Mr. Hernandez, and Mr. Cruz-Ramirez in the murder of a

5    micaro and confirmed that the micaro was killed in retaliation for a fight between MS-13

6    members and the micaros the previous day, and that as a result of the killing, the micaros began to

7    pay "rent" to the MS-13 (*id*. at 12–13).

8                             *           *           *

9         The Ginn affidavit clearly established probable cause to investigate the Estrada homicide

10   and the role of Mr. Flores and Mr. Hernandez in the homicide and cover-up.  Probable cause

11   exists when there is a "fair probability" that contraband or evidence is located in a particular

12   place.  *Gates*, 462 U.S. at 230.  There was clearly a fair probability that evidence relating to the

13   Estrada homicide would be found on the Flores cell phone and the Hernandez cell phone.  The

14   question is whether the warrant could have been more particularized by time or subject matter.

15        With regards to substantive matter, Mr. Flores contends that the warrant should have only

16   authorized retrieval of cell phone records sent between the cell phones of Mr. Flores, Mr. Herrera,

17   and Mr. Hernandez — such that irrelevant or personal text messages from friends and family

18   were excluded.  Such a limitation was not required.  There was certainly a fair probability that

19   review of cell phone records between the Flores cell phone and cell phones belonging to

20   individuals other than Mr. Hernandez and Mr. Herrera would yield evidence of the Estrada

21   homicide.  For example, a review of text messages from the Flores cell phone might have

22   revealed plans to conceal evidence or publicity of the homicide to intimidate rivals — and there is

23   no indication that these communications would have been limited to messages to or from Mr.

24   Hernandez or Mr. Herrera.  Further, Metro PCS currently has a policy against data-mining and

25   will not run searches to retrieve specific information and Mr. Flores does not allege that Metro

26   PCS' policy was any different at the time the warrant was executed (Dkt. No. 2136-1).  Thus, the

27   seizure could not have been executed with any more particularity with respect to subject matter.

28

1    The date range of the search warrant, however, was overbroad and insufficiently

2    particular.  Certainly, the Ginn affidavit established that there was probable cause to seize cell

3    phone records in relation to the Estrada homicide — records that may have offered insight into

4    the motive, execution, cover-up, and publicity of the homicide.  But even the most generous

5    reading of the Ginn affidavit could not have established probable cause to seize cell phone

6    records from *nine months* before the date of the Estrada homicide.  At most, the warrant

7    established probable cause for cell phone records dating back to May 1, 2008, and extending

8    through the end of the warrant period.  The Ginn affidavit established enough probable cause to

9    seize cell phone records dated after the Estrada homicide, as such records may have contained

10   discussions about the Estrada homicide or attempts to cover it up.  Additionally, even though the

11   Ginn affidavit specified that the Estrada homicide was in retaliation for a fight with the micaros

12   *the day prior* — the Ginn affidavit arguably supported probable cause extending back to May 1,

13   2008, because the Ginn affidavit explained that tension was brewing between the micaros and

14   MS-13 prior to the homicide, and the cell phone records from the earlier months may have

15   contained evidence of this brewing tension.  There was no probable cause, however, to seek

16   records from before May 1, 2008.

17        The government's post-hoc rationalization that the warrant established sufficient probable

18   cause to investigate a racketeering conspiracy for the entire time period is unavailing.  In

19   reviewing a search warrant for probable cause, a court is limited to the information and

20   circumstances contained within the four corners of the underlying affidavit.  *Millender*, 2010 WL

21   3307491, at *10.  Here, although the face of the warrant cited the racketeering conspiracy statute,

22   18 U.S.C. 1962(d), the warrant affidavit failed to proffer any basis, let alone probable cause, that

23   cell phone records prior to May 1, 2008, would contain evidence of Mr. Flores' or Mr.

24   Hernandez's participation in a racketeering conspiracy.  The affidavit did not even conjecture that

25   Mr. Flores or Mr. Hernandez were members of MS-13 prior to May 1, 2008, let alone recount any

26   facts that would suggest that evidence related to a racketeering conspiracy, but unrelated to the

27   Estrada homicide, would be found in the Flores or Hernandez cell phone records.  Tellingly,

28   although the Ginn affidavit specifically stated that there was probable cause to believe the cell

25

United States District Court

For the Northern District of California

1    phone records would reveal evidence of the Estrada homicide, it made no similar assertion

2    regarding any other crime (Dkt. No. 1993-1 at 18).  Accordingly, the date range of the search

3    warrant was overbroad as to records prior to May 1, 2008.

4         The warrant could have easily been more particularized based on information known to

5    Officer Ginn at the time, as the overbreadth of the warrant could have been simply remedied

6    through a narrowing of the date range of sought cell phone records.  Consequently, the records

7    preceding May 1, 2008, must be suppressed unless the government establishes a warrant

8    exception for the seizure of these records.

9                    **B.        Inevitable Discovery Doctrine.**

10        The government argues that even if the search warrant was invalid, the exclusionary rule

11   does not apply because the text messages would have inevitably been discovered.  Under the

12   inevitable discovery doctrine, if the government can prove by a preponderance of evidence that

13   the evidence would have been inevitably discovered, regardless of any overreaching by law

14   enforcement, the exclusionary rule does not apply.  *United States v. Reilly*, 224 F.3d 986, 994 (9th

15   Cir. 2000).  In response, Mr. Flores argues that failure of law enforcement to obtain a lawful

16   warrant, despite the presence of probable cause that could have supported a warrant, precludes

17   application of the inevitable discovery doctrine (Reply Br. 5).

18        If the government can make an adequate showing, the inevitable discovery doctrine

19   applies here.  Unlike the decisions cited by Mr. Flores, ICE did not simply neglect to apply for a

20   search warrant, even though there was probable cause to do so.  Here, ICE applied for a search

21   warrant, but may not have had probable cause at the time (or failed to articulate probable cause)

22   to seize cell phone records that were remote in time from the Estrada homicide.  Furthermore, the

23   "inevitable discovery" would not have occurred by asserting probable cause in a later warrant

24   application.  The discovery would have been obtained through a mechanism entirely different

25   from a warrant.  Once the records were 180 days old, the Stored Communications Act would have

26   permitted issuance of a court order for the records if it was demonstrated that the cell phone

27   records were relevant and material to an ongoing criminal investigation — a lesser showing than

28   that required by the Fourth Amendment.  *See* 18 U.S.C. 2703 (a), (d).

The current record is not sufficient, however, to determine whether the cell phone records would have been preserved by Metro PCS or what specific facts the government would have articulated to procure a court order to obtain the records predating May 1, 2008.  Moreover, neither party has notified the undersigned whether the government even intends to use cell phone records predating May 1, 2008.  Any cell phone records from May 1, 2008, or earlier, may be excluded unless by **OCTOBER 10, 2010**, at **NOON** the government produces: (1) the specific cell phone records it wishes to use at trial; (2) sworn testimony attesting to all foundational factual requirements to show that ICE would have been able to obtain a court order for the cell phone records; and (3) competent evidence regarding Metro PCS' retention, storage, and destruction policies for cell phone records from September 24, 2007, to present.

### C.    Applicability of *Herring*.

The government argues that even if the search warrant was defective, *Herring v. United States*, __ U.S. __, 129 S. Ct. 695 (2009), dictates that the exclusionary rule does not apply here. The applicability of *Herring* to the cell phone records at issue need not be resolved unless the government is unable to proffer sufficient foundational facts to establish it would have inevitably obtained the cell phone records.

### CONCLUSION

A number of the motions discussed herein require evidentiary hearings or supplementary proffers by the parties to resolve in full.  Otherwise, all suppression motions filed by defendants Flores, Hernandez, and Castillo are hereby resolved.  The schedule for the required evidentiary hearings is as follows:

| Dkt. No. | Defendant(s) | Date | Time |
|---|---|---|---|
| 1994 | Flores | October 27, 2010 | 1:30 p.m. |
| 2001 | Hernandez | November 3, 2010 | 7:30 a.m. |
| 1992 | Flores, Hernandez | November 10, 2010 | 1:30 p.m. |

It is presumed that only the defendants listed above need be present at each hearing.  If any other defendants and counsel wish to be present, please notify Courtroom Deputy Dawn Toland at 415-522-2020.

United States District Court

For the Northern District of California

1    If the government does not plan to use contested evidence discussed herein at trial, the

2  government shall notify the relevant defendants and the undersigned by **OCTOBER 10, 2010**, at

3  **NOON** that it will forego presentation of such evidence.  In such circumstances, if an evidentiary

4  hearing has been scheduled with respect to the withdrawn evidence, the evidentiary hearing will

5  be vacated as to that matter.

6

7    **IT IS SO ORDERED.**

8

9  Dated:  September 22, 2010.

10                                                    _____
                                                     WILLIAM ALSUP
                                                     UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28