**United States District Court**
For the Northern District of California

1

2

3

4

5

6

IN THE UNITED STATES DISTRICT COURT

7

FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9

10

UNITED STATES OF AMERICA,

No. CR 08-0730 WHA

11

Plaintiff,

12

v.

**ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO EXCLUDE GANG EXPERT TESTIMONY**

13

IVAN CERNA, *et al*.

14

Defendants.

15

_____/

16

**INTRODUCTION**

17

In this RICO/VICAR prosecution, the present issue is the extent to which the prosecution

18

may present gang expert opinion testimony on elements of the charged offenses in its case in

19

chief.  After an evidentiary hearing and much argument, this order holds that the scope of opinion

20

trial testimony of the government's proffered gang experts must be largely limited.  Specifically,

21

most aspects of the proffered testimony are within the ken of the jury and will not assist it, will

22

not meet the reliability requirements of Rule 702, and will be substantially more prejudicial than

23

probative.

24

The proposed expert witnesses — Sergeant Mario Molina, Sergeant Dion McDonnell, and

25

Detective Frank Flores — are sincere, dedicated, experienced, and valuable police officers.  If

26

this were the issue, their expert testimony would sail in.  This, however, is not the issue.  For the

27

reasons stated herein, only limited aspects of Sergeant Molina's and Sergeant McDonnell's

28

proposed opinion evidence will be allowed.  No issue has been raised as to their percipient fact

testimony, so this order is limited solely to their proposed expert opinion testimony.

**STATEMENT**

This prosecution is aimed at members of a San Francisco clique of MS-13, an alleged international gang.  All remaining defendants have been charged with RICO conspiracy and VICAR violations of conspiracy to commit murder in aid of racketeering and conspiracy to commit assault with a dangerous weapon in aid of racketeering.  Some have been specifically charged with murder, attempted murder, or assault with a dangerous weapon in aid of racketeering.

Significantly, it will not be enough in this federal prosecution to prove murder and other predicate acts.  The government must also prove the *enterprise* requirements of the RICO and VICAR statutes.  Specifically, the government must demonstrate that MS-13 or the local clique was a RICO enterprise under 18 U.S.C. 1961(4) — which requires proof that MS-13 or the local clique had the following structural features: (1) a purpose; (2) a relationship between those associated with MS-13; and (3) longevity sufficient to permit MS-13's associates to pursue its purpose.  *Boyle v. United States*, 129 S. Ct. 2237, 2244 (2009).  Moreover, to prove up the VICAR charges, the government must also show that defendants perpetrated the charged violent crimes for the purpose of gaining entrance to or maintaining and increasing position in MS-13 or the local clique.  *United States v. Fernandez*, 388 F.3d 1199, 1220 (9th Cir. 2004).

Eight months ago, the government made its FRCrP 16(a)(1)(G) expert disclosures.  These identified three gang expert witnesses — Detective Frank Flores, Sergeant Dion McDonnell, and Sergeant Mario Molina.  Defendants challenged the adequacy of the disclosures (Dkt. No. 1669).  The government was ordered to show cause as to why its gang experts should not be stricken (Dkt. No. 1721).  The order stated that, with some exceptions, it was questionable whether the proposed gang expert testimony would be admissible.  The order explained that the "existence of the gang and its organization are key RICO proof elements" that "should be proven by first-hand testimony, presumably by former members, not by opinions from the police."  Three days later, the government provided defendants with amended expert summaries for the testimony of Sergeant McDonnell and Detective Flores (Dkt. No. 2092-2).  The parties then submitted further briefing and a hearing was held on May 27.

On June 8, an order granted in part and denied in part defendants' motions regarding the expert witness disclosures (Dkt. No. 1821). Based on the disclosures provided up to that time, the order held that "police expert opinions as to the structure, organization, and operations of the MS-13 gang will not be allowed in as case-in-chief evidence to prove the substantive elements of the RICO or VICAR offenses charged herein." It, however, provided that the government would have "another chance for gang-opinion testimony" and "[c]onceivably, there may be aspects that would be allowed."

As invited, the government submitted revised disclosures for its gang experts (Dkt. No. 1884). They said that Detective Flores "will be testifying as an expert on the structure, rules, rituals, symbols, slang, and practices of the transnational gang known as *La Mara Salvatrucha* (also known as 'MS-13')" (Dkt. No. 1884-1 at 1). The revised Molina and McDonnell disclosures stated that they each "will be testifying as an expert on the structure, rules, rituals, symbols, slang, and practices of MS-13 in the San Francisco Bay Area" (*id*. at 8, 12). Each listed the proposed opinions. Although the revised disclosures provided more detailed opinions, they again failed to reveal the specific bases for the experts' opinions. Instead, for each expert, the revised disclosures simply specified that the opinions were based on the expert's "training and experience," citing *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000).[1]

Defendant Luis Herrera then moved to the exclude the gang expert testimony (Dkt. No. 1912). Defendant Cesar Alvarado similarly moved to exclude the gang expert testimony and requested a *Daubert* evidentiary hearing if the testimony was not excluded on the submissions (Dkt. No. 1978). Defendant Jonathan Cruz-Ramirez did not formally move to exclude the gang expert testimony but submitted a reply to an earlier government filing that was characterized by the defense as a motion to admit testimony by gang experts (Dkt. No. 1963). Oral argument on these motions was held on September 13. It was then determined that an evidentiary hearing was needed to determine the bases for each expert's opinions and whether the opinions were admissible (Dkt. No. 2288).

---

[1] The government specified for all three of its experts that "among other things" they will testify to the enumerated topics. As noted in the June 8 order, the government may not rely on the term "among other things" to shoehorn in undisclosed expert testimony at trial (Dkt. No. 1821 at 3 n.1).

United States District Court
For the Northern District of California

1    With the benefit of a list of numbered opinions — 107 altogether (and placed hereto as
2    Appendix A for convenience) — each of the government's proffered gang experts testified over
3    the course of five days.  Sergeant Molina was subjected to approximately twelve hours of direct
4    and cross examination, Sergeant McDonnell was subjected to approximately eight hours of direct
5    and cross examination, and Detective Flores was subjected to approximately eight hours of direct
6    and cross examination.  The government was given the opportunity to demonstrate that its experts
7    were qualified to offer their opinions and that each opinion was appropriate expert testimony, had
8    a reliable basis, and was not simply a re-transmission of hearsay.  Each expert was subjected to
9    lengthy cross-examination by defense counsel.

10    While the evidentiary hearing was still underway, the government withdrew certain
11    opinions included in its expert disclosures.  Specifically, the government struck Molina Opinions
12    15, 16, and 25–27, and McDonnell Opinion 19 (Dkt. No. 2423).  The government also amended
13    Molina Opinion 28.  The stricken opinions were among the more inflammatory opinions included
14    in the disclosures but others remained, as will be shown.

15    Both sides were given an opportunity to submit supplemental, post-hearing briefing on
16    any subjects they wished without page restrictions (Dkt. No. 2497).  Additionally, counsel for
17    defendant Guillermo Herrera requested disclosure of further materials that were purportedly the
18    bases of some of the experts' opinions, but which were not yet produced by the government (Dkt.
19    Nos. 2485, 2524).  Briefing was allowed on these issues as well (Dkt. Nos. 2497, 2533).  Finally,
20    a dispute arose over whether the experts should be required to disclose the names of certain
21    confidential informant sources they relied upon in coming to their expert opinions.  Given
22    uncertainties that arose during the evidentiary hearing regarding certain bases for the experts'
23    opinions which the government was not willing to disclose to defense counsel, both Sergeant
24    McDonnell and Sergeant Molina were dismissed from the proceedings subject to recall should it
25    be determined after supplemental briefing that further examination regarding the bases of their
26    opinions was warranted.  Many of the concerns raised in the disclosure requests are now moot, as
27    discussed in a separate order.
28

4

United States District Court

For the Northern District of California

1    The parties took ample advantage of their opportunity to submit supplemental briefing.

2   On behalf of all defendants except defendant Manuel Franco, the following defendants submitted

3   post-hearing briefs: defendant Danilo Velasquez (Dkt. No. 2586), defendant Guillermo Herrera

4   (Dkt. Nos. 2581, 2591); defendant Rafael Montoya (Dkt. No. 2580); defendant Jonathan Cruz-

5   Ramirez (Dkt. No. 2567); and defendant Ivan Cerna (Dkt. No. 2587).  The government submitted

6   a response (Dkt. No. 2619) and defendants submitted a joint reply (Dkt. No. 2641).

7                                              **ANALYSIS**

8    Sergeant Molina, Sergeant McDonnell, and Detective Flores have extensive law

9   enforcement experience with MS-13.  Experience alone, however, is not all that is required.  For

10   one thing, expert testimony is only appropriate where the matters touched upon are beyond the

11   ken of the average layperson's understanding.  Allowing the government to prove up elements of

12   the offense through police opinion would shift the responsibility for assessing fact evidence from

13   the jury to the police.

14    More specifically, here it would allow the government to prosecute by simple syllogism:

15   first, through expert opinion, the government would show MS-13 was a violent racketeering

16   organization.  Second, the government would show any given defendant was a member or

17   associate of MS-13.  In this way, no more *fact* evidence than a few tattoos would be necessary to

18   convict all accused.  Again, RICO and VICAR require *enterprise* proof.  And, they require proof

19   of murder and other predicate acts.  All of this is amenable to ordinary fact proof of the type

20   ordinarily understood by juries without the need for specialized police opinions.  To be sure, the

21   prosecutors here also promise fact proof.  But still a juror could vote to convict merely on the

22   strength of the opinion evidence plus some MS-13 tattoos.

23    Exacerbating matters, the proposed testimony is so riddled with references to "violence,"

24   as to be highly molten without any actual proof of any violence within the four corners of the

25   proffer.  Further, almost all of the proffer has proven to be mere *ipse dixit* immune from practical

26   cross-examination.  And, even when an opinion is based on something other than inscrutable

27   "experience and training," it is usually based on inadmissible hearsay about the accused from the

28   street or other officers.  These problems will now be fully explained below.

**United States District Court**
For the Northern District of California

1    **1.    SFPD SERGEANT MARIO MOLINA**

2         Sergeant Mario Molina is a San Francisco police officer who previously worked for the

3    SFPD Gang Task Force.  His proposed expert testimony covers the existence, structure, history,

4    and organization of MS-13; the violent nature of MS-13; the typical behavior and proclivities of

5    MS-13 members; the crimes that MS-13 members commit; MS-13 slang, styles of dress, colors,

6    and symbols; and gang "turf" delineations in San Francisco.  The proffer extends beyond MS-13

7    and covers prison gangs and rival gangs as well.  The opinions would prove up all elements of the

8    government's RICO conspiracy charge against all remaining defendants, save only for proving

9    that each defendant was a gang member.  Moreover, the proposed testimony would advise the

10   jury that any violent crimes committed by individuals associated with MS-13 were done to further

11   a RICO enterprise.

12        Without ever actually proving up a single such instance, Sergeant Molina's proposed

13   opinions are festooned with references to violence, crime, and similar atmospherics.  Even the

14   revised and shortened Molina disclosure employs words and phrases depicting violence, death,

15   crimes, illegality, criminals, and prison at least 50 times.  This word count does not include words

16   depicting the fear and intimidation that MS-13 purportedly attempts to elicit from its victims and

17   community members.  For example, Molina Opinion 32 — which is only one sentence long —

18   refers to both "violent creed" and "predisposition of violence" when describing MS-13.  (As

19   stated, for ease of reference, the proposed opinions are set forth in Appendix A to this order.)

20        **A.    Qualifications**

21        Under Rule 702, a witness may be "qualified as an expert by knowledge, skill, experience,

22   training, or education."  The government has demonstrated that Sergeant Molina has specialized

23   knowledge, experience, and training sufficient to qualify him as an expert on MS-13.  Sergeant

24   Molina has derived this knowledge, experience, and training from his career working for the

25   SFPD for almost fifteen years, including for the Gang Task Force.  Sergeant Molina has

26   demonstrated extensive experience with Latin gangs, including MS-13.  Moreover, Sergeant

27   Molina had additional experience as a counselor at the Youth Guidance Center in San Francisco,

28   as a probation officer in San Francisco, as a participant in community outreach programs in local

schools, and is fluent in Spanish (Tr. 278–291).

The objections to Sergeant Molina's qualifications are overruled. That he has never been qualified to testify as an expert in federal court does not prevent him from testifying in this case (Tr. 770, 916). Nor does his lack of academic research and writing experience and training prevent him from qualifying as an expert (Tr. 765–766, 751, 985–986). The embarrassing errors in his curriculum vitae are good cross-examination material but are not fatal (Tr. 719, 751–756, 766–773). Similarly, his testimony that he had only limited experience and contacts with MS-13 after October 2008 does not disqualify him from offering expert testimony regarding MS-13 after October 2008. Again, that is for cross-examination (Tr. 757–761, 993–1002).

Defendants' argument that the disclosed testimony violates a prohibition against "ultimate issue" testimony is also overruled. Expert testimony from which a fact finder might draw an *inference* regarding a defendant's mental state is not prohibited by Rule 704(b). *See United States v. Morales*, 108 F.3d 1031, 1037–38 (9th Cir. 1997) (finding that expert testimony is not impermissible under Rule 704(b) unless it *necessarily* follows that the defendant did or did not have the requisite *mens rea*).

That Sergeant Molina is an expert, however, does not automatically render all of his proposed testimony admissible. Most of his proposed testimony will not be allowed because it does not concern a proper subject of *expert* opinion or because it violates other evidentiary principles.

### B.      Not Assisting the Trier of Fact

Rule 702 only allows expert opinion where "specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue." In other words, expert testimony is only appropriate where "untrained laymen" would be unable to intelligently comprehend the fact evidence and determine the particular issue without the guidance of an expert. FED. R. EVID. 702 Advisory Committee Note. This is because the jury — not a police expert — must serve as the fact finder.

Although prior decisions in our circuit have found that general testimony regarding the existence, structure, and history of a criminal organization may assist the jury in non-RICO cases,

United States District Court

For the Northern District of California

there is no published appellate decision in our circuit explicitly upholding such expert testimony during the government's case-in-chief in a RICO/VICAR prosecution. Nor are there any decisions in our circuit finding a district court's decision to exclude such gang expert testimony to be an abuse of discretion. *See, e.g.*, *United States v. Valencia-Amezcua*, 278 F.3d 901, 908 (9th Cir. 2002).

In light of the absence of controlling authority, this order finds persuasive the Second Circuit's approach in *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008). The *Mejia* decision addressed the dangers inherent in police officer gang testimony and the importance of properly screening the testimony. In coming to this determination, the Second Circuit found:

> [I]t is a little too convenient that the Government has found an individual who is expert on precisely those facts that the Government must prove to secure a guilty verdict — even more so when that expert happens to be one of the Government's own investigators. . . . When the Government skips the intermediate steps and proceeds from internal expertise to trial, and when those officer experts come to court and simply disgorge their factual knowledge to the jury, the experts are no longer aiding the jury in factfinding; they are instructing the jury on the existence of the facts needed to satisfy the elements of the charged offense.

*Id.* at 191. Like our case, *Mejia* involved a RICO prosecution of MS-13 members and the police officer gang expert was proffered to testify regarding MS-13's structure, derivation, background, history, conflicts, hierarchy, cliques, methods, activities, and slang. *Id.* at 186–87.

All of the enterprise opinions proffered by Sergeant Molina involve facts well within the ken of the average layperson. Unlike other cases that have allowed structure testimony, Sergeant Molina's proffered opinions do not concern an elaborate money laundering or drug trafficking scheme. The structure here was simple. The racketeering acts were straightforward. No expert testimony is needed for a layperson to understand the alleged structure and organization of MS-13. Allegedly, MS-13 cliques exist across the country and internationally (Molina ¶ 2). "Leaders" of cliques ran meetings, made decisions, and at times consulted with even higher-ranking individuals from outside of the clique (Molina ¶¶ 3–5). Gang money was used to purchase firearms (Molina ¶ 17). There were rules and penalties for violating them (Molina ¶ 5). One rule was not to cooperate with police. Violators would be killed. MS-13 members purportedly attended meetings in Los Angeles and communicated with others in Southern

California (Molina ¶ 18).

The proffer is the very type of expert testimony that the Second Circuit found to be unhelpful to a jury. If Sergeant Molina is permitted to testify about matters that will *not* assist the jury, his testimony will be no more than police argument masquerading as sworn evidence. As the Second Circuit explained:

> If the officer expert strays beyond the bounds of appropriately "expert" matters, that officer becomes, rather than a sociologist describing the inner workings of a closed community, a chronicler of the recent past whose pronouncements on elements of the charged offense serve as shortcuts to proving guilt.

*Mejia*, 545 F.3d at 190. In other words, expert testimony must serve as an aid to understanding facts — not a summary of the government's best case.

To obtain a RICO conspiracy conviction, the government must prove the existence of a racketeering enterprise. As such, it must prove the 20th Street clique was more than a series of ad-hoc dust-ups — it must prove a coherent, ongoing structure. Through Sergeant Molina's expert opinions, the government seeks to establish that the clique operated in an organized fashion, had a set hierarchy and leadership structure, maintained decision-making protocols and rules, held meetings, had an established agenda, collected membership dues, and coordinated with other cliques outside of San Francisco. The proposed testimony also seeks to establish that MS-13 members were expected to perpetrate violent acts in furtherance of the enterprise — a critical element to proving up the VICAR charges.

While the government must prove the enterprise elements, the government should do so via ordinary fact proof — cooperating witnesses, informants, defendant statements, victim testimony, and other traditional methods. The jury will not need police opinion evidence to synthesize such plain vanilla evidence. In *Hankey*, our court of appeals noted that its allowance of gang expert testimony in that case was influenced by the fact that the "gang" evidence was *not* proffered to prove a substantive element of a crime — which is different from the instant case wherein the government seeks to use the gang expert testimony for that precise purpose in its case in chief. *Hankey*, 203 F.3d at 1172. Consequently, Sergeant Molina will not be permitted to give opinions as to the structure, rules, organization, and operations of MS-13.

United States District Court

For the Northern District of California

9

United States District Court

For the Northern District of California

1   On the other hand, Sergeant Molina's interpretation of code words, colors, tattoos, gang-

2   territory mapping, and symbols generally will assist the jury in understanding fact evidence

3   otherwise presented at trial and will be allowed.  Such testimony may alert a juror that seemingly

4   innocuous words — such as "girls" — have a double-meaning that a juror might not otherwise

5   understand without an expert's explanation.  *See United States v. Alonso*, 48 F.3d 1536, 1542 (9th

6   Cir. 1995).

7   **C.     Reliability of Expert Testimony**

8   The foregoing is largely dispositive but there are two more reasons for exclusion, the next

9   one being insufficient reliability.  District courts have a continuing duty to act as vigilant

10  gatekeepers to ensure expert testimony "rests on a reliable foundation and is relevant to the task at

11  hand." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (*citing Daubert v. Merrell*

12  *Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)); *United States v. Freeman*, 498 F.3d 893, 904 (9th

13  Cir. 2007).  In executing this gatekeeping responsibility, district courts have broad latitude in

14  determining *how* to test an expert's reliability.  *Hankey*, 203 F.3d at 1168.

15  After extensive inquiry into the reliability of each of Sergeant Molina's proffered

16  opinions, fundamental concerns still persist regarding the bases of the opinions, how the opinions

17  were reached, re-transmission of inadmissible evidence to the jury, and difficulties arising from

18  Sergeant Molina's dual role as both an expert and an investigating officer.  Each is now discussed

19  in turn.

20  **(1)     *Ipse Dixit***

21  The government seeks to satisfy its reliability burden with a chant of "training and

22  experience."  This it cannot do.  Although our court of appeals explained in *Hankey* that the

23  reliability of the gang expert's testimony at issue depends "heavily on the knowledge and

24  experience of the expert rather than the methodology or theory behind it," the *Hankey* decision

25  did not hold that a bare assertion of "training and experience" satisfies the reliability requirement.

26  *Id*. at 1169.  Even where the reliability of expert testimony is largely dependent on the expert's

27  experience, the witness must still explain how the experience leads to the conclusions reached,

28  why the experience provides a sufficient basis for the opinions, and how the experience is reliably

applied to the facts.  *Id.* at 1168; FED. R. EVID. 702 Advisory Committee Note.  The district court may not simply take the expert's word for it that his or her experience renders the entirety of his/her testimony reliable.  Moreover, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."  Instead, where there is "simply too great an analytical gap between the data and the opinion proffered," the opinion should be excluded.  *General Electric v. Joiner*, 522 U.S. 136, 146 (1997).

While Sergeant Molina was able to offer bases for a few of his opinions, most were too general to allow for a determination of whether a particular opinion was rooted in something more than his "say so."  This problem specifically arose when Sergeant Molina offered opinions regarding MS-13's structure, rules, organization, operations, proclivities, and behavioral expectations.  For example, Molina Opinion 5 opined:

> Significant decisions affecting the gang are decided at a leadership level above the clique leader.  For instance a decision to kill a fellow MS-13 member for violating gang rules — usually the rule prohibiting cooperation with law enforcement — requires consultation with gang leaders and must be supported by some sort of proof or documentation, *i.e.*, "paper." Killing members of rival gangs, in contrast, does not require such extensive review.  Indeed, it is expected. Clique leaders are expected periodically to meet with or speak to other clique leaders and the big homies to report on the status of their local cliques.

(Molina ¶ 5).  Sergeant Molina testified that the basis for this opinion was his "training and experience," "conversations with other officers," and "reviewing documentaries" (Tr. 324).  This description is so general that it is impossible to tell how Sergeant Molina's ultimate opinion was extrapolated, much less whether it was properly extrapolated.

This answer was repeated over and again in response to any inquiry into the bases of the proposed opinions.  It became the mantra of the evidentiary hearing.  Opinions 1–7, 9–12, 21, 24, and 34–35 were each stated to be based in whole or part on Sergeant Molina's "training" and "experience" (Tr. 318–19, 321–22, 324–26, 333–34, 338,  340–41, 364–65, 393, 737–38, 871, 966).  This was *ipse dixit.*  There was no objective factual foundation on which to test the opinions.  Cross-examination was futile.  Interrogation met the stonewall of "training and experience" beyond which it was impossible to penetrate.  Rule 702 demands more.  *United*

*States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002) (finding investigating agent's knowledge, prior investigation of the defendants, and seized evidence to be too vague a basis to satisfy Rule 702).

Obviously, the government is aware that it could try to transmit the same information to the jury via informants and cooperating witnesses. Informants and cooperating witnesses sometimes prove to be discredited, however. By using Sergeant Molina's aura of expertise and his persistence in non-specificity, the government would be able to keep discrediting warts out of its case and immunize its case from cross-examination.

### (2)   *Flimsy Logic*

Even where Sergeant Molina was able to provide a factual foundation beyond "training" or "experience," it proved far too flimsy. For example, Molina Opinion 18 provided:

> Now the 20th Street clique in San Francisco has strong ties to Southern California, specifically, the PLS clique, which has a franchise in Richmond. Members of the 20th Street clique maintain communication with Southern California by attending interstate "misas" (meetings) and receiving "bendiciones" (instructions) from the Los Angeles area.

(Molina ¶ 18). Sergeant Molina testified that the basis for this opinion was a jail call wherein defendant Marvin Carcamo referenced meetings in Southern California (Tr. 827–29). When asked how he confirmed the information from the jail call was reliable and how the opinion was extrapolated therefrom, Sergeant Molina asserted that he further knew that San Francisco gang members had been arrested in Southern California (Tr. 831). When pressed for specifics, Sergeant Molina first pointed to the arrest of defendant Jose Quinteros in "Southern California" for a "marijuana charge" (not a gang crime), although he could not provide any explanation for how the arrest reinforced the opinion (Tr. 831–32). All he could do was to point to the fact that another MS-13 member — "Duke" — fled to Los Angeles after allegedly committing a homicide in San Francisco (Tr. 832–836).[2] Significantly, Sergeant Molina did not know if Duke attended any gang meetings in Southern California or was apprehended on MS-13 turf. Still, he surmised that the flight demonstrated strong ties between the San Francisco group and a Los Angeles clique

---

[2] Sergeant Molina did not identify "Duke" by his given name. "Duke" is not a defendant in this prosecution. For all that is in the record, Duke was residing in Los Angeles.

United States District Court

For the Northern District of California

1   (*ibid.*).  This was a fast glide over thin ice.  The mere presence or arrest of an alleged MS-13 gang

2   member somewhere in Los Angeles does not demonstrate that the San Francisco clique received

3   instructions from Los Angeles or that its members attended interstate MS-13 meetings in Los

4   Angeles.

5           Molina Opinion 23 is yet another example of a logical disconnect.  The opinion asserts:

6           The leadership of the 20th Street Clique, however, has always been and
            continues to be held by Salvadoran nationals.  For instance, the early
7           leaders were Darwin "Yo-Yo" Flores (currently incarcerated in Soledad
            Prison) and Guillermo "Memo" Fuentes (who was murdered in 2004 by
8           a 22B *Norteño* gang member).  In recent years up through now, the
            leadership position has been split among different factions within the
9           gang, although the division within the gang is fluid and varies with the
            personality of gang members.

10   (Molina ¶ 23).  Sergeant Molina stated the opinion was based on his "personal observations in the

11   Mission District" and "talking to gang members in the Mission District" (Tr. 368).  His specific

12   bases were: (1) Darwin Flores was a "well-known figure" and was "involved in acts of violence";

13   (2) an article on gangs was published in 1996 or 1997 and Darwin Flores was interviewed for the

14   article; (3) the article referenced *West Side Story*; (4) the article referenced Guillermo Fuentes; (5)

15   when Guillermo Fuentes was killed, Sergeant Molina observed members of MS-13 honoring his

16   death and there was "talk on the street" that the leader of MS-13 had been killed (Tr. 367–72).[3]

17   While these bases offer some support for the general opinion that Guillermo Fuentes was a leader

18   of MS-13 at one point in time, they offer no support for the remainder of the opinion and its

19   commentary of the leadership of MS-13 from past to present.  This extrapolation is too flimsy.

20                        **(3)      *Re-Transmission of Inadmissible Evidence***

21           As occurred at the evidentiary hearing, attempts to peel back to the bases of Sergeant

22   Molina's opinions lead to the re-transmission of hearsay, bad act evidence, mental state opinion,

23   *Bruton* issues, and other inadmissible testimony.  It is permissible under Rule 703 for an expert to

24   *base* opinions on facts that are otherwise inadmissible, including hearsay, so long as they are of a

25   type "reasonably *relied upon* by experts in the particular field in *forming* opinions upon the

26   subject."  FED. R. EVID. 703 (emphases added).  An expert may not, however, simply re-transmit

27

28       _____

         [3] Sergeant Molina originally identified the article as being published in the *Bay Guardian* (Tr.
         369–70).  Cross-examination revealed the article appeared in *S.F. Weekly*, not the *Bay Guardian* (Tr. 750–51).

1   hearsay or other inadmissible evidence to the jury in the guise of expert opinion.  An expert must

2   "apply[] his extensive experience and a reliable methodology" to the otherwise inadmissible

3   evidence to transform it into proper expert opinion.  *See Mejia*, 545 F.3d at 197 (citation omitted).

4          Although at first Sergeant Molina asserted that his opinions were not simply repetitions

5   but the result of his processing, comparing, and corroborating information from his sources, he

6   later admitted that some of his opinions were no more than repetition (Tr. 823).  As one example,

7   he admitted that some of his opinions simply repeat statements made by Informant 1211 (Tr.

8   852–853).  Similarly, Sergeant Molina was only able to vaguely describe two jail calls and

9   asserted that it was not "fair" for him to have to remember details about the other jail calls he had

10  listened to, despite the fact his opinions were derived in part from the calls (Tr. 356, 358, 800).

11  This general inability to remember the bases of opinions makes it impossible to judge whether or

12  not certain opinions are simply a re-transmission of rank hearsay or otherwise inadmissible

13  evidence.

14         For the same reasons, it is impossible to discern whether certain proffered opinions run

15  afoul of the Confrontation Clause of the Sixth Amendment.  If any of the opinions are

16  regurgitations of "testimonial" statements — such as statements taken by police officers during

17  the course of interrogation — the defendant must be permitted to cross-examine the individual

18  who made the statement.  *See generally Crawford v. Washington*, 541 U.S. 36, 50–51, 69.

19              **(4)    *Secret Bases***

20         During the evidentiary hearing, the government objected to the disclosure of the names of

21  informants on whom Sergeant Molina relied in coming to his opinions (Tr. 629–30, 856–57,

22  865–69).  Specifically, the government objected to the disclosure of the names of Informant 1211

23  and two additional informants — referred to at the hearing as Informants "A" and "B."[4]

24         Secret bases for expert testimony are inherently unreliable.  There is no way to verify that

25  they actually exist, much less that they are reliable.  Although Sergeant Molina testified under

26  oath that no informant was the *sole* basis for any of his opinions, they were clearly *a* basis for

27

28         [4]  The government provided the names to the undersigned *ex parte* and under seal.  For the remainder
    of the evidentiary hearing, the two informants were referred to as Informant "A" and Informant "B."  To date,
    these informants' identities have not been disclosed to defendants.

1   many of them.  Yet that specific basis could not be effectively challenged because the informants'

2   identities remained shrouded in mystery (Tr. 872–73).

3        Compounding this problem was Sergeant Molina's inability to pinpoint which of his

4   opinions were derived from the unidentified informants.  For example, although Sergeant Molina

5   freely admitted that he relied on Informant 1211 in developing his opinions, he was unable to

6   identify *which* of his opinions were derived from Informant 1211 (Tr. 821).  Nor could he identify

7   the extent to which he relied on Informant 1211 in comparison to other sources (Tr. 870–71).

8   Thus, not only are the bases of some of Sergeant Molina's opinions secret, but it is unknown

9   which of his opinions were impacted by this secrecy.

10            **(5)    *"Expertise" in Investigating Defendants Themselves***

11        The vast majority of Sergeant Molina's opinions are entirely based on his investigation of

12   the very defendants for this very case (Tr. 822).  This is because all of Sergeant Molina's

13   experience and knowledge regarding MS-13 in San Francisco was derived from the 20th Street

14   clique during the time period for which the defendants are now charged with participating in the

15   racketeering conspiracy (Tr. 783–84, 805).  *See, e.g., Daubert v. Merrell Dow Pharm., Inc.*, 43

16   F.3d 1311, 1317 (9th Cir. 1995) (explaining reliability determination requires consideration of

17   whether the expert is "proposing to testify about matters growing naturally and directly out of

18   research [he/she has] conducted independent of the litigation, or whether [he/she has] developed

19   [his/her] opinions expressly for purposes of testifying").  While experts may develop their

20   opinions for a particular case, unlike a "traditional" expert, they are allowed to do so only if their

21   methodology is reliable.

22        In his role as a police officer, Sergeant Molina has: conducted surveillance on almost all,

23   if not all, of the defendants remaining in this case (Tr. 793–94); listened to jail calls made by

24   defendants in this case (Tr. 795–800, 831–32); searched, recovered, and reviewed evidence from

25   defendants in this case (Tr. 802, 808); arrested defendants in this case (Tr. 802–05); and spoken to

26   all remaining defendants in the case (Tr. 816–17, 822).  These activities extend to reviewing

27   evidence underlying the charges in the instant action (Tr. 847–48).  The government itself

28   stipulated that "there's contacts with these defendants, and of course there's evidence taken from

United States District Court
For the Northern District of California

15

United States District Court

For the Northern District of California

these defendants that form part of his opinion" and that some of the bases include "evidence that's part of the Government's case" (Tr. 802). Moreover, when pressed for any detail or explanation for the bases of his opinions, Sergeant Molina resorted to discussing individual defendants and their actions during the time period charged in the indictment.

This raises two distinct problems. The first is that Sergeant Molina will wear two hats. One hat will be for fact testimony. The other will be for opinion testimony. Even the government recognizes the danger that the latter will be confused with and treated as the former. Splitting his appearance into two segments at trial will mitigate this risk but it will not eliminate it. That his opinion testimony will cover the same general turf as the fact testimony inflames this tension. *See United States v. Anchrum*, 590 F.3d 795, 803–04 (9th Cir. 2009).

The second is that any effective cross-examination of the opinions to draw out the bases will elicit inadmissible hearsay from the street and other officers, among other inadmissible matter (when not met with mere *ipse dixit*). Although the government has promised the gang experts will not discuss the individual defendants in their opinions on direct (they will in their *fact* testimony), the evidentiary hearing revealed that any effective cross-examination will lead to exactly that kind of evidence when the basis for an opinion is anything more than the mantra of training and experience (Tr. 247; Dkt. No. 1884-1 at 8, 12). It is unfair to saddle defense counsel with the Hobson's choice of letting conclusory opinions stand unchallenged versus opening the door to otherwise inadmissible street talk and police chatter.

\*            \*            \*

To sum up, reliability was not established for Sergeant Molina's opinions other than for matters like code words, colors, tattoos, gang-territory mapping, and symbols.

### D.      Rule 403 and Violence

Much of the proffer is inflammatory and dripping with allusions to violence. As stated, the expert disclosure for Sergeant Molina — totaling less than five pages — employs words depicting violence, death, crimes, illegality, criminals, and prison no less than 50 times (Dkt. No. 1884-1 at 12-17). For example, one of Sergeant Molina's opinions is: "MS-13 members engage in violence to control drug territory, to extort and rob, and simply to bolster their gang identity"

(Molina ¶ 2).  No factual support is referenced, however.  Whatever meaningful probative value lurks in the opinion is outweighed by substantial danger of unfair prejudice and will pose a foregone conclusion that MS-13 translates to violent criminals.  Further examples of opinions that similarly appear to serve little purpose but to inflame the jury include:

- "For instance, a decision to kill a fellow MS-13 member for violating gang rules — usually the rule prohibiting cooperation with law enforcement — requires consultation with gang leaders . . . Killing members of rival gangs, in contrast, does not require such extensive review.  Indeed it is expected" (Molina ¶ 5).

- "MS-13 member have engaged in the production of 'rap' music that glorifies their violent creed and their predisposition for violence, some of which is posted on the Internet" (Molina ¶ 32).

It may very well be that *fact* proof will show multiple homicides and extreme and heartless violence by the accused.  This order shrinks not from violence by *fact* proof.  But it is unwilling to allow police opinion to tag the accused as violent without specific anchors in specific violence.  All relevant violence should be proven up in the normal, traditional way — using *fact* witnesses.

Similarly, the proposed testimony regarding prison gangs and bad acts by others in prison is inadmissible under Rule 403.  Our case is about street crimes, not prison crimes.  All of the references to prison gangs like Mexican Mafia and Nuestra Familia prove very little about the organization of MS-13 in San Francisco while portraying the accused as hardened convicts in and out of prison.  None of our defendants was in prison at the relevant times.  If prison gang evidence is to come in at all, it should be direct, first-hand evidence.

Rule 403 concerns are also implicated by the proposed testimony regarding the bad acts of other cliques and rival gangs.  Descriptions of violence committed by Pasadena Locos Sureños, Norteños, or other groups is unfairly prejudicial to defendants in this case because the jury might impute such conduct to the specific clique at issue in this case — the 20th Street clique.

In sum, Sergeant Molina may not refer to violence, crime, prison gangs such as Mexican Mafia, or the bad acts of other gangs in his role as an expert.  As a fact witness, of course, he may do so as to any relevant act of violence.

United States District Court

For the Northern District of California

1

**E.      Inadmissible Opinions**

2        Molina Opinions 3–5, 9, 11, 14, 15–19, 21–23, 25–28, and 32–33 are entirely excluded.

3    The following portions of Molina Opinions 2, 6, 7–8, 10, 13, 20, and 24 are also excluded.  These

4    excluded portions are:

5    •    Opinion 2: "MS-13 members engage in violence to control drug territory, to extort and
          rob, and simply to bolster their gang identity . . . throughout the United States and the
6         world, although the heaviest concentration of gang members and the most important
          leaders are in Los Angeles and in El Salvador.  Many of the leaders are imprisoned, but
7         continue to conduct the affairs of the gang while in custody."

8    •    Opinion 6: "In the San Francisco Bay Area, there is an MS-13 clique in Richmond,
          California, which is an off-shoot of . . . .  In San Francisco itself, there is an MS-13 clique
9         that claims territory centered on 20th Street and Mission Street.  As a result, the San
          Francisco clique of MS-13 is called '20th Street.'"

10

11   •    Opinion 7: " . . . claim allegiance to the Mexican Mafia prison gang and obey the Mexican
          Mafia's dictates.  Indeed, made members of the Mexican Mafia, called 'carnales,' are
12        drawn from the ranks of various *Sureño* gang members who have proven their dedication
          and worth to the Mexican Mafia through the commission of crimes.  The number 13 in
13        MS-13's name evinces this loyalty to the Mexican Mafia, because the letter 'M' — the
          symbol of the Mexican Mafia — is the thirteenth letter of the alphabet."

14   •    Opinion 8: "In fact, Mission Playground is the headquarters of the 20th Street clique of
          MS-13: they usually hang out there and hold their meetings there."

15

16   •    Opinion 10: " . . . pledge their loyalty to the *Nuestra Familia* prison gang, whose made
          members (also called 'carnales') direct the criminal activities of *Norteños* both within
17        prison and outside of prison.  *Nuestra Familia* was formed in the 1960s in the California
          state prison system by Northern California Latino inmates who resented the Mexican
18        Mafia's perceived bias in favor of Southern California Latino inmates.  *Nuestra Familia*
          and the Mexican Mafia are mortal enemies, and each side competes violently for control
19        of illegal activities such as narcotics trafficking, extortion, and robbery.  *Nuestra Familia*
          *carnales* are pulled from the ranks of *Norteño* gang members who have proven their
20        dedication and worth to *Nuestra Familia* through the commission of crimes."

21   •    Opinion 13: " . . . and their feud have resulted in many acts of violence.  However,
          *Sureños* and *Norteños* individually reflect the diversity of San Francisco.  For instance,
22        there are a substantial number of non-Latino *Norteños*.  In addition, some *Sureño* gang
          members used to be part of the majority *Norteños* in the past."

23   •    Opinion 20: "Likewise "work" and "jale" are words for violence committed by the gang."

24   •    Opinion 24: "Indeed, one motto of MS-13 is '*mata, roba, viola, controla*,' which means in
          Spanish, 'kill, steal, rape, control.'"

25

26        For the convenience of counsel, this order will append hereto as Appendix B a version of

27   opinion evidence allowed by this order for Sergeant Molina.  Although no corresponding list for

28   Sergeant McDonnell is appended, parallel latitude will be allowed for his opinions.

18

United States District Court

For the Northern District of California

### 2.    SERGEANT DION MCDONNELL

Much of SFPD Sergeant Dion McDonnell's proposed expert testimony overlaps, if not repeats, Sergeant Molina's.  The proposed testimony covers the violent nature of MS-13; the typical behavior and proclivities of MS-13; the feud between the Norteños and Sureños; MS-13 tattoos and hand signs; terms of derision; and gang "turf" delineations in San Francisco.  Like the Molina proposal, Sergeant McDonnell's testimony would extend to cliques and gangs of which defendants are not alleged to be a part, including prison gangs and rival gangs.

### A.    Qualifications

As before, the government has demonstrated that Sergeant McDonnell has the knowledge, experience, and training sufficient to qualify him as an expert on certain aspects of MS-13. Sergeant McDonnell, a sergeant in the SFPD Gang Task Force, has served as a police officer for the SFPD for ten years.  Although defendants argue that Sergeant McDonnell is not qualified because he does not speak Spanish, one need not be fluent in Spanish to be an expert in MS-13 gang jargon — much like one need not be fluent in Latin to be a classics expert.  Although language skills may certainly enhance one's expertise or understanding, they are not required. Sergeant McDonnell is qualified to opine on MS-13 even though he is not fluent in Spanish.

Of course, Sergeant McDonnell admitted that he is less knowledgeable than Sergeant Molina and the latter could testify to all the same expert opinions as Sergeant McDonnell (Tr. 164).  That Sergeant McDonnell is less qualified than Sergeant Molina, however, does not knock him out of the box.  (Cumulativeness of testimony is a separate issue.)  True, Sergeant McDonnell has not testified before in federal court.  Also true, much of his prior expert experience was at the Youth Guidance Center or in juvenile court.  These shortfalls do not disqualify him.  They are good material for cross-examination, but that is all.  While Sergeant McDonnell does not have extensive knowledge, he has enough to qualify as an expert.  Sergeant McDonnell's proposed testimony, however, is largely inadmissible, for the same reasons as above.

### B.    Not Assisting the Trier of Fact

Once again, the proffer is well within the ken of the average layperson and is thus unnecessary.  For example, the ordinary layperson does not need an expert to explain that

1  violence committed by gang members makes a gang "more fearsome and intimidating"

2  (McDonnell ¶ 22). Similarly, other *opinions* centering on violent proclivities of MS-13 members

3  will not assist the jury. The jury, as the fact finder, can understand normal *fact* evidence about

4  violent acts without police commentary. A jury does not need an expert's assistance to

5  understand that MS-13 "expects its members to be totally devoted to the gang and expects its

6  members to be trustworthy" or that "respect within the gang" can be gained through "courage and

7  ruthlessness" (McDonnell ¶¶ 20, 21). These are only a few examples. Most of Sergeant

8  McDonnell's proffer is in this vein. To allow the proffer would amount to letting Sergeant

9  McDonnell serve as a summary argument piece.

10      **C.    Reliability of Expert Testimony**

11          Sergeant McDonnell admitted that his *only* experience with MS-13 comes from his

12  investigation of the 20th Street clique (Tr. 590, 595). That is, the foundation for Sergeant

13  McDonnell's opinions comes from the very defendants in this case — he has "talked to just about

14  every [defendant]" (Tr. 549, 623–25, 816–17); surveilled the defendants (Tr. 564–65); viewed the

15  MySpace pages of the defendants (Tr. 561); arrested the defendants and collected evidence from

16  searching their homes (Tr. 590–91, 668, 676–77); and interviewed the defendants "in the context

17  of the investigation of incidents . . . connected with this particular case" (Tr. 538) — including

18  post-*Miranda* custodial statements. Similarly, Sergeant McDonnell has relied on key informants

19  in this case — Informant 1211, Informant 1218, Informant "A," and Informant "B" (Tr. 819–21).

20  As with Sergeant Molina, it is hard to see how cross-examination can occur without drawing out

21  fact evidence that would, on its own, be inadmissible.

22          Sergeant McDonnell also testified that he was indiscriminate in choosing the sources

23  relied. Specifically, he freely stated that he relies "on anything I can get my head on, you know.

24  So if there's information out there I can absorb, and it's relevant, well, then I'll rely on it. So

25  regardless of the source, the person, the book, whatever, if it's information that I'll process, and

26  it's something I rely on as relevant, well, then, I'll rely on it" (Tr. 552). As stated earlier,

27  although the type of testimony at issue does not require satisfaction of the traditional *Daubert*

28  factors, the testimony must still have a ring of reliability. His haphazard approach has no ring of

**United States District Court**
For the Northern District of California

20

reliability.

Many of Sergeant McDonnell opinions, as with his colleague's, boil down to nothing more than *ipse dixit*.  He was unable to offer any modicum of detail with respect to the bases he relied on in coming to his opinions.  The more inflammatory the opinion, the more he vagued out on any supporting basis.  For example, McDonnell Opinion 20 included the statement that "cooperation with law enforcement for any reason is a cardinal sin for a gang member.  Violation of this rule results in being 'green lighted,' or being authorized to be killed."  When asked to provide the basis for this opinion, however, Sergeant McDonnell failed to establish any link between talking to law enforcement for *any* reason and being "green lighted."  Instead, Sergeant McDonnell simply defined being "green lighted" as being "subject to punishment" and stated that he has talked to "dropouts" who have been "green lighted" (Tr. 516–17).  Sergeant McDonnell did not offer any testimony to support the assertion that being "green lighted" means being authorized to be killed.  The opinion may well be true but Sergeant McDonnell's basis for the opinion cannot pass muster.

Even where reliability is largely dependent on experience, the expert must explain how the experience leads to the conclusions reached, why the experience provides a sufficient basis for the opinions, and how the experience is reliably applied to the facts.  *Hankey*, 203 F.3d at 1169; FED. R. EVID. 702 Advisory Committee Note.  Sergeant McDonnell invoked a conclusory answer repeatedly.  For example, when asked to expound on the basis of his opinion that "[v]iolence against rivals or against anyone who is perceived to have disrespected the gang enhances the reputation of the member committing the act because it makes the gang that much more fearsome and intimidating," Sergeant McDonnell could only offer conclusory reasoning for the opinion.  He explained: "it's their culture.  It's their nature to confront rival gang members" (Tr. 518).  This is far too thin.

In contrast, Sergeant McDonnell's opinions relating to code words, colors, tattoos, gang-territory mapping, and symbols were based on more than conjecture — they were rooted in his own repeated observations of gang turf delineations, colors, symbols, and tattoos, as well as his

perception of code words.  This will be allowed.[5]

### D.    Rule 403 and Violence Proof

Although the McDonnell proffer avoids an extravagant number of inflammatory terms, some of his opinions are incendiary while offering no countervailing probative value. Specifically, a number of Sergeant McDonnell's proposed opinions refer to violent prison gangs and other cliques, and these opinions must be excluded for the reasons stated earlier. Additionally, his opinions that allude to the brutal acts, nature, proclivities, and intentions of MS-13 members must also be excluded.  Violence is certainly admissible but it ought to be proved up through actual fact evidence, not through police opinion testimony.

### E.    Inadmissible Opinions

For the foregoing reasons, McDonnell Opinions 19–23 will not be allowed.  The following portions of McDonnell Opinions 3–5, 13, 15, and 24 will also be excluded:

- Opinion 3: "In prison, however, *Norteños* ally themselves under the banner of the *Nuestra Familia* prison gang, which was formed in the California State prison system in the 1960s to protect and look after the interests of the Northern California Latino prisoners, which felt that the dominant Latino prison gang then in existence, the Mexican Mafia, favored Southern California and immigrant Latino prisoners.  Made members of *Nuestra Familia* ('*carnales*') often use *Norteños* inside prison and on the streets to commit crimes for them, such as narcotics trafficking, robbery, extortion, and acts of violence.  *Norteños* who prove their loyalty and dedication to *Nuestra Familia* have a chance of eventually being chosen to become *carnales* of the *Nuestra Familia*."

- Opinion 4: "Once in prison, *Sureños* ally themselves with the Mexican Mafia and obey orders from the Mexican Mafia."

- Opinion 5: " . . . and hold the number '14' as one of their symbols, because the letter 'N' — for *Nuestra Familia* — is the fourteenth letter of the alphabet . . . because 'M' — for the Mexican Mafia —  is the thirteenth letter."

- Opinion 13: "There is another MS-13 clique across the Bay in Richmond, which is a franchise of a . . . ."

- Opinion 15: " . . . which demonstrates its allegiance to the Mexican Mafia."

---

[5]  During the evidentiary hearing, Sergeant McDonnell referenced an eleven-factor test employed in state proceedings to validate gang members.  This test was not included in Sergeant McDonnell's disclosed opinions and the government did not demonstrate the basis or reliability of this test during the evidentiary hearing.  Although the government has not indicated that Sergeant McDonnell will testify in his expert capacity that the application of the test has resulted in his conclusion that certain defendants are gang members, out of an abundance of caution, this order notes that any such opinions have not been disclosed and may not be used in the case in chief.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

- Opinion 24: "These insults have triggered many violent encounters between gang members."

### 3.   DETECTIVE FRANK FLORES

Some of Detective Flores' proposed expert testimony overlaps with the Molina and McDonnell proffers.  And, as with the other proffers, it goes into the violent nature of MS-13; the typical behavior and proclivities of MS-13; the crimes that MS-13 members commit; MS-13 slang, styles of dress, colors, symbols, and tattoos; and prison gangs.  Because Detective Flores has no expertise regarding MS-13 in the San Francisco Bay Area, his testimony is solely derived from his knowledge of cliques from outside of the San Francisco Bay Area — of which defendants are not alleged to have been members.  Accordingly, his proposed testimony covers the broader structure, history, operation, rules, and organization of MS-13.

### A.   Qualifications

Although the government has demonstrated that Detective Flores has the knowledge, experience, and training sufficient to qualify him as an expert on certain aspects of MS-13 *outside* of the San Francisco Bay Area, the government has not demonstrated that this knowledge translates to MS-13 in the San Francisco Bay Area.

Detective Flores, a detective in the Los Angeles Police Department Gang and Narcotics Division, has served for eleven years as an LAPD police officer but does not have first-hand experience with MS-13 in the San Francisco Bay Area.  All of the gang members, community members, and county jail officers Detective Flores spoke to in developing his opinions were from Los Angeles (Tr. 44, 49, 71, 79, 177).  Detective Flores also has limited knowledge of gangs in San Francisco (Tr. 169–70).

Notably, although Detective Flores purports to have "universal" knowledge of MS-13, he has no specific academic training or education related to gangs, psychology, or sociology, has not published academic articles, and has not developed materials on his expertise beyond Power Point presentations (Tr. 110–11).  Thus, all of his knowledge and experience is specific to Los Angeles cliques and other non-San Francisco cliques.  This knowledge of non-San Francisco cliques does not translate into expertise relevant to our case.  Significantly, Detective Flores' own disclosed opinions and testimony conceded time and again *that there are local variations between the*

23

United States District Court
For the Northern District of California

*cliques and not all practices are universal* (Tr. 88, 120; Flores ¶¶ 45, 46). Detective Flores specifically agreed that the internal structure and rules of MS-13 in San Francisco could be "completely different" from the cliques he is familiar with, and he would be unaware of such differences (Tr. 119–20). Detective Flores also admitted he had zero familiarity with the clique at issue and was even unaware of its name (Tr. 118-19). For these aforementioned reasons, Detective Flores is not qualified to address MS-13 in the Bay Area.

To prove the enterprise elements of RICO and VICAR, it is unnecessary for the government to prove up an international cartel, as it seems intent on doing via Detective Flores' opinions. Nor is it necessary for the government to prove up how MS-13 cliques operated in Los Angeles. It is enough to prove up the structure and other enterprise elements of the San Francisco clique. We will have our hands full with these facts for several months and it would just confuse matters to embark on a world-wide inquiry. But if we are to do so, it should be done by fact evidence.

**B.     Not Assisting the Trier of Fact**

Many of Detective Flores' opinions are simple factual statements regarding the alleged rules, structure, nature, and organization of MS-13 and do not require the guidance of an expert. As stated earlier, this type of testimony should be presented through fact witnesses, rather than through expert opinion. For example, Flores Opinion 38 describes the collection of money by local cliques to purchase drugs and guns, fund gang functions, pay bail for fellow members, and other purposes. This opinion is uncomplicated. Jurors will be able to grasp the fact evidence without police opinion to guide them. Indeed, this is the same type of opinion the Second Circuit found unhelpful to the jury and inadmissible under FRE 702. *Mejia*, 545 F.3d at 191.

Detective Flores' proposed testimony would serve only one function — a shortcut of proof. As stated, to obtain a RICO conspiracy conviction, the government must demonstrate that MS-13 had an ongoing, coherent structure. Through the proposed expert testimony, the government would be able to instruct the jury that MS-13 indeed operated in an organized fashion, had a set leadership structure and hierarchy, had rules, held meetings, kept records, and required membership dues. It would establish that a member's violation of any of MS-13's rules

24

was punishable by death.  Furthermore, the testimony offers the blanket conclusion that all acts of violence committed by MS-13 members were universally in furtherance of the enterprise.  If all these statements are true, they can be proven by actual fact evidence.  They are uncomplicated. Specialists are not needed to walk a jury through the evidence, must less to offer conclusory opinions without walking anyone through any evidence.

### C.   Reliability of Expert Testimony

Although the Flores proffer avoids the drawbacks of being based on the investigation *sub judice*, his testimony was still not shown to be reliable.  Despite being given ample opportunity at the evidentiary hearing to do so, Detective Flores failed to offer any specificity in describing the bases of his opinions.  He could not point to anything specific on which his opinions were based. Instead, Detective Flores repeatedly invoked a vague mantra of "totality of experience" to support his opinions.  Indeed, Detective Flores specifically identified his "totality of experience" for no less than 33 of his opinions and offered a general conclusion that *all* of his proffered opinions were based on the totality of his experience (Tr. 46–47, 50–52, 56–62, 66, 70–74, 76, 79, 80, 83, 85, 87–89, 91–93, 95, 98, 153).  The remainder of his opinions similarly were supported by no more than his assertion that his "personal experience" sufficed.  This inability to offer any detail or any backup suitable for testing or verification undermined his reliability.  On one occasion he elaborated on his "personal experience," but the elaboration hurt rather than helped reliability. Flores Opinion 14 stated that:

> Each gang has a loose hierarchy, depending on the size of the clique, there is usually a leader called the "shot caller" or "primera palabra," *i.e.*, "first word."  Sometimes there is a second in command called the "segunda palabra," or "second word."  There may be a third in command called "llavero" or "key holder."  There may also be a treasurer for the clique.

When asked for the basis of this opinion, Detective Flores stated it was:

> Through my personal experience in dealing with the gang over the course of my career, I've come to understand that not all cliques run the same. There are many things that influence the clique, largely, the age of the clique, how long the clique has been in existence, the number of persons belonging to that clique, and again, the effect of law enforcement in maintaining or keeping the clique disorganized or organized.  So these words are common phrases.  There are some others which help identify, per se, the leaders, or the persons in leadership within that clique.

United States District Court

For the Northern District of California

25

United States District Court

For the Northern District of California

1    (Tr. 53).  Since he acknowledges that "not all cliques run the same," one must ask how his

2    experience with Los Angeles cliques translates to San Francisco cliques?  The variables his own

3    answer set forth were not evaluated by him, that is, his own opinion does not account for the very

4    variables he testified should be taken into account in sizing up a clique structure.[6]

5         **D.     Rule 403, Violence Proof, and Minimal Corresponding Probative Value**

6         As stated, Detective Flores' own disclosed opinions suggest that characteristics of non-

7    San Francisco cliques may simply not be applicable to the 20th Street clique at issue.

8         In direct contrast to its questionable probative value, the proffer indulges the usual

9    references to crime, violence, and prison.  For example, Flores Opinion 27 expounds on the

10   meaning of a gang tattoo as signifying the "adoption of the gang lifestyle, one built on fear,

11   intimidation, and violence, on upholding the gang's reputation and one's own reputation in the

12   gang" (Flores ¶ 27).  Flores Opinion 32 specifies that "MS-13 members take pride in their gang

13   identity: without their gang affiliation, they would be dismissed as mere '*paisas*,' ordinary

14   criminals."  Without any factual basis, he proposes to opine to the jury that anyone with the tattoo

15   is no ordinary criminal but an extraordinary criminal preying on society via fear, intimidation,

16   and violence.  Notably, Detective Flores also testified that he would be unable to offer expert

17   testimony without telling the jury that MS-13 uses violence as a means to achieving its objectives

18   (Tr. 132).

19        Violence can and should be proven up with the usual fact evidence.  The jury can easily

20   understand it without police argument masquerading as sworn evidence.  Accordingly, Detective

21   Flores is altogether excluded from testifying in the instant case.

22                           *          *          *

23        Although most of the proposed testimony is now excluded from the case in chief, two

24   caveats are important.  *First*, if cross-examination or defense opening statements fairly open the

25   ─────────────

26        [6] Questions about the reliability of Detective Flores' testimony extended beyond his failure to provide
     substantive explanations — in one instance it became clear that Detective Flores did no more than simply ratify
     what the government told him to say, without any independent determination that it was appropriate to do so.
27   Although Detective Flores had never seen the photographs and demonstratives proffered by the government, he
     still stated that they were the basis for his testimony (Tr. 121).  This is mere blind acceptance and regurgitation
28   of the government's best case.

1   door to admitting now-excluded opinions, so it will have to be. Defense counsel should frame

2   their questions and openings with care. *Second*, near the end of the government's case in chief

3   (or in its rebuttal case), the *fact* evidence presented to the jury will then be known and the Court

4   will be in a better position to evaluate whether aspects of the fact evidence deserve expert

5   explanation. If so, on motion by the government, and with the benefit of the actual record before

6   the jury, the Court conceivably might allow some opinions now excluded. For example, the

7   actual evidence of violent acts by defendants might by then be so explicit, detailed, and pervasive

8   that the incremental harm might be tolerable in allowing an opinion on a issue that, in light of all

9   the fact evidence, deserves expert illumination despite containing conclusory allusions to

10  violence. This is only one example. Other twists and turns in the actual conduct of the trial may

11  warrant modest variations from this order.

### CONCLUSION

13      For the foregoing reasons, defendants' motions to exclude gang expert testimony are

14  **GRANTED IN PART AND DENIED IN PART**. Detective Flores is excluded altogether from

15  testifying in the case in chief. Although Sergeant Molina and Sergeant McDonnell may testify,

16  their testimony is limited as set forth above. As to the allowed opinion testimony, an appropriate

17  cautionary instruction will be given to the jury. *In no way does this order exclude fact testimony*

18  *by these witnesses*.

19      The defense counter expert disclosures in response to the government's expert disclosures,

20  as narrowed by this order, will be due on January 31, 2011 (Dkt. No. 2513 at 4).

22      **IT IS SO ORDERED.**

24  Dated: December 17, 2010.

                WILLIAM ALSUP
                UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California

**APPENDIX A**

**SERGEANT MARIO MOLINA'S PROPOSED OPINIONS**

1.  *La Mara Salvatrucha* — which loosely translates into "beware the Salvadorans" — is a gang composed largely of Salvadoran nationals that was established in the mid-1980s in Los Angeles, California. *La Mara Salvatrucha* is also known as "MS-13."

2.  MS-13 members engage in violence to control drug territory, to extort and rob, and simply to bolster their gang identity. MS-13 has cliques throughout the United States and the world, although the heaviest concentration of gang members and the most important leaders are in Los Angeles and in El Salvador. Many of the leaders are imprisoned, but continue to conduct the affairs of the gang while in custody.

3.  MS-13 is organized into local cliques. Each clique has a leader, usually called the "shot caller" or "*la palabra*," (the word), who leads gang meetings, advises members of gang rules and developments, reports the clique's affairs to other gang leaders, and sets the agenda for the clique.

4.  Clique leaders take directions from higher ranking gang members — sometimes referred to as the "big homies" — who are usually in Los Angeles or El Salvador. Many of the big homies are imprisoned, but manage to convey their directives via secret notes — called "kites" or "filters" — smuggled out of prison, via visitors, or via telephones smuggled into prison.

5.  Significant decisions affecting the gang are decided at a leadership level above the clique leader. For instance, a decision to kill a fellow MS-13 member for violating gang rules — usually the rule prohibiting cooperation with law enforcement — requires consultation with gang leaders and must be supported by some sort of proof or documentation, i.e., "paper." Killing members of rival gangs, in contrast, does not require such extensive review. Indeed, it is expected. Clique leaders are expected periodically to meet with or speak to other clique leaders and the big homies to report on the status of their local cliques.

6.  In the San Francisco Bay Area, there is an MS-13 clique in Richmond, California, which is an off-shoot of a Southern California clique called *Pasadena Locos Sureños*, or "PLS." In

San Francisco itself, there is an MS-13 clique that claims territory centered on 20th Street and Mission Street. As a result, the San Francisco clique of MS-13 is called "20th Street."

7. MS-13 is a *Sureño* gang, which means that its members typically are immigrants with roots outside of the United States, claim the color blue, and — while they may feud with other *Sureño* gang members on the streets — claim allegiance to the Mexican Mafia prison gang and obey the Mexican Mafia's dictates. Indeed, made members of the Mexican Mafia, called "*carnales*," are drawn from the ranks of various *Sureño* gang members who have proven their dedication and worth to the Mexican Mafia through the commission of crimes. The number 13 in MS-13's name evinces this loyalty to the Mexican Mafia, because the letter "M" — the symbol of the Mexican Mafia — is the thirteenth letter of the alphabet.

8. *Sureño* gangs in San Francisco generally claim the northern parts of the Mission District as their territory. This includes the area defined by 16th Street between Guerrero Street and Potrero Avenue, the 2200-block of Mission Street, roughly between 18th and 19th Streets, South Van Ness and 19th Streets, pushing on to Folsom Street, and a few small alleys between Mission and Valencia Streets, i.e., Carlos Alley and Sycamore Alley. Mission Playground, Franklin Square Park, and Dolores Park are also claimed by *Sureños*. In fact, Mission Playground is the headquarters of the 20th Street clique of MS-13: they usually hang out there and hold their meetings there.

9. In addition to MS-13, other *Sureño* gangs are the 16th Street *Sureños*, the 19th *Sureños*, and the 11th Street *Sureño*s, which actually claims parts of the Tenderloin District as its territory.

10. *Sureño* gang members, including MS-13 members, in the San Francisco Bay Area are outnumbered by their principal rivals, the *Norteños* (also generically called "Northerners"). *Norteños* trace their roots to migrant farm workers who came to Northern California for work, and they typically draw their ranks from Latinos who were born in the United States with familial roots in Northern California. *Norteños* claim the color red and — while they feud with each other on the streets — pledge their loyalty to the *Nuestra Familia* prison gang, whose made members (also called "*carnales*") direct the criminal activities of *Norteños* both within prison and outside of prison. *Nuestra Familia* was formed in the 1960s in the

California state prison system by Northern California Latino inmates who resented the Mexican Mafia's perceived bias in favor of Southern California Latino inmates. *Nuestra Familia* and the Mexican Mafia are mortal enemies, and each side competes violently for control of illegal activities such as narcotics trafficking, extortion, and robbery. *Nuestra Familia carnales* are pulled from the ranks of *Norteño* gang members who have proven their dedication and worth to *Nuestra Familia* through the commission of crimes.

11. *Norteños* claim the number 14 as their gang number because the letter "N" — representing the *Nuestra Familia* — is the fourteenth letter of the alphabet.

12. By way of example, some *Norteño* cliques (or "sets") in San Francisco include San Francisco Mission ("SFM"), Loco Northside ("LNS"), 22nd and Bryant ("22B"), 21st and Alabama ("21 ABL"), and the Back Streets. Generally, *Norteños* claim as their turf the south side of the Mission District, with the 24th Street corridor as the northern boundary, and 24th Street between Church Street and Potrero Avenue east-west, and Mission Street between 23rd Street to the Top of the Hill in Daly City heading north-south. In addition, certain parks and playgrounds are also claimed by *Norteños*.

13. *Sureños* and *Norteños* gang members are arch-rivals in San Francisco, and their feud have resulted in many acts of violence. However, *Sureños* and *Norteños* individually reflect the diversity of San Francisco. For instance, there are a substantial number of non-Latino *Norteños*. In addition, some *Sureño* gang members used to be part of the majority *Norteños* in the past.

14. Indeed, some older members of MS-13 got along with older *Norteño* gang members. This is in part because MS-13 in San Francisco traces its roots to local gangs such as Sur-13, which became an MS-13 clique years later in the 1990s after its membership became increasing Salvadoran and after the rise of MS-13 elsewhere.

15. **[Withdrawn by Dkt. No. 2423.]** However, in recent years, the hostility between *Sureños* and *Norteños* in general, and MS-13 and *Norteños* in particular, has increased. This is because new MS-13 members tend to be newly arrived into the San Francisco Bay Area and do not share the same history with their rivals as older members do. Also, the MS-13 cliques

in Los Angeles compete with many more rival gangs and, as a result, are much more violent, so members who came up from Southern California brought their violent outlook with them. Furthermore, MS-13 leadership perceived the 20th Street clique of MS-13 as weak and not compliant with MS-13 rules, so they have directed the gang to be more MS-13-like, to be more violent, which some members — particularly the younger members who are trying to prove themselves and develop reputations — have taken to heart.

16.   **[Withdrawn by Dkt. No. 2423.]**  The 20th Street clique of MS-13 has grown in numbers over the years. In the early 1990s the gang dealt narcotics, committed numerous aggravated assaults, homicides, rapes, robberies and property crimes, especially auto theft.  They were also victims of the same type of crimes.  Due to very proactive law enforcement, numerous members were incarcerated, weakening the core of the gang. They continued with their criminal activities in a lesser capacity.

17.   **[Amended October 13.]**  During the 1990s, the gang was deemed a local gang because the connection to El Salvador was not as obvious as it is now.  In the early 2000s, however, the level of communication with and leadership from El Salvador and Los Angeles became more apparent.  The 20th Street clique collected money during their meetings to send back to their homeland.  They also bought construction and carpentry tools which they shipped to El Salvador.  Gang money was also used for other gang activities, notably to purchase firearms as well as to use for bail for arrested gang members or as commissary money for jailed gang members.  The majority of the gang's members are employed in the construction trades. Members use their knowledge of the different work sites to commit future crimes, especially auto theft.

18.   Now, the 20th Street clique in San Francisco has strong ties to Southern California, specifically, the PLS clique, which has a franchise in Richmond.  Members of the 20th Street clique maintain communication with Southern California by attending interstate "*misas*" (meetings) and receiving "*bendiciones*" (instructions) from the Los Angeles area.

19.   MS-13 members speak in codes, especially when passing information regarding identifiable monikers.  For instance, they pronounce the name of a gang member out of order: thus, for

iv

example, "Coyote" becomes "Tecoyo."  Members of MS-13 also identify each other by gang moniker, which they pick when they are jumped into the gang.  Some members know other members only by moniker and do not know each others' true names.  This makes it difficult for the police to identify gang members.

20. MS-13 members use other codes to communicate.  For instance, the word "girl" is often used as a code word for gun, and girls' names are also used for the same purpose.  Many of these codes are context specific.  Some of the more common codes, however, include "fiesta" or "party" to refer to a hunt for members of rival gangs.  Likewise "work" and "*jale*" are words for violence committed by the gang.  Members also use code in their letters to each other.

21. In order to be a member of MS-13, one must be "jumped in," that is, be ritualistically beaten by other gang members.  The typical duration of this beating for many MS-13 cliques is 13 seconds because the number 13 is sacred to the gang, but the 20th Street clique carries out the beating for 20 seconds to mirror the name of the gang.

22. Presently, about 70% of the membership of the 20th Street clique is of Salvadorian descent.  There is also an influx of Yucatecos and Honduran nationals that recently immigrated into the San Francisco Bay Area and are joining the gang.  Many Honduran nationals are being accepted here as part of the 20th Street Clique.

23. The leadership of the 20th Street Clique, however, has always been and continues to be held by Salvadorian nationals.  For instance, the early leaders were Darwin "Yo-Yo" Flores (currently incarcerated in Soledad Prison) and Guillermo "Memo" Fuentes (who was murdered in 2004 by a 22B *Norteño* gang member).  In recent years up through now, the leadership position has been split among different factions within the gang, although the division within the gang is fluid and varies with the personality of gang members.

24. As noted above, MS-13 gang members consider themselves *Sureños* and typically wear blue clothing items to show their allegiance.  They also tattoo themselves with gang symbols and "tag" locations with gang graffiti to claim territory or to challenge rival gang members.  Common words and symbols in their graffiti, tattoos, hand signs, and clothing include the number "20," "*Mara Salvatrucha*," "MS," "MS-13," *la garra* (i.e., the Devil's horns hand

1    sign), "20 *Locotes*," the Salvadorian flag and/or shield, "*Sureño*," "Lower Mission Gangster,"

2    "XIII," "XX," "FRISCO XX," and "*controla*" (i.e., control), among others.  Indeed, one

3    motto of MS-13 is "*mata*, *roba*, *viola*, *controla*," which means in Spanish, "kill, steal, rape,

4    control."

5    25.    **[Withdrawn by Dkt. No. 2423.]**  MS-13 is currently at war with all *Norteño* cliques in the

6    San Francisco Bay Area, and in particular, with the 22B *Norteño* clique.  The main reason

7    behind this particular feud is because Marcos "Gringo" Campos, a 22B member, murdered

8    Guillermo "Memo" Fuentes (then the 20th Street clique leader) in 2004.  In recent years, MS-

9    13 has chosen the area served by the Ingleside Police District, mostly populated by *Norteño*

10   gangs, as their hunting grounds.  The Ingleside District has experienced a spike in murders,

11   aggravated assaults, and other violent crimes against *Norteños* or Latino males who were

12   perceived to be *Norteños*.  The *Norteño* gangs claim the 24th Street corridor between

13   Guerrero Street and San Bruno Avenue and the borders of 23rd Street to Cesar Chavez.

14   Historically, most of the *Norteño* violence against MS-13 has occurred in MS-13 turf, which

15   is the north side of the Mission District.

16   26.    **[Withdrawn by Dkt. No. 2423.]**  The 20th Street clique has become one of the most active

17   gangs in San Francisco.  The gang "hunts" for rival gang members to bolster their fearsome

18   reputation and to intimidate their rivals and the community.  For the same reasons, the gang

19   also seeks to retaliate quickly (commit "payback") against rival gangs or other adversaries

20   whenever 20th Street members or associates are attacked and/or disrespected, or when 20th

21   Street demands are ignored.

22   27.    **[Withdrawn by Dkt. No. 2423.]**  In recent years, the 20th Street clique gang has been

23   experiencing a split in leadership because some of the older gang members — the "OGs" or

24   "original gangsters" — want to lay low and maintain the status quo, but the "youngsters"

25   want to enforce their gang creed and bolster their gang reputation through acts of violence.

26   28.    **[Amended by Dkt. No. 2423.]**  In San Francisco, in addition to the main *Norteño* and *Sureño*

27   gangs, there are also smaller gangs, such as the 11th Street *Sureños* in the Tenderloin District.

28   Moreover, some sellers of false identification cards and/or marijuana are loosely organized

and are called as "*nieros*," "*miqueros*," or members of "*DF*" (because they tend to come from Mexico City, which is sometimes called the *District Federales*). [*Original opinion: Violence committed by MS-13 is euphemistically called "work" or "jale." In addition to acts of violence, the 20th Street clique also extorts money and property from other groups — for instance, sellers of false identification cards and/or marijuana, referred to as "nieros," "miquieros," or "DF" (because they tend to come from Mexico City, which is sometimes called the District Federales, as well as smaller gangs, such as the 11th Street Sureños — that engage in criminal activity in territory claimed either by the clique or by friendly Sureño gangs.*]

29. "*Chavala*" or "*chavalas*" is slang for a little girl that MS-13 members use to refer to their rivals. Whenever an MS-13 member encounters a *chavala*, he is supposed to take some sort of violent action. "*Chapetes*" or "*chaps*" is another derisive slang term used by MS-13 members for their rivals, as is the term "buster."

30. "Scraps" in turn is a pejorative slang term used by *Norteños* to refer to MS-13 members.

31. Many MS-13 gang members sport the shaved head or close cropped look, which is the traditional *Sureño* style. However, the younger generation gang members ("soldiers") in San Francisco often shave both sides of the head and tie the top layers of their hair in a ponytail. The new generation of 20th Street clique members often sport 4X white T-shirts and saggy pants, or clothing with sports logos, such as clothing associated with the Dallas Cowboys, Los Angeles Dodgers, Seattle Seahawks, Raiders, and Duke Blue Devils, among others. Its members also wear jewelry depicting "MS-13" or a combination of "MS 20th Street" accompanied with blue stones.

32. MS-13 members also have engaged in the production of "rap" music that glorifies their violent creed and their predisposition for violence, some of which is posted on the Internet.

33. Some web pages also display gang symbols, writings, photographs, and other indicia of MS-13.

34. MS-13 20th Street has a soccer team in San Francisco Amateur Soccer Division called "*Los Guanacos*."

35. The term "*cholo*" is generally used to refer to any Latino gang member.

**DETECTIVE DION MCDONNELL'S PROPOSED OPINIONS**

1.  Latino gangs exist and operate in San Francisco and are divided into two general opposing sides, *Norteños* and *Sureños*.

2.  *Norteños* (sometimes generically called "Northerners") are primarily American-born Latinos while *Sureños* are primarily born outside of the United States. Historically, *Norteños* trace their familial roots to migrant workers who came to Northern California to work in agriculture. *Sureños*, in contrast, typically are immigrants, legal or otherwise.

3.  Out on the streets, *Norteños* feud with *Sureños*. Each side also feuds internally. In prison, however, *Norteños* ally themselves under the banner of the *Nuestra Familia* prison gang, which was formed in the California state prison system in the 1960s to protect and look after the interests of Northern California Latino prisoners, which felt that the dominant Latino prison gang then in existence, the Mexican Mafia, favored Southern California and immigrant Latino prisoners. Made members of *Nuestra Familia* ("*carnales*") often use *Norteños* inside prison and on the streets to commit crimes for them, such as narcotics trafficking, robbery, extortion, and acts of violence. *Norteños* who prove their loyalty and dedication to the *Nuestra Familia* have a chance of eventually being chosen to become *carnales* of the *Nuestra Familia*.

4.  *Sureños* are generally outnumbered in Northern California. Thus, in the Bay Area, while *Sureño* gangs sometimes feud with each other, they mostly war with *Norteño* gangs. Once in prison, *Sureños* ally themselves with the Mexican Mafia and obey orders from the Mexican Mafia.

5.  *Norteños* primarily claim the color red and hold the number "14" as one of their symbols, because the letter "N" — for *Nuestra Familia* — is the fourteenth letter of the alphabet. In contrast, *Sureños* primarily claim the color blue and the number "13," because "M" — for the Mexican Mafia — is the thirteenth letter.

6.  Both *Norteños* and *Sureños* occupy large swaths of the Mission District and other areas in San Francisco. *Norteños* are more prevalent in San Francisco. For example, the Natoma Street Locos, or "NSL 14th," occupies 14th Street from Valencia Street down to South Van Ness.

1    Then the other *Norteño* cliques are located in the south of the Mission District, near the 24th

2    Street corridor, which runs from Guerrero Street to Potrero Street and across Potrero Street

3    to which used to be *La Raza* Park and Ralph Playground.

4    7.    There are also numerous *Norteño* cliques in the lower half of the Mission District towards

5    21st Street and Alabama Street, 22nd and Florida Streets, and throughout the 24th Street

6    corridor.

7    8.    There is a buffer area between *Norteños* and *Sureños* in the Mission District of about one or

8    two blocks.  On the west side of the Mission District/24th Street corridor is territory of the

9    "Loco North Side," or "LNS." Capp Street and Shotwell also have their own cliques.  Then

10   "22 FLO" occupies 22nd Street and Florida Street.  "21st ABL" — 21st and Alabama — is

11   another clique occupying those streets, along with cliques on Hampshire Street and York

12   Street.  "22B" is another clique occupying 22nd Street and Bryant Street.

13   9.    In the Ingleside District toward Precita Park and 26 BC, is *Barrio Caliente*.  Then moving

14   south on Mission Street toward 30th Street is the 30th Street clique near Highland and

15   Richland Streets.  Farther out in the Geneva Avenue and Mission Street area are the 31st

16   Street *Norteños*.  In the area around Excelsior Avenue and Mission Street, an older *Norteño*

17   clique, "E-Mob," is re-forming.

18   10.   On San Bruno Avenue and Wayland is the Barrio Southeast *Norteños*.  Their territory is on

19   the 2700-block of San Bruno Avenue, Wayland, and Bacon Streets.

20   11.   *Sureños* generally claim the north side of the Mission District, from 15th Street/Mission

21   Streets to 21st Street/Mission, as well as Mission Playground at 850 Valencia Street, Dolores

22   Park, Franklin Square Park, and a 3-block radius east of Mission Street to South Van Ness,

23   and then up to Church Street.  For instance, the 16th Street Gang occupies 16th Street and the

24   Mission Street corridor, i.e., 2000-block of Mission Street between 15th and 17th Streets, and

25   then the 1900-block and the 2000-block of Mission Street.  The 11th Street *Sureños* operate

26   in the Tenderloin District, as does the Eddy Street clique of *Sureños*.  The former occupies

27   the Eddy Street corridor through Jones and Larkin, while the Eddy Street clique occupies the

28   500-block of Eddy Street.

12.   MS-13 is a *Sureño* gang in San Francisco.  They claim the area in the Mission District at about 19th and 20th Streets and Mission Street.  Thus, the MS-13 clique in San Francisco is commonly known as "20th Street."  In addition to 19th and 20th Street and Mission Street, MS-13 also claims the surrounding blocks west to Mission Playground at 19th Street and Valencia Street and up into Dolores Park.

13.   There is another MS-13 clique across the Bay in Richmond, which is a franchise of a Los Angeles clique called "*Pasadena Locos Sureños*," or "PLS."

14.   The common territory for the Mission-based *Sureño* gangs is Dolores Park and Franklin Square Park.  The 19th Street *Sureños* and MS-13 share Mission Playground, although MS-13 occupies the larger portion of Mission Playground.

15.   MS-13 in the Bay Area is a *Sureño* gang, as evidenced by the number 13 in its name, which demonstrates its allegiance to the Mexican Mafia.

16.   Tattoos are important to MS-13 gang members because they demonstrate a member's gang identity, his affiliation.

17.   Some MS-13 tattoos include the number "20," for 20th Street, written in either Arabic or Roman numerals.  Also, there is a tattoo consisting of three small dots, which stands for "my crazy life."  Sometimes, there's an additional dot, which represents the number 10, so that in combination with the three small dots, it symbolizes the number *Sureño* number 13.

18.   Another common MS-13 tattoo is of "*la garra*," the devil horns hand sign, which looks like the University of Texas hook 'em horns sign.  This is particular to MS-13.  Other tattoos include the letters "M" and "S," the words "*La Mara Salvatrucha*," "El Salvador," or some variant of "South," "Southside," or "*Sur*," which is short for *Sureño*.

19.   **[Withdrawn by Dkt. No. 2423.]**  MS-13 members seek to commit crimes in rival's territory.  This sends a statement to their rivals that MS-13 can act with impunity in their territory, an assertion of dominance.

20.   MS-13 expects its members to be totally devoted to the gang and expects its members to be trustworthy.  Trust is needed to survive on the streets where they are in competition or even war with rival gangs, and where they are trying to avoid law enforcement.  Thus, cooperation

x

1    with law enforcement for any reason is a cardinal sin for a gang member.  Violation of this
2    rule results in being "green lighted," or being authorized to be killed.

3    21.    The principal manner MS-13 members gain respect within the gang is to develop a reputation
4         for courage and ruthlessness.  They do so by committing acts of violence against rivals, i.e.,
5         "putting in work."  They also get credit for other crimes, but nothing impresses fellow gang
6         members like violence against rivals, which demonstrates both courage and dedication to the
7         gang.

8    22.    Violence against rivals or against anyone who is perceived to have disrespected the gang
9         enhances the reputation of the member committing the act because it makes the gang that
10        much more fearsome and intimidating.

11   23.    In addition to committing crimes in rival territory, MS-13 also defends its own territory.
12        Members will challenge individuals in their territory and ask them to state their gang
13        affiliation.  For instance, if a Latino male is wearing red in MS-13 territory, he will be forced
14        to take off the offending clothing or surrender it.  If he refuses, he will be beaten.

15   24.    "Scraps" is a term of derision used by *Norteños* to refer to a *Sureño*, while "*chap*" or
16        "*chapetes*" is a *Sureño* term of derision for a *Norteño*.  *Sureños* also call *Norteños* "*chavala*"
17        and/or "buster." These insults have triggered many violent encounters between gang
18        members.

19   25.    Gang members do not cooperate with the police, even against a member of a rival gang.
20        Gang members settle their differences themselves.

21                          DETECTIVE FRANK FLORES' PROPOSED OPINIONS

22   1.    MS-13 originated in Los Angeles in the mid-1980s.  Because of the civil war in El Salvador,
23        there was a large influx of immigrants from that country to the United States in general and
24        Los Angeles in particular.  These immigrants banded together to form their own gangs for
25        self-protection against other gangs.

26   2.    MS-13 is not just in California, but in 25 to 35 other states, as well as in foreign countries
27        such as El Salvador, Canada, Honduras, Guatemala, and Mexico.

28   3.    There are an estimated 10,000 MS-13 members in the United States, principally located in

                                               xi

California, Virginia, Maryland, Texas, Arizona, Washington, and Nevada. MS-13 spread as Central American immigrants spread, usually to follow employment opportunities or to avoid the threat of deportation. MS-13 was established in El Salvador and other countries when gang members in the United States were deported back to their countries of origin.

4.   The early mannerisms and dress of MS-13 were adopted from hard rock culture, e.g., long hair, AC/DC t-shirts, which, over the years, evolved into the more prevalent "cholo" style, e.g., baggy clothing, white t-shirts, shaved or slicked-back hair, muscle T-shirts, sports jerseys, large belt buckles.

5.   MS-13 members identify themselves as "*Sureños*," which is a general term for members of California Latino street gangs who align with the Mexican Mafia ("La EME"), a prison gang that exercises control in the prisons of Southern California and the street gangs who align themselves with it.

6.   Some common traits of *Sureños* include: adopting the color blue as their gang color, and to a lesser extent, white and black, usually worn in combination with blue, and the number 13 as one of their symbols. They also wear sports jerseys, caps, belts, and other clothing that are blue, as well as clothing with phrases such as "Southside" or "Southpole" to display their gang affiliation. Belt buckles also often evince gang affiliation, such as belt buckles with "MS" or the number "13" inscribed therein.

7.   The number 13 is significant because it corresponds to the letter "M," which is the thirteenth letter in the alphabet and the symbol of the Mexican Mafia, which is one of the dominant prison gangs in the California prison system. Out on the streets, gangs often fight against each other. Once a gang member is sent to prison, however, that person — at least for self-protection if not for more mercenary reasons — often has to choose sides among the many different prison gangs, such as the Aryan Brotherhood (composed of white inmates), the Black Guerilla Family (composed of African-American inmates), the *Nuestra Familia* (which claims the allegiance of Latinos usually born in the United States and with familial roots in Northern California) and, of course, the Mexican Mafia.

8.   *Sureños* align with the Mexican Mafia for protection in prison. The Mexican Mafia also

directs crimes within prison, such as violent attacks and drug dealing, as well as directs *Sureños* outside of prison to engage in illegal activities, such as drug trafficking and violence. A *Sureño* who proves his loyalty and worth by committing crimes for the Mexican Mafia may be chosen by the made members of the Mexican Mafia ("*carnales*") to become a *carnal*.

9.    Basically, MS-13 is organized into local cliques, like franchises, based on local geography that it inhabits and claims.  For instance, the Normandie clique identifies with Normandie Avenue that runs in Los Angeles, California, while the Hollywood clique associates itself with the Hollywood region in Los Angeles.

10.   Like franchises, some of the cliques in Los Angeles have transplanted themselves elsewhere. This happens usually when a member of the original clique moves to a new location and starts an MS-13 clique in the new area.  For instance, gang members of the well-known Normandie clique in Los Angeles who were deported back to El Salvador have formed a Normandie clique in El Salvador.

11.   Using the names of existing cliques grants a new "franchise" borrowed respect if the clique's name is well-known.  "Franchising" the name, however, at least nominally subjects the new clique to the oversight of the original clique.

12.   Of course, entirely new cliques can and are created.  For instance, El Salvador has a locally named clique called the "*Tecals*" (Sailors) clique.

13.   Cliques are often referred to by their initials.  For instance, "SLSW" stands for "*Sailors Locos Salvatrucha Westside*," which is a clique in El Salvador.  "NLS" stands for both "Northside Locos" and "Normandie Locos."  "PLS" stands for "*Pasadena Locos Sureños*."

14.   Each clique has a loose hierarchy.  Depending on the size of the clique, there is usually a leader called the "shot caller" or "*primera palabra*," i.e., "first word."  Sometimes there is a second in command called the "*segunda palabra*," or "second word."  There may be a third in command called "*llavero*" or "key holder."  There may also be a treasurer for the clique.

15.   Members ascend to leadership within a clique based on their reputation as gang members: i.e., someone who is feared and respected and who comes recommended by past leadership or by others who are feared and respected typically become leaders.  Respect comes from

1    demonstrating aggressiveness and courage, usually by engaging in violence against rivals

2    gang members or even the police, or representing the gang through acts of daring and bravura,

3    which enhances the reputation of the gang as a whole.

4    16.    A clique leader is supposed to enforce discipline, uphold the rules of the gang, and make sure

5    that his members adhere to the rules.  He leads meetings and is supposed to make sure

6    members pay dues as well as are representing the gang in the conduct of criminal activity,

7    especially violence against rivals.

8    17.    Typically, MS-13 meetings begin with a roll call, followed by announcements of news about

9    the clique, especially about any on-going feuds.  Any disciplinary actions — sometimes

10    referred to as "court" — against members is also addressed and, if necessary, administered.

11    Gang dues are also collected and use of gang money and property is also discussed.  Planned

12    criminal activity, such as retaliation against rivals, is also discussed.

13    18.    Different cliques communicate with each other to help each other survive, usually in feuds

14    against common rivals, as well as to ensure that MS-13 cliques are aware of each other's

15    affairs.  Meetings of the leadership of different cliques, sometimes called "*generales*," are

16    periodically convened.

17    19.    At *generales*, issues and problems common to the cliques are addressed, such as identifying

18    common enemies, responding to law enforcement, and sharing intelligence.  Informants and

19    infiltrators are also a concern at all levels of organization.

20    20.    New members to MS-13 are initiated by being "jumped in," that is, a ritual beating of the

21    initiate by members of the gang for a set period of time, usually to the count of 13 seconds,

22    although the time varies from clique to clique.  This ritual is to reinforce to the initiate the

23    world into which he is entering, a world of violence and toughness: the initiate joins the gang

24    through violence and can only leave the gang through violence, or, in the worst case, death.

25    The ritual beating also establishes the bond between gang members, and sets the expectation

26    for them that they will have to fight for each other and together.

27    21.    Members of MS-13 are expected to devote their lives to the gang and to make the gang their

28    priority.  They are supposed to engage in violence to benefit the gang and enhance the gang's

reputation.  The notion of benefit includes making money for the gang, usually through illegal activities, but can be something as simple as "representing" the gang, that is, bolstering the notoriety of the gang by engaging in feats of daring, such as fighting against more numerous rivals or shooting at rivals in rivals's territory.

22.     Members of MS-13 rarely successfully leave the gang because leaving the gang means making an enemy of the gang.  Leaving the gang is perceived as disrespecting or betraying the gang.  Those who effectively leave the gang typically uproot their lives and relocate.

23.     MS-13 uses graffiti to identity its territory, to communicate with each other, to antagonize rivals, and to instill intimidation and fear in rivals and in the community.  The graffiti remind people of MS-13's existence and presence.  Graffiti are advertisement for the gang and enhance their notoriety.

24.     Typical MS-13 graffiti include MS-13 signs, symbols, and phrases.  For instance, the letters "MS" by itself or in combination with the number "13" — sometimes written in Roman numerals — or "MS *Trece*" or "*Sureños Trece*," "*La Mara Salvatrucha*," the devil's pitchfork, the devil horns hand sign (called "*la garra*" and which looks like the Texas A&M hand sign), a clock with hands on "1" and "3" for 13, El Salvador, the Salvadoran flag, all are examples of common MS-13 signs, symbols, and phrases.  Likewise, "*Sur*," which is short for *Sureño*, is often seen.  Also, "*eme ese*" — Spanish for the letters "M" and "S" — are also drawn as MS-13 graffiti, tattooed onto members, or worn or possessed by gang members.  A teardrop tattoo typically means that someone has killed for the gang.  Other MS-13 symbols used in graffiti and tattoos include prison towers to signify confinement, grave stones or the letters "RIP" or the phrase "*en paz descancen*" to signify the death of a gang member, guns, knives, and other weapons, and demonic symbols suck as a skeletal hand making the devil's horn hand sign.

25.     Not all MS-13 members have tattoos.  Over the years, the gang has gotten, if not more sophisticated, then at least more sensible.  As the police have been investigating the gang more, the gang realize that its members's tattoos — which they used to proudly display to demonstrate their affiliation and spread the reputation of the gang — have become a

detriment: it makes them obviously identifiable.  So tattooing has diminished over the years, or at least is less obvious: members now often avoid tattoos or get smaller tattoos in less obvious places.

26.     MS-13 and their rivals carry out their rivalry via graffiti.  They seek out and deface each other's graffiti and cover rivals's graffiti with their own.

27.     Another common symbol which is often tattooed on to gang members is a cluster of three dots in a triangular formation.  This tattoo is known as the "*mi vida loca*," or "my crazy life" tattoo.  It signifies adoption of the gang lifestyle, one built on fear, intimidation, and violence, on upholding the gang's reputation and one's own reputation in the gang.

28.     Certain slang terms or profanities are commonly used as put-downs by MS-13 members for their rivals.  "*Mierda seca*" is one, and refers to dried feces.  "*Putos*" is a profanity used to refer to homosexuals.

29.     The term "*marero*" in El Salvador is a general word for a gang member, but here in the United States, it usually refers to an MS-13 member.

30.     It is customary for MS-13 members to mourn the death of one of their own with a memorial at the site of death.  Usually, the memorial consists of a photograph of the deceased with written messages and with gang symbols to show that during his life, he was part of the gang.

31.     MS-13 members use hand signs to communicate.  The hand signs state their allegiance to the gang.  One hand sign is the devil horns gesture.  Another is forming the letters "M" and "S" with the hands.

32.     In the world of gangs, identifying oneself with a particular gang is expected.  MS-13 members take pride in their gang identity: without their gang affiliation, they would be dismissed as mere "*paisas*," ordinary criminals.  Their gang membership ostensibly boosts their standing on the streets, makes them part of a selective, elite organization that is selective in its membership and that has its own specific rituals and rules.

33.     Someone who is not a member of MS-13 who displays MS-13 gang symbols, has a gang tattoo, or flashes gang signs runs the risk of retaliation by the gang.  An outsider misappropriating MS-13 symbols and mannerisms is deemed to be disrespecting the gang.

34.   One of MS-13's mottos is some variation of the words "*matar, violar, controlar*," which means "to kill," "to rape" and "to control," or "*rifa*" and "*controla*," which means "to rule" and "to control." These mottos manifest the gang's desire and intent to dominate others through violence and intimidation.

35.   In Los Angeles, much of the rivalry between MS-13 and other gangs is over control of territory in which to distribute drugs or control of taxation of drug dealers. However, feuds can ignite over other issues, such as control over extortion victims. Of course, gang identity is also a cause of violence: an MS-13 member will attack a member of a rival gang simply because of their different allegiances.

36.   MS-13 members often speak or write in a simple code. For instance, they'll switch the letters of a name or pronounce the syllables of a name in reverse order. Thus, "Flores" will be spelled or pronounced "Resflo."

37.   MS-13 members often use other code words. For instance, the word "girls" is often used for guns. Carrying this further, a girl's name is also used to refer to guns. Meaning is often based on context.

38.   In some ways, MS-13 as a whole is supposed to operate in an almost feudal capacity. Local cliques collect money from its members for the use of the clique. Typically, this would be to purchase drugs, guns, and sometimes for gang functions, like parties. Money is also used to provide bail for incarcerated members or to pay for lawyers for arrested members. For those members in jail or prison, gang money is also collected and placed in their commissary accounts. Ideally, any money left over is sent to El Salvador to help out gang members there, members who are hiding from law enforcement or who are imprisoned. What may be a relatively small amount of United States dollars goes quite far in El Salvador and Central America.

39.   Like any organization, cliques typically keep records of its membership and dues. These are usually very simple, like a name with a number next to it denoting the amount paid.

40.   MS-13 members also keep newspapers clippings of their gang's crimes and exploits. These are prized as trophies. The gang is part of their lives, and they are proud of the activities of

1          the gang, especially if these are infamous crimes.

2    41.    MS-13 members commit acts of violence and other crimes to demonstrate their courage and

3          commitment to the gang.  Doing so increases their standing in the gang.

4    42.    Incarcerated gang members have figured out ways to communicate with the outside.  They

5          speak over the telephone, usually using code.  They also get personal visits with friends and

6          family, girlfriends, who convey messages.  Coded letters are often used as well.  Also, El

7          Salvadoran prisons are not particularly strict, so members often sneak in cellular telephones

8          to use.  This also happens sometimes in the United States.

9    43.    A "kite" or a "filter" is a little note on which messages are written.  They are often hidden in

10         small items or even inside the body and passed around within prison or passed on to a visitor

11         who delivers it to someone outside of prison.

12   44.    MS-13 has rules that are supposed to be followed by all its members, though there are local

13         variations and adherence varies.  For instance, all members are supposed to be "jumped in,"

14         and violation of rules are supposed to be punished, often by a "13," i.e., a beating for 13

15         seconds.  The principal rule is that a member does not cooperate with law enforcement.

16         "Snitching" is a capital offense.  Even talking to law enforcement about something that does

17         not implicate the gang is considered a sin.  In addition, members are supposed to attend gang

18         meetings, pay dues, and "represent" the gang well.  "Representing" the gang well, in the gang

19         world, means to demonstrate courage and dominance, which means the commission of

20         violence.  A member enhances his reputation with audacious acts of violence, such as fighting

21         rivals when outnumbered, not backing down when challenged by anyone, or hunting for rivals

22         in rivals's territories.  An MS-13 cannot allow himself to be disrespected without retaliating;

23         he cannot back down from a fight or challenge, whether from a rival gang member or from

24         a *paisa*.  MS-13 members must retaliate when challenged or disrespected or else they will be

25         perceived as weak.

26   45.    There are also other rules, some specific to local cliques.  In Los Angeles, where the principal

27         rival to MS-13 is the 18th Street gang, an MS-13 member is not supposed to use the number

28         18 or 8.

46.    Violations of gang rules can bring on a wide range of punishments, depending on the severity of the transgression and the strictness of the clique's leadership.  Sometimes, for minor infractions, it can be a fine.  For something more serious, it could be a beating by other members.  The worst offenses result in a "green light," that is death: the gang's members are authorized to kill you.  The most serious capital offense is to cooperate with law enforcement, that is, betraying the gang.

47.    The word "*chavala*" (plural "*chavalas*") is slang for a little girl, and it is a term of disrespect that MS-13 members often use to refer to their rivals. Whenever an MS-13 member encounters a *chavala*, he is supposed to take some sort of action.  He is supposed to at least challenge the rival to a fight, if try to kill the rival.

**APPENDIX B**

**SERGEANT MARIO MOLINA'S ALLOWED OPINIONS**

1. *La Mara Salvatrucha* — which loosely translates into "beware the Salvadorans" — is a gang composed largely of Salvadoran nationals that was established in the mid-1980s in Los Angeles, California.  *La Mara Salvatrucha* is also known as "MS-13."

2. MS-13 has various cliques in parts of California and elsewhere.

3. A Southern California clique is called *Pasadena Locos Sureños*, sometimes called "PLS."

4. MS-13 is a *Sureño* gang, which means that its members typically are immigrants with roots outside of the United States, claim the color.

5. *Sureño* gangs in San Francisco generally claim the northern parts of the Mission District as their territory.  This includes the area defined by 16th Street between Guerrero Street and Potrero Avenue, the 2200-block of Mission Street, roughly between 18th and 19th Streets, South Van Ness and 19th Streets, pushing on to Folsom Street, and a few small alleys between Mission and Valencia Streets, *i.e.*, Carlos Alley and Sycamore Alley. *Mission Playground, Franklin Square Park, and Dolores Park are also claimed by Sureños.*

6. *Sureño* gang members in the San Francisco Bay Area are outnumbered by their principal rivals, the *Norteños* (also generically called "Northerners").

7. *Norteños* trace their roots to migrant farm workers who came to Northern California for work, and they typically draw their ranks from Latinos who were born in the United States with familial roots in Northern California.

8. *Norteños* claim the color red.

9. By way of example, some *Norteño* cliques in San Francisco include San Francisco Mission ("SFM"), Loco Northside ("LNS"), 22nd and Bryant ("22B"), 21st and Alabama ("21 ABL"), and the Back Streets.  Generally, *Norteños* claim as their turf the south side of the Mission District, with the 24th Street corridor as the northern boundary, and 24th Street between Church Street and Potrero Avenue east-west, and Mission Street between 23rd Street to the Top of the Hill in Daly City heading north-south. In addition, certain parks and playgrounds are also claimed by *Norteños*.

**United States District Court**
For the Northern District of California

10. *Sureños* and *Norteños* gang members are rivals in San Francisco.

11. *Sureño* members use codes to communicate. For instance, the word "girl" is often used as a code word for gun, and girls' names are also used for the same purpose. Many of these codes are context specific. Some of the more common codes, however, include "fiesta" or "party" to refer to a hunt for members of rival gangs. Members also use code in their letters to each other.

12. As noted above, MS-13 gang members consider themselves *Sureños* and typically wear blue clothing items to show their allegiance. They also tattoo themselves with gang symbols and "tag" locations with gang graffiti to claim territory or to challenge rival gang members. Common words and symbols in their graffiti, tattoos, hand signs, and clothing include the number "20," "*Mara Salvatrucha*," "MS," "MS-13," *la garra* (*i.e.*, the Devil's horns hand sign), "20 *Locotes*," the Salvadorian flag and/or shield, "*Sureño*," "Lower Mission Gangster," "XIII," "XX," "FRISCO XX," and "*controla*" (*i.e.*, control), among others.

13. "*Chavala*" or "*chavalas*" is slang for a little girl used to refer to rivals. "*Chapetes*" or "*chaps*" is another derisive slang term used by MS-13 members for their rivals, as is the term "buster."

14. "Scraps" in turn is a pejorative slang term used by *Norteños* to refer to MS-13 members.

15. Many MS-13 gang members sport the shaved head or close cropped look, which is the traditional *Sureño* style. However, the younger generation gang members in San Francisco often shave both sides of the head and tie the top layers of their hair in a ponytail. Some sport 4X white T-shirts and saggy pants, or clothing with sports logos, such as clothing associated with the Dallas Cowboys, Los Angeles Dodgers, Seattle Seahawks, Raiders, and Duke Blue Devils, among others. Its members also wear jewelry depicting "MS-13" accompanied with blue stones.

16. MS-13 has a soccer team in San Francisco Amateur Soccer Division called "*Los Guanacos*."

17. The term "*cholo*" is generally used to refer to any Latino gang member.

*NOTE:  THE ABOVE ALLOWED OPINIONS MAY BE SUPPLEMENTED BY FACT  EVIDENCE PRESUMABLY KNOWN BY SERGEANT MOLINA.*