United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,

  v.

IVAN CERNA, *et al.*

    Defendants.
                                  /

No. CR 08-0730 WHA

**MEMORANDUM OPINION RE SEVERANCE AND TRIAL CONTINUANCE MOTIONS**

**INTRODUCTION**

This memorandum opinion explains the recent rulings on severance and trial continuance (Dkt. No. 3135). As stated earlier, three of the remaining twelve defendants will be tried separately from the first nine and the smaller trial will necessarily be postponed. All other severance and postponement requests are **DENIED**, generous continuances having already been granted previously in this prosecution now pending for almost 28 months.

**STATEMENT**

In this RICO/VICAR MS-13 gang prosecution, the indictment was filed in October 2008; was superseded in 2009; and the third and final superseding indictment issued in September 2009. A total of 34 defendants were accused. Twenty-two have pled or were tried earlier. Twelve now remain for trial. The trial is estimated to last many months.

Discovery and trial preparation have been complicated by two main factors. *First*, the government has turned over a large number of audio recordings, almost all in Spanish,

leading to a defense project to translate and transcribe them. This started in 2009 and has to date consumed $819,989 in CJA funds to pay for the translations and transcriptions. Of course, many millions in CJA funds have otherwise been devoted to this case. *Second*, with respect to other written discovery, the prosecutors have redacted names (and other identifying information) to protect civilian witnesses, whose lives would have otherwise be in danger due to their cooperation and/or their perceived cooperation. This problem was eventually solved via a stipulated protective order allowing access by counsel (and eventually even by the accuseds) to protected information.

The original trial date was set for May 2010 but was continued to September 2010 upon the filing of the third superseding indictment. In the summer of 2010, however, the later trial date was yet again moved to allow further time for the translation/transcription project (for the audio recordings). The new trial date was set as March 7, 2011, which remains the trial date.

The scheduling order continuing the trial date specified that "the burden is on defense counsel to prioritize the transcription/translation project so as to be ready for trial" (Dkt. No. 1921). An accompanying memorandum opinion explained that no further continuances would be granted to translate and transcribe the audio recordings (Dkt. No. 1922). The memorandum opinion detailed why all the audio recordings necessary for trial can be and will be transcribed and translated for effective use in a March 2011 trial. Specifically, the memorandum opinion detailed why the DH consensual recordings (body wires and phone conversations recorded with the informants' permission) are the recordings most likely to contain probative evidence whereas the jails calls made after the accuseds were charged and apprehended are unlikely to contain probative evidence. The order specifically recognized that not all of the thousands of jail calls would be translated and transcribed before trial, but noted that this was not necessary for a fair trial. The order expressed confidence in counsel's ability to prioritize and select those recordings that matter most. Defense counsel was specifically advised that the continuance would be the last continuance granted due to the recordings issue:

2

> "[r]eluctantly, the Court will postpone the trial by another six months in order to allow more of these recordings to be processed. That will be it. At long last the Court has concluded that there is no necessity for indulging in the enormous luxury of translating and transcribing each and every recording and that counsel have sufficient information about the recordings to prioritize the few that really need prioritizing" (Dkt. No. 1922 at 1–2).

Since the memorandum opinion was issued, there have been no further recordings produced by the government and no disruptions to the translation/transcription process have been reported. Until the instant motion, no counsel have alerted the Court to any supposed need for even more resources to speed up the process.

## ANALYSIS

### 1. MOTION TO CONTINUE

Through a motion filed by defendant Moris Flores and joined by all other remaining defendants, the defense seeks to continue the March 7 trial date (Dkt. No. 2884).[1] This request is **DENIED**. The request is rooted in the assertion that a continuance is necessary to conduct further investigation and prepare for trial. Although it is true that another continuance would provide counsel with additional time to prepare, defendants' right to counsel and right to due process do not require another continuance. By March 7 — the first day of *voir dire* — counsel will have had adequate time to prepare. Moreover, any minimal benefit that would inure to counsel is significantly outweighed by logistical considerations counseling for trial proceeding on March 7, as well as substantive concerns such as witness memory loss and danger to cooperating witnesses and civilian witnesses.

A trial court has broad discretion with respect to trial scheduling. *Houston v. Schomig*, 533 F.3d 1076, 1079 (9th Cir. 2008). In considering whether a continuance should be granted, the trial court should consider: (1) the defendant's diligence in

---

[1] All remaining defendants move to join in defendant Flores' continuance motion (Dkt. Nos. 2902, 2908, 2913, 2925, 2935, 2936, 2937, 2938, 2940, 2948, 2949, 2953, 2954, 2973). These joinder motions are **GRANTED**. Counsel for defendant Marvin Carcamo, however, is reminded that the filing of a tardy joinder motion runs the risk of the joinder motion being denied as untimely. The tardy filing of the joinder motion will be overlooked in this instance as the government could adequately respond to the arguments contained in the continuance motion without additional detail from defendant Carcamo short of his interest in joining the motion.

3

readying the defense; (2) the likelihood the requested continuance would satisfy the defendant's needs; (3) the inconvenience to the court, the opposing party, and witnesses; and (4) the extent to which the defendant may be prejudiced by denial of the requested continuance. *United States v. Tham*, 960 F.2d 1391, 1396 (9th Cir. 1992). As discussed below, after considering these factors, the undersigned has concluded that the defense has not demonstrated that a continuance is warranted. Specifically, the defense has failed to articulate a specific need for a continuance that outweighs the significant problems a continuance would pose for the orderly progression of the case and the interest of the public. This case has been pending for almost two and a half years — memories of witnesses are fading and many resources have been allocated and committed to the commencement of trial on March 7. A continuance would also unnecessarily prolong and exacerbate the danger faced by civilian and cooperating witnesses.

### A. Audio Recordings

The primary defense argument for a continuance is the claim that "material" audio recordings will not be translated and transcribed by March 7. This argument is little more than a rehash of the same argument made by the defense approximately seven months ago. Indeed, the six-month continuance of trial from September 2010 to the current trial date was to allow for further translation and transcription by the defense (Dkt. No. 1921). Significantly, the government produced a list of audio recordings it intended to use at trial over ten months ago — prior to the granting of the last continuance. Although the listed recordings are not all that the defense must transcribe and translate, the list provided the defense with clear advance notice of the recordings the government will be relying on for its case-in-chief.

As discussed above, a memorandum opinion issued over six months ago found that it was unnecessary and wholly impracticable for the defense to translate and transcribe all of the audio recordings produced by the government (Dkt. No. 1922). The opinion clearly explained that the DH consensual recordings were the critical, "high grade ore" that

4

1 needed to be transcribed and translated prior to trial. These recordings will be translated
2 and transcribed by the end of February (Claus Decl. ¶ 2).

3 The defense's current definition of "material" audio recordings is inconsistent with
4 the July 2010 opinion's findings. For example, the defense has apparently classified 1,300
5 of the 1,800 jail calls as "priority" for translation and transcription based on "possible
6 materiality" (Perilman Decl. ¶ 5). This vague assertion of "materiality" of a vast number
7 of jail calls — which the government will not use in its case-in-chief — does not warrant a
8 continuance. Again, the jail calls were known by defendants to be monitored so it is
9 highly unlikely that anything said therein would inculpate one defendant and somehow
10 exculpate another. This is a search for a needle in a haystack where it is unlikely any
11 needle is even there. By contrast, the DH consensual recordings are of much more
12 potential value, being part of the alleged *res gestae* itself. The defense acknowledges that
13 translation and transcription of the DH consensual recordings will be complete by trial,
14 and there is no reason why the non-DH *consensual* recordings cannot also be translated
15 and transcribed prior to trial.[2]

16 Notably absent from the defense's submissions are details regarding the time and
17 resources invested by the defense in the translation/transcription project over the last six
18 months since the memorandum opinion issued. Although it is true that the government
19 produced a large number of audio recordings in 2009, there has been no proffer suggesting
20 that it would have been impossible or even impracticable for the defense to have made
21 further progress on the translation/transcription project than it has so far. It is unclear how
22 many individuals have been devoted to the project and how much time these individuals
23 have spent on the project. The defense does not claim that the resources allocated to the
24 defense — monetary or human — were exhausted. Even if that were the case, the defense
25 could have applied — and was indeed repeatedly encouraged by the Court to apply — for

---

[2] The Perilman and Claus declarations do not provide an estimate for when the consensual non-DH recordings will be transcribed and translated. Instead, the declarations estimate that all "priority" non-DH recordings — including jail calls — will be complete by June 2011. All of these recordings have already been transcribed and only need to be translated.

5

more CJA funding to secure any additional needed resources. The CJA authorization for the translation/transcription project (totaling $1.7 million), however, has not been exhausted and additional applications for further assistance have not been received. Additionally, if the defense was falling behind its schedule for the project, it should have notified the undersigned earlier so that remedies could be taken. Instead, the defense has waited to the eve of trial to replay the same old broken record.

Similarly, although the motion and supporting declarations provide "estimates" as to when the translation/transcription project will be complete, the bases for these estimates are not provided. For example, it is unclear whether the estimates are based on one individual working forty hours a week, or some other expenditure of resources.

The continuance motion also fails to articulate what is expected to be found in the vast morass of jail calls and audio recordings that purportedly cannot be translated and transcribed prior to the March 7 trial date. Accordingly, the defense has failed to articulate how it would be prejudiced if all recordings were not translated and transcribed and has failed to articulate with any specificity how a continuance would actually aid the defense in a meaningful way.

The defense also complains that the government had not — as of the filing of the continuance motion — provided the defense with final transcripts of the recordings the government intends to use at trial. This, however, was not required. The scheduling order required an exchange of final transcripts between the defense and the government on January 18 — a deadline which the government complied with (in contrast to the majority of the defense) (Dkt. Nos. 1921, 2513, 3022, 3028, 3031, 3038, 3039, 3060, 3072, 3074, 3090, 3091, 3116). Although the defense asserts that the government "promised" to disclose final government transcripts on a rolling basis (rather than draft transcripts — which the government did disclose on a rolling basis), the only support the defense provides for this contention is a letter to the government drafted by *defense counsel* noting the defense's unconfirmed belief the government would do so (Rosenbush Decl. ¶ 2). For obvious reasons, this does not constitute adequate proof of a government promise to that

effect. Finally, the defense's assertion that it does not have adequate time to review the final transcripts is purely speculative — no support for this claim has been tendered.

### B. Recent Discovery Productions

The defense also argues that recent productions by the government warrant a continuance. These arguments are similarly rejected.

*First*, although the government produced approximately 500 pages of *Brady* and Jencks material on December 22, 2010, and the produced material contained information defendants were previously unaware of, the production was timely under the current scheduling order and prior iterations of the scheduling order (Dkt. Nos. 1921, 2513). By no means should the defense have been surprised that the government would be making such a production at that time. Indeed, the undersigned has repeatedly declined to modify *Brady* disclosure deadlines, frequently reminding all parties that the government has an obligation to provide *Brady* materials in time for effective use at trial, irrespective of the deadlines established in the scheduling orders (*see, e.g.*, Dkt. Nos. 694, 2513, 2727). More importantly, the production at issue was made two and a half months before jury *voir dire* will commence — the defense has adequate time to investigate any information contained in the production. Also notable is that the produced Jencks Act materials were not even required to be produced at this juncture.

*Second*, the defense complains that the government produced 6,000 pages of unredacted discovery in early January. This objection is also overruled. Ample time remains for defendants to analyze this unredacted discovery. Although it is inconvenient that the government did not produce the unredacted discovery with corresponding bates numbers to the original redacted discovery, this inconvenience is not insurmountable. The documents can be compared and any additional resources required by the defense (e.g. additional support staff) may be applied for through the proper CJA channel. Significantly, the discovery is not new — it was produced to the defense in redacted form and records of interest should have already been flagged and noted by the defense teams well before this most recent production. The sources and dates of reports and memoranda

1  are known and can be compared with the unredacted versions of the same documents.
2  The government is not required to produce discovery in a format ideally suited to the
3  defense plan of preparation. It does not even appear that the defense asked the
4  government before the production to use the Bates number system now requested. And in
5  spite of the defense's objections to the discovery being produced 79 days after the entry of
6  the stipulated protective order, no motions to compel were filed to obtain the discovery at
7  an earlier date.

8  It also bears noting that much of the continuance motion is devoted to discussing
9  pre-July 2010 events — events which were already considered in granting the prior
10 continuance to March 7. These events are irrelevant to whether yet another continuance
11 should be granted at this stage. For example, the continuance motion conveniently omits
12 any discussion of the bill of particulars litigation that occurred after April 2010.
13 Significantly, the complaints raised in the instant motion regarding the government's April
14 2010 bill of particulars were also raised in an earlier motion filed by defendant Flores,
15 which was heard and ruled upon in August 2010 (Dkt. No. 1854). Indeed, as a result of
16 that motion, the government submitted an additional bill of particulars with respect to
17 Count Four in September 2010 (Dkt. No. 2263). Similarly, the discovery mishaps that
18 occurred prior to the granting of the last continuance were already taken into account
19 when deciding the appropriate length of time to delay the trial. They will not be "double
20 counted" for a further continuance.

21         **C.    List of Protected Witnesses**

22 The defense also claims a continuance is necessary because defense counsel
23 cannot easily identify many of the individuals listed on the government's December 15
24 protected witness list and investigation regarding these witnesses will purportedly require
25 substantial time. The defense faults the government because: (1) the government did not
26 link the names of the protected witnesses to the incidents charged in the indictment or bill
27 of particulars; and (2) did not provide any further identifying information of the witnesses
28 such as addresses and social security numbers. The government, however, was not

8

required to provide anything beyond the identities of the protected witnesses. The December 6 order requiring the government to produce the list of protected witnesses specifically explained that the list was necessary to provide defense counsel with enough information to faithfully comply with the stipulated protective order and protect witness identities (Dkt. No. 2704). An order denying a defense motion to modify the scheduling order made clear that the stipulated protective order simply governed treatment of material disclosed pursuant to the government's *existing* obligations and did not create *new* discovery obligations (Dkt. No. 2727). The 109 witnesses listed in the protected witness list were not necessarily witnesses that the government will be calling at trial — those witnesses were disclosed in the government's January 31 final witness list.

In any event, the defense was not limited to investigating the incidents charged in the indictment until *after* the production of the government's protected witness list. Counsel have surely been tracking down at least some witnesses before the protected witness list was produced by the government. In any event, as the trial progresses should the government call a witness who the defense really did not have an opportunity to adequately investigate despite good faith and diligence, the defense may move — with a specific and cogent showing of necessity — for an opportunity to investigate the witness prior to the witness being re-called for cross-examination. And, of course, the defense need not cease its investigation efforts upon commencement of *voir dire* on March 7. Defense investigation will of course continue even as trial progresses. Court will be out of session beginning at 1 p.m. each court day and there will be occasional dark days. Moreover, defense team investigators, paralegals, and other support staff are not required to attend trial and will be able to conduct investigation remotely, even during trial hours.

### D. Civilian Witness Safety

A trial continuance would put civilian trial witnesses at further risk of harm. In addition to memory loss problems that witnesses might experience should a further continuance be granted, a continuance would exacerbate the already-existing threats to the safety of civilian and cooperating witnesses. After a long period of protection, the

9

identities of both civilian and cooperating witnesses have been released to defense counsel. Defense teams are presumably attempting to locate and interview these witnesses and their neighbors. Despite some ongoing protections built into the stipulated protective order, the civilian witnesses are at a heightened risk. Continuing the entire trial yet again would only prolong and exacerbate this risk.

There have been at least two fights between current and/or former defendants in the holding cells. In one case, stitches were needed. The Court is convinced that the motivation for this violence was the perceived cooperation of the attacked individuals. In fact, it is true that some defendants who have pled guilty will cooperate against the remaining defendants. The longer we wait to try this case, the longer the safety of cooperating and civilian witnesses will be at risk.

### E. Moot Requests to Continue

Defendant Montoya's joinder motion to the continuance motion is **DENIED AS MOOT** without prejudice to a renewed joinder motion in the event that his guilty plea is vacated (Dkt. No. 2947).

### 2. MOTIONS TO SEVER

Defendants Guillermo Herrera, Giovanni Hernandez, Jonathan Cruz-Ramirez, Luis Herrera, Danilo Velasquez, Moris Flores, and Manuel Franco move for severance from all or some of their codefendants (Dkt. Nos. 2750, 2751, 2752, 2753, 2757, 2764, 2765, 2767). These motions are **GRANTED IN PART AND DENIED IN PART**. Defendants Franco, Luis Herrera, and Velasquez will be tried separately. All other remaining defendants will proceed to trial on March 7.

Our court of appeals has emphasized that "a joint trial is particularly appropriate where the co-defendants are charged with conspiracy, because the concern for judicial efficiency is less likely to be outweighed by possible prejudice to the defendants when much of the same evidence would be admissible against each of them in separate trials." *United States v. Fernandez*, 388 F.3d 1199, 1243 (9th Cir. 2004) (citations omitted). FRCrP 14 "does not require severance even if prejudice is shown; rather, it leaves the

10

tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro v. United States*, 506 U.S. 534, 538–39 (1993). Severance is warranted "only if there is a serious risk that a joint trial would compromise a specific right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id*. at 539.

Here, an adequate showing for severance has only been made for defendants Franco, Luis Herrera, and Velasquez. With respect to defendant Franco, the government and a number of defendants have shown that defendant Franco should be severed to avoid *Bruton* complications. Defendant Luis Herrera has shown that his notably late entry into the alleged conspiracy warrants his severance and that such a severance will not implicate the same problems that severance of his codefendants would. Finally, defendant Velasquez has shown that his counsel cannot possibly proceed to trial on March 7 due to severe personal issues and it is unlikely that entirely new counsel could be prepared to proceed to trial within a month of being appointed. All other arguments for severance are rejected.

### A. *Bruton* Issues

Defendants Cruz-Ramirez, Lopez, Guillermo Herrera, and Franco each move for severance due to purported *Bruton* concerns. Specifically: defendant Cruz-Ramirez seeks severance from defendants Franco, Cruz-Zavala, and Lopez; defendant Lopez seeks severance from defendant Flores and Marvin Carcamo; defendant Guillermo Herrera seeks severance from defendants Franco and Cruz-Ramirez; and defendant Franco seeks a severance from all of his fellow codefendants.[3] These motions are **GRANTED IN PART AND DENIED IN PART**. Defendant Franco will be severed due to the extent of his prior testimonial statements which would only be admissible against him and not his codefendants. Helpfully, neither defendant Velasquez nor defendant Luis Herrera were implicated by defendant Franco's prior testimonial statements. Accordingly, defendants

---

[3] Defendant Lopez also originally sought severance from defendant Rafael Montoya, but this request is now moot as defendant Montoya pled guilty and is no longer proceeding to trial with defendant Lopez.

11

1  Velasquez, Franco, and Luis Herrera may proceed to trial together without *Bruton* complications.

2  With the exception of defendant Franco's testimonial statements, there has been no proffer of codefendant statements raising insurmountable *Bruton* issues requiring severance. *First*, many of the statements challenged by the defense are not inculpatory. For example, the vast majority of statements made by defendant Marvin Carcamo in an April 2 jail call are reactionary statements to the news of defendant Lopez's *arrest* rather than statements *inculpating* defendant Lopez (e.g. "Damn dawg," "That's fucked up, homie," "When did they get him"). Where a codefendant's confession does not directly implicate the protesting defendant, there is no *Bruton* violation. *Richardson v. Marsh*, 481 U.S. 200, 208–09 (1987).

Nonetheless, with the exception of statements made by defendant Franco, the vast remainder of the statements challenged in the severance motions are coconspirator statements that are independently admissible under Rule 801(d)(2)(E). A coconspirator statement is admissible against a defendant when the offering party demonstrates: (1) a conspiracy existed which involved the declarant and the non-offering party; (2) the statement was made during the course of the conspiracy; and (3) the statement was made in furtherance of the conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). Accordingly, if the government demonstrates at trial that there is sufficient evidence of the conspiracy and the non-offering party's involvement in it, the statements are admissible if made in furtherance of the conspiracy.

Although mere conversations between coconspirators are not "in furtherance" of a conspiracy, statements made to induce enlistment or further participation in the group's activities or to prompt further action by coconspirators are considered "in furtherance" of the conspiracy. Similarly, statements made to "reassure" coconspirators of a conspiracy's continued existence, to allay a coconspirator's fears, or to keep coconspirators abreast of the conspiracy's activities are also considered "in furtherance" of the conspiracy. *United States v. Yarbrough*, 852 F.2d 1522, 1535–36 (9th Cir. 1988). The statements at issue fall within these aforementioned categories. The statements were largely made to inform

12

1  coconspirators of current crises and events that the speaker likely believed the
2  coconspirators should be aware of in order to keep the conspiracy alive and well.

3  It does not matter that some statements were made prior to a defendant's entry into
4  the conspiracy — statements made by coconspirators prior to the entry of a defendant in a
5  conspiracy may be used against the defendant who subsequently joins the conspiracy.
6  *United States v. Brown*, 943 F.2d 1246, 1255 (9th Cir. 1991). Similarly, statements need
7  not be made to a member of the conspiracy to be an admissible coconspirator statement
8  under Rule 801(d)(2)(E). Instead, the focus is on the conspirator's intent in making the
9  statement, rather than the *actual* effect of the statement. *United States v. Zavala Serra*,
10 853 F.2d 1512, 1516 (9th Cir. 1988). The cases cited by defendants are distinguishable.
11 For example, in *United States v. Eubanks*, 591 F.2d 513, 521 (9th Cir. 1979), the
12 statements at issue were made by a conspirator to his wife — there was no evidence the
13 conspirator declarant was trying to induce his wife to be part of the conspiracy or that the
14 statements were somehow in furtherance of the conspiracy. This is different from the case
15 at hand, where the statements at issue were made to aid the conspiracy and were to
16 individuals whom the declarants clearly believed to be part of the same conspiracy.

17 In any event, where it is unclear at trial whether a statement was made in
18 furtherance of the conspiracy, a hearing will be held outside the presence of the jury to see
19 if the government is able to make the requisite preliminary showing.

20 If it is determined that a statement is not a coconspirator statement, the Court will
21 then implement a three-part universal fix to any potential *Bruton* problems. *First*, the
22 statement will be adequately redacted to remove the non-declarant defendant's identity.
23 *See Richardson*, 481 U.S. at 208–09. *Second*, the jury will be given an appropriate
24 instruction. *Third*, in those instances where redaction and/or a jury instruction is
25 inadequate, the objected-to statement will be precluded from coming into evidence. The
26 government has agreed that exclusion of statements would be appropriate in such
27 circumstances (January 10 Tr. 22).
28

13

Finally, the defense's objections to the statements on the basis of *Crawford v. Washington*, 541 U.S. 36 (2004), are rejected. As our court of appeals has explained, coconspirator statements are not testimonial and are thus outside the reach of *Crawford*. *United States v. Allen*, 425 F.3d 1231, 1235 (9th Cir. 2005).

### B. Mutually Antagonistic Defenses

Defendants Franco and Guillermo Herrera move for severance, claiming they have mutually antagonistic defenses from their codefendants which require severance. For the aforementioned reasons, defendant Franco will be severed due to *Bruton* concerns. Accordingly, defendant Franco's assertion that his defenses are mutually antagonistic to those of his codefendants need not be decided. Defendant Guillermo Herrera's request for severance from defendant Cruz-Ramirez due to purportedly mutually antagonistic defenses is **DENIED**.

Mutually antagonistic defenses are not prejudicial *per se*. *Zafiro*, 506 U.S. at 538. It has not been demonstrated that defendant Cruz-Ramirez's inconsistent accounts of whether he or defendant Guillermo Herrera was the shooter in the Estrada homicide is so prejudicial that severance is necessary. Although defendant Guillermo Herrera will certainly attempt to claim that defendant Cruz-Ramirez was the shooter while defendant Cruz-Ramirez will likely claim defendant Guillermo Herrera was the shooter, this disagreement does not make their defenses irreconcilable nor mutually exclusive. Instead, the quibble is over details rather than actual culpability for the incident. Both defendants are charged with the Estrada homicide and while both defendants may point the finger at one another in terms of who was the shooter, one defendant being the shooter will certainly not exonerate the other. Nor does the acceptance of one defendant's defense preclude the acquittal of the other.

### C. "Withdrawal" or "Unavailability"

Defendants Cruz-Ramirez, Guillermo Herrera, Hernandez, and Guevara argue — via motion and/or joinder — that severance is appropriate because they were out of the country or were incarcerated for a portion of the conspiracy's duration. These arguments

14

are rejected. *First*, a "late joiner" to a conspiracy is still liable for the scope and duration of the conspiracy even prior to the date he/she joined. *United States v. Traylor*, 656 F.2d 1326, 1337 (9th Cir. 1981) ("A person may join a conspiracy that has already been formed and is in existence. The new conspirator will be bound by all that has gone on before in the conspiracy") (citations omitted). *Second*, where a conspirator has not withdrawn or abandoned the conspiracy, the conspirator's involvement in the conspiracy has not ended. *See United States v. Jimenez-Recio*, 537 U.S. 270, 275 (2003). Even if the government "defeats" or frustrates the conspiracy's objective, the conspiracy is considered to be alive and well. Without withdrawal, the arrest or incarceration of a conspirator does not mean that a conspirator is no longer part of the conspiracy. *United States v. Lothian*, 976 F.2d 1257, 1261 (9th Cir. 1992). The actions and statements of an unarrested coconspirator who is still operating in furtherance of the conspiracy is still admissible against an arrested coconspirator to prove existence of the conspiracy. *United States v. Wentz*, 456 F.2d 634, 637 (9th Cir. 1972).

Defendants Flores, Cruz-Ramirez, Guillermo Herrera, Hernandez, and Guevara also argue — via motion or joinder — that severance is necessary because evidence of a coconspirators' actions from before the defendant reached majority age is inadmissible. These objections are also overruled. There is no authority supporting this position. Instead, it is well-accepted that although a jury cannot convict an adult defendant solely on the basis of acts of juvenile delinquency, post-majority participation in a conspiracy will allow that defendant to be properly charged with the entire scope of conspiracy — albeit not for the substantive crimes committed prior to joining the conspiracy. *United States v. Baker*, 10 F.3d 1374, 1419 (9th Cir. 1993). Common sense thus dictates that pre-majority evidence of a conspiracy will be admissible where a juvenile continues his/her conspiratorial conduct past the age of majority. As the Eleventh Circuit has explained, evidence of the entire scope of the conspiracy is admissible to prove the scope of the conspiracy, even if that evidence relates to pre-majority conduct. *United States v. Cruz*, 805 F.2d 1464, 1476 (11th Cir. 1986).

15

### D. Prejudicial Spillover

Defendants Cruz-Ramirez, Flores, Franco, Guillermo Herrera, Hernandez, Luis Herrera, Portillo, and Velasquez each argue that severance is necessary due to prejudicial "spillover." Specifically, each defendant alleges that prejudicial spillover will result because he was not a "big fish" in the gang, did not directly participate in the VICAR acts, or was a latecomer to the gang. With the exception of the objections of defendant Luis Herrera, these objections are overruled. The evidence alleged to be prejudicial spillover would still be admissible absent joinder of the defendants as all remaining defendants face charges of racketeering conspiracy and conspiracy to commit a violent act in aid of racketeering.

Defendant Luis Herrera, however, will be severed because unlike all other defendants he was not alleged to join the conspiracy until December 2008 — three months after the original indictment was filed. Although evidence of acts committed prior to defendant Luis Herrera's joining of the conspiracy are admissible for the purpose of proving the existence of the racketeering enterprise and conspiracy, his joining of the conspiracy at such a late stage warrants severance and trial with a smaller number of defendants. Moreover, substantive, direct evidence specific to defendant Herrera is limited to a discrete universe post-dating December 2008 and accordingly severance of defendant Herrera does not implicate the many witness memory and safety problems and logistical disruption that would result from severance of any of the other defendants.

### E. Preparedness of Counsel

As previously discussed with respect to the denial of the requested continuance, counsel have had ample time to prepare for the March 7 trial. Severance is not warranted to allow further time for counsel to prepare.

The argument that defense counsel for defendants Luis Herrera, Marvin Carcamo, and Guevara cannot be prepared because of their "late" appointment conveniently overlooks the fact that all three defense counsel were either appointed to substitute

16

*preexisting* counsel or were added as second counsel.[4] Accordingly, the "late" date of appointment of counsel is a red herring in that each of the three defendants had counsel prior to the appointment of their current counsel. The appointment of substitute counsel does not wipe clean the entire slate of prior counsel's work and representation of the defendant. Although some time for transition is of course necessary, all three defense teams have had more than ample time to transition. Current counsel for defendant Marvin Carcamo — the most "recent" attorney to be added to the case — *replaced* prior counsel in early August 2010.

Additionally, although defendants Luis Herrera, Hernandez, and Velasquez were all added to the case in September 2009 as part of the third superseding indictment, this delay was already considered and accommodated in the continuance of the trial date to September 2010. Accordingly, objections on this basis are overruled.

Defendant Velasquez, however, will be severed due to the severe personal issues currently being experienced by his counsel which will prevent his counsel from focusing on critical trial preparation in the coming months. The details regarding these personal issues have been submitted under seal and warrant a continuance (and hence a severance) in order to ensure adequate preparation of counsel.

### F. Other Logistical Issues

Defendants Cruz-Ramirez, Luis Herrera, and Velasquez each argue that severance is necessary due to the large number of defendants that were proceeding to trial at the time of the filing of their severance motions. Specifically, defendants argued that juror confusion, security problems, and courtroom capacity issues would result if all proceed to trial together. These concerns are overruled as moot. Three defendants are being severed for a second trial and a number of defendants have since pled guilty. Accordingly, the first trial is currently scheduled to proceed with only nine defendants — assuming no

---

[4] Although defendant Marvin Carcamo's counsel's complaint about being "last counsel" appointed in this case (raised in unrelated court filings) is entertained here, as discussed below, defendant Carcamo's untimely joinder motion is denied due to its utter failure to provide any explanation as to which arguments for severance apply to him and why.

17

further guilty pleas.  Furthermore, the undersigned has met with court staff and the United States Marshals Service and has been assured that there are no unresolvable security or courtroom capacity issues that would bar a joint trial of nine defendants.

### G. Joinders

Defendant Portillo moves to join in the severance motions of all remaining defendants (Dkt. No. 2776).  The motion is woefully inadequate in that it offers no explanation as to how the severance motions sought to be joined apply to him.  The most the motion offers it that the severance motions of Aristide Carcamo, Lopez, Guillermo Herrera, Hernandez, Cruz-Ramirez, Luis Herrera, and Velasquez are of "particular applicability."  The undersigned cannot make arguments for counsel and determine which arguments contained in the wide array of severance motions filed apply to defendant Portillo's particular situation.  The joinder motion is **DENIED**.

Defendant Hernandez moves to join in the severance motions filed by defendants Luis Herrera, Velasquez, Cruz-Ramirez, and Flores (Dkt. Nos. 2787, 2788, 2789).  Defendant Hernandez's motion to join the severance motions filed by defendants Luis Herrera, Velasquez, and Flores are **GRANTED** (Dkt. Nos. 2787, 2789).  Defendant Hernandez's motion to join the Cruz-Ramirez severance motion, however, is **DENIED**.  The joinder motion does not provide any additional detail with respect to how the motion applies to him except that he joins "to the extent" there are common issues.  This is not enough.

Defendants Marvin Carcamo and Cruz-Zavala both also move to join in *all* severance motions filed (Dkt. Nos. 2839, 2862).  These motions were not only late, but were both totally devoid of explanation as to why any of the other severance motions apply.  The joinder motions are **DENIED**.

Counsel for defendants Portillo, Marvin Carcamo, and Cruz-Zavala must all review the undersigned's prior orders and admonitions concerning joinders.  All three defendants have attempted to join in all severance motions although many of the motions

18

cannot possibly apply to them (indeed, at least two motions sought to be joined were based on rationales filed *ex parte* and under seal).

Defendant Guevara moves to join in the severance motions of defendants Aristedes Carcamo, Hernandez, Cruz-Ramirez, Luis Herrera, and Velasquez. The joinder motion is **GRANTED**. Unlike the other joinder motions, the joinder motion provides the necessary additional facts and does not leave the undersigned guessing as to the reasons why the motions sought to be joined apply to defendant Guevara.[5]

Similarly, defendant Guillermo Herrera's motions to join in the severance motions of defendants Cruz-Ramirez and Flores are **GRANTED** (Dkt. Nos. 2780, 2791). The joinder motions provide the additional facts necessary to discern the basis for joinder.

### H. Moot Requests to Sever

The severance motions of defendants Wilbert Castillo and Aristedes Carcamo and the joinder motion of Ivan Cerna are **DENIED AS MOOT** without prejudice to renewed motions in the event that their guilty pleas are vacated (Dkt. Nos. 2738, 2761, 2762).

### I. Future Requests to Sever

Defendant Guillermo Herrera moves to reserve "unknown motions to sever pending review of late discovery and as-yet undisclosed materials" (Dkt. No. 2980). This motion is **GRANTED IN PART AND DENIED IN PART**. Of course, tardy severance motions may be filed where new material or circumstances arise that counsel with due diligence could not have anticipated. In any such tardy motion, however, counsel must articulate the specific reasons why the late-filing should be accepted.

Defendants Cruz-Ramirez, Cruz-Zavala, Guevara, Hernandez, Lopez and Velasquez move to join in this motion. These joinder motions are **GRANTED**. Defendant Portillo, however, moved to join in the motion well after the government's opposition was filed, the hearing was held, and the order regarding severance issued. Defendant Portillo's joinder motion is **DENIED**.

---

[5] Defendant Guevara's explanation for the late filing of the joinder motion is insufficient. The joinder motion's late filing, however, will be overlooked because unlike the other tardy joinder motions, the joinder motion offered additional substantive detail required to determine how the motions apply to him.

19

**CONCLUSION**

For the reasons stated herein, trial will commence as previously scheduled on March 7 for all defendants except defendants Manuel Franco, Luis Herrera, and Danilo Velasquez.

**IT IS SO ORDERED.**

Dated: February 9, 2011.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE