IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>IVAN CERNA, *et al*.<br><br>Defendants.<br>_____/ | No. CR 08-0730 WHA<br><br>**MEMORANDUM OPINION<br>RE ADMISSION OF CERTAIN<br>CO-CONSPIRATOR STATEMENTS** |

In this RICO/VICAR gang trial, a number of government witnesses testified to statements allegedly made by defendants and other gang members in this case. Prior oral and written rulings have explained why many of these objected-to statements did or did not qualify as co-conspirator statements under Rule 801(d)(2)(E) or why the statements were not offered for the truth of the matter asserted (*see, e.g.*, Dkt. No. 4321; Tr. 11076–77, 11123–28). Nevertheless, throughout the course of trial, there have been occasions where the Court did not have the opportunity to articulate in detail the specific grounds for ruling that a particular statement was or was not admissible as a co-conspirator statement. This memorandum opinion seeks to explain the bases for those rulings not already explained.

A statement is admissible under Rule 801(d)(2)(E) if: (1) a conspiracy existed when the statement was made; (2) the defendant had knowledge of, and participated in the conspiracy; and (3) the statement was made in furtherance of the conspiracy. *United States v. Larson*, 460 F.3d 1200, 1211 (9th Cir. 2006). Evidence presented by the government at trial

established by a preponderance of the evidence that the conspiracies alleged in Count One, Two and Three existed and the offered statements were made during the course of these conspiracies.[1] *United States v. Bourjaily*, 483 U.S. 171, 175 (1987); *United States v. Peralta*, 941 F.2d 1003, 1006–07 (9th Cir. 1991). The government also established by a preponderance of the evidence that the declarant and the defendants at issue were members of the conspiracy. Consequently, the remaining issue for the Court was whether each statement was *in furtherance* of the conspiracy. This memorandum opinion explains why, as implicitly found earlier, certain statements were or were not in furtherance of the conspiracy.

Witness Jose Alvarado's testimony that Snoopy purportedly told him that Jaime Martinez took over leadership of the 20th Street clique after Cyco and Peloncito were incarcerated was admitted as a co-conspirator statement because it sought to further the conspiracy by keeping a co-conspirator abreast of important developments in the conspiracy — namely, the current state of gang leadership after incarceration of its former leaders (Tr. 8766).[2] For these same reasons, Defendant Moris Flores' alleged statement to Witness Alvarado that he took over the leadership of the 20th Street clique after Cyco and Peloncito were incarcerated was also in furtherance of the conspiracy because the statement sought to apprise a co-conspirator of the current state of gang leadership (Tr. 9815).

Witness Alvarado also testified that Popeye allegedly told him that the gun charges were dropped against him but that Spooky remained incarcerated.[3] Popeye's statement was in furtherance of the conspiracy in that it served to apprise Witness Alvarado that the coast was not clear regarding a pending gun charge against a fellow co-conspirator (Tr. 8784). Although Popeye was released, a fellow co-conspirator (Spooky) remained under

---

[1] The indictment charges three separate conspiracies but they are somewhat overlapping and all relate to the same clique of MS-13. Therefore, for the sake of simplicity, this order will refer to "conspiracy" although there are three conspiracies charged.

[2] "Snoopy" was identified as MS-13 member Freddis Martinez, Jaime Martinez's brother. "Peloncito" was identified as Defendant Angel Noel Guevara. "Cyco" was identified as Defendant Marvin Carcamo.

[3] "Popeye" was identified as MS-13 member and former 20th Street Clique member Edwin Ramos. "Spooky" was identified as Defendant Erick Lopez.

2

scrutiny and subject to prosecution for the gun charge. Given that the gun at issue was allegedly involved in committing homicides, providing news that the police had continued interest in the matter furthered the conspiracy by keeping co-conspirators abreast of law enforcement activity.

Witness Carlos Garrido testified that after he told fellow gang members hanging out at 20th and Mission Street to "lookout" because "we had just done the shootout and the police was going to get hot," Colmillo allegedly informed him that the area where he had perpetrated the shooting was clear of activity — no police, no paramedics, and no bodies were on the scene (Tr. 9498).[4] Colmillo's statement furthered the conspiracy by advising Witness Garrido that the coast was clear and that the scene of the crime was not being monitored, allowing Witness Garrido to plan his next moves accordingly.

Defendant Erick Lopez's statement to Witness Jose Espinal that Triste had been hit and to "get things ready" because "they had awoken the beast" was also in furtherance of the conspiracy (Tr. 10519).[5] The alleged statement arguably sought to mobilize and motivate retaliation for the shooting of a fellow gang member and sought to reiterate and reinforce the gang's common purpose of attacking rivals. It also served to enhance Defendant Lopez's status in the gang by making clear to his fellow co-conspirators that he was ready and willing to take action for the gang. *See United States v. Flores*, 572 F.3d 1254, 1264 (11th Cir. 2009); *United States v. Yarbrough*, 852 F.2d 1522, 1535–36 (9th Cir. 1988).

Similarly, Defendant Guillermo Herrera's alleged statement to Witness Espinal that Defendant Herrera had shot a miquero "so you can see the Mara and the beast" was in furtherance of the conspiracy (Tr. 10579). The statement, made after the homicide of Armando Estrada, furthered the conspiracy by keeping Defendant Herrera's co-conspirators apprised of recent activity. Additionally, Defendant Herrera's voice was purportedly

---

[4] "Colmillo" was identified as a 20th Street Clique member.

[5] "Triste" was identified as 20th Street Clique member Danilo Velasquez, a codefendant in this case who was severed from the instant trial and will proceed to trial separately.

3

1  "laughing" while he made the statement — indicating the information was relayed in a
2  bragging manner in order to enhance Defendant Herrera's stature in the gang.

3      Defendant Marvin Carcamo's alleged statement to Witness Palma that he had stabbed
4  a suspected Norteño seated in a car — while accompanied by other MS-13 members — was
5  also in furtherance of the conspiracy. Defendant Carcamo allegedly stated that he confronted
6  a car passenger by asking if he "gang banged" and stabbed the passenger (with enough force
7  to break the passenger's gold chain) despite the passenger's pleas because the passenger was
8  wearing a red belt (Tr. 7501). The details included in the story (such as the passenger's pleas)
9  illustrate the story was told to brag about Defendant Carcamo's actions, rather than offer a
10 historical account for no particular purpose. The statement accordingly served to enhance
11 Defendant Carcamo's status in the gang. The statement also served to foster trust and
12 cohesiveness among Defendant Carcamo's co-conspirators and to reiterate and reinforce the
13 gang's common purpose of attacking rivals. The simple fact that Defendant Carcamo was
14 incarcerated when he made the statement does not mean the statement was not in furtherance
15 of the conspiracy. Where a conspirator has not withdrawn from or abandoned the conspiracy,
16 the arrest or incarceration of the conspirator does not automatically mean that the conspirator
17 is no longer part of the conspiracy. *See United States v. Jiminez-Recio*, 537 U.S. 270, 275
18 (2003). Sufficient evidence was presented that the conspirators remained active in the
19 conspiracy even after incarceration and still worked to improve their standing during periods
20 of incarceration.

21     Defendant Angel Noel Guevara's alleged statement to Witness Palma that he shot two
22 "chapetes" so he would be sent to the California Youth Authority (juvenile detention) to gain
23 "more knowledge and more experience" was also in furtherance of the conspiracy and
24 properly admitted as a co-conspirator statement under Rule 801(d)(2)(E) (Tr. 7509). The
25 statement served to enhance Defendant Guevara's status in the gang and to reiterate the
26 gang's common purpose in attacking its rivals. The evidence indicates that when Defendant
27 Guevara made the statement, he was still a leader or was coming off a period of leadership
28 and the statement sought to bolster his stature in the gang. Moreover, as Witness Palma

4

testified, the focus of Defendant Guevara's statement was not a description of the shooting as much as an explanation of his motivation for committing the shooting. The statement thus also served to advise his co-conspirators — who were incarcerated with him — about the "educational" value of serving prison time.

Defendant Moris Flores' alleged statement to Witness Palma that he "put in a lot of work for Triste" after Triste was shot, was also in furtherance of the conspiracy (Tr. 7497). By asserting he put in a *lot* of "work" (attacking rival gang members) for Triste, Defendant Flores was explaining that he did his part to ensure the shooting was avenged. The statement served to foster trust and cohesiveness among the co-conspirators, reiterate and reinforce the gang's common purpose of attacking rivals, and reassure a fellow co-conspirator he was more than willing to mete out strong retaliation against those who harmed fellow co-conspirators.

Witness Oliver Marota ("Kid Frost"), a member and former leader of the 11th Street Sureños, also testified to a number of statements. Over time, the 11th Street Sureños and the 20th Street Clique fluctuated between being enemies or allies and Witness Marota had a number of communications with leaders and members of the 20th Street Clique.

Witness Marota testified that in 2005 Tigre would make inquiries regarding whether Witness Marota and his associates were putting in "work" and would provide Witness Marota with updates regarding the work being done by the 20th Street Clique (Tr. 11039–41).[6] At the time of the statements, Witness Marota was a leader of the 11th Street Sureños and Tigre was a leader of the 20th Street Clique and both groups had called a truce and were cooperating with one another. As part of this truce, the leaders agreed to regularly meet and apprise each other of gang news. As an initial matter, Tigre's statements were transactional in nature and were not hearsay because they were not admitted for the truth of the matter asserted. Nonetheless, even if the statements were hearsay, they were made in furtherance of the conspiracy because they sought to update the leader of the ally group on the 20th Street Clique's activities and in doing so sought to build confidence in the ally regarding the 20th Street Clique's strength and its willingness to maintain the negotiated truce.

---

[6] "Tigre" was identified as MS-13 member and former 20th Street Clique leader Ivan Cerna.

1    Similarly, Witness Marota testified that Tigre informed him and a member of the 19th
2 Street Sureños (yet another group allied at the time with the 20th Street Clique) that the police
3 were following him and that Witness Marota would need to contact Jaime Martinez in the
4 future instead of Tigre to continue any cross-gang business (Tr. 11042). The statement was
5 made during a "meeting" between the parties. Tigre's communication sought to further the
6 conspiracy by notifying the gang's allies — who were engaged in a common endeavor — that
7 they should be careful about detection by the authorities. More specifically, the statement
8 sought to notify the 20th Street Clique's allies that they should not contact Tigre because it
9 would only arouse the suspicion of the police as to the 20th Street Clique. As the statement
10 above, this statement was not hearsay in that was not offered for the truth of the matter
11 asserted. Regardless, even if Tigre's statement were offered for the truth, the statement was
12 made in furtherance of the conspiracy because it sought to provide the conspiracy's allies with
13 a head's up about potential exposure to law enforcement and sought to minimize the
14 possibility that an ally would inculpate the 20th Street Clique by contacting Tigre when the
15 police were monitoring him.

16    Witness Marota also testified that Defendant Carcamo told him that the "homeys from
17 L.A." told Defendant Carcamo that he would need to take over the territory of the 11th Street
18 Sureños. In that same conversation, Defendant Carcamo allegedly yelled at Witness Marota
19 and accused the 11th Street Surenos of not doing "anything" and not putting in work while the
20 20th Street Clique was putting in work and killing "chapetes" (Tr. 11057–59). As previously
21 explained, much of Defendant Carcamo's statements were transactional and were not
22 admitted for the truth stated therein but instead to prove up the transaction (Tr. 11076).
23 Nonetheless, even if offered for their truth, the statements were made in furtherance of the
24 conspiracy in that the statements sought to mobilize (via threat) an ally of the 20th Street
25 clique to carry its weight and to voluntarily cede its territory to MS-13.

6

Witness Marota also testified that he spoke with an MS-13 member named Niño, who told him that Slow was the leader of the 20th Street Clique.[7] The statement was made so that Witness Marota would be directed to contact Defendant Flores regarding the taxing of the Honduran drug dealers (Tr. 11083). Niño's statement was made in furtherance of the conspiracy because it sought to facilitate the 20th Street Clique's leader's ability to communicate with a potential rival and conduct gang business as needed.

In contrast, Defendant Cruz-Ramirez's statements to Witness Marota denying involvement in charging rent in 11th Street Sureño territory and taking credit for shootings he perpetrated in the past were not in furtherance of the conspiracy (Tr. 11089, 11091, 11096). The statements were made to Witness Marota while both were cellmates at Santa Rita Jail and the statements constituted little more than idle conversation. By this time, the 11th Street Sureños were no longer allied with the 20th Street Clique and Witness Marota had specifically become a persona non-grata with the 20th Street Clique. Indeed, by this juncture, the 20th Street Clique had attacked Witness Marota and threatened to put his head on a pole (Tr. 11019, 11064). The statements by Defendant Cruz-Ramirez were not made in furtherance of the conspiracy. For these same reasons, the statements made by Defendant Lopez to Witness Marota identifying certain individuals as snitches were also not in furtherance of the conspiracy (Tr. 11100). Again, these statements were made while the two were cellmates and constituted idle conversation with no expectation of furthering the conspiracy.

Similarly, Defendant Lopez's statement that he did not want to take a deal from the government for a gun charge because the gun at issue had "two chapetes" on it was not in furtherance of the conspiracy (Tr. 7491–92).[8] The statement was made to Witness Palma while the two were in a federal holding cell and it was not shown that the statement was any more than Defendant Lopez expressing his personal qualms regarding a plea bargain offer. There is no indication that Defendant Lopez expressed these worries to keep Witness Palma

---

[7] "Slow" has been identified as Defendant Moris Flores.

[8] The witness explained that he believed this meant that the gun was used to kill two Norteños.

7

1 abreast of the gang's activities, to bolster his status, or to further the gang's common purpose
2 or interests in any way.

3 Witness Palma also testified that Marvin Carcamo told him (while both were
4 cellmates) that he was *worried* about a gun that had been confiscated by the police during a
5 raid of his house because the gun was used in a "pegada" of a Norteño in front of a liquor
6 store at 25th or 26th Street (Tr. 7499).[9] This too was not made in furtherance of the
7 conspiracy and therefore not a co-conspirator statement admissible against all defendants.
8 There is no indication that the statement was made to bolster Defendant Carcamo's status or
9 further the gang's common purpose or interests. Nor was the statement made to keep Witness
10 Palma abreast of the gang's activities so that he could comport himself accordingly. Instead,
11 the statement expressed Defendant Carcamo's personal worry regarding a historical fact. Had
12 the statement been made to a someone who could do something to address the problem or had
13 the firearm not been already confiscated by the police, the analysis might be different. Here,
14 however, the statement was made to a fellow inmate who could do nothing about the situation
15 since he was incarcerated and the gun had already been confiscated. Thus, the statement was
16 not a co-conspirator statement and the jury was correspondingly instructed that it could
17 consider the statement against Defendant Carcamo and not against the other defendants.

18 Finally, it bears noting that the objection in the defense case to Witness Espinal's
19 testimony that he did not recall anything happening to Solo or Smiley after they left the
20 gang was overruled because the statement was not hearsay — not because the statement was a
21 co-conspirator statement under Rule 801(d)(2)(E) (Tr. 15501).

24 Dated: August 15, 2011.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

---

[9] The witness explained a "pegada" meant a homicide.

8